# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF LOUISIANA
# MONROE DIVISION

-------------------------------------------------------

CHILDREN'S HEALTH DEFENSE,
TRIALSITE, INC., CREATIVE
DESTRUCTION MEDIA, LLC,
ERIN ELIZABETH FINN,  JIM HOFT,
DR. BEN TAPPER, BEN SWANN,
DR. JOSEPH MERCOLA,  TY
BOLLINGER, CHARLENE
BOLLINGER & JEFF CROUERE,

        *Plaintiffs,*

    v.

WP COMPANY, LLC D/B/A THE
WASHINGTON POST, THE BRITISH
BROADCASTING CORP., THE
ASSOCIATED PRESS & REUTERS
NEWS & MEDIA, INC.,

        *Defendants*.

-------------------------------------------------------

CIVIL ACTION NO. 3:23-cv-00720

Judge Terry A. Doughty

Magistrate Judge Kayla D. McClusky

JURY TRIAL DEMANDED

# PLAINTIFFS' BRIEF OPPOSING
# DEFENDANTS' RULE 12(b)(6) MOTION TO DISMISS

i

## <u>TABLE OF CONTENTS</u>

Introduction ................................................................................................................. 1

Statement of Facts ........................................................................................................ 2

Argument ...................................................................................................................... 5

  I. Standard of Review ................................................................................................ 6

  II. Plaintiffs Plausibly Allege Agreement. .............................................................. 7

  III. Plaintiffs Have Validly Stated Both a Per Se and Rule of Reason Claim ......................... 12

    A.   *Plaintiffs Have Pleaded All the Elements of a Per Se Unlawful Group Boycott.* ......... 12

    B.   *The TNI Group Boycott Has Additional Traits Reinforcing Per Se Liability.* .............. 15

    C.   *Plaintiffs Have Adequately Pleaded Relevant Markets.* ................................................. 18

    D.   *Plaintiffs Have Also Stated a Rule of Reason Claim.* ..................................................... 19

  IV. Plaintiffs Have Pleaded Antitrust Injury and Antitrust Standing ....................................... 21

    A.   *Targets of a Group Boycott Have Axiomatic Antitrust Injury.* ..................................... 21

    B.   *Harm to Competition Is Fully Pleaded Here.* ................................................................. 22

    C.   *Plaintiffs CHD's and Dr. Tapper's Losses Are Recoverable.* ....................................... 24

Conclusion .................................................................................................................. 25

i

## **TABLE OF AUTHORITIES**

**Cases**

*Acad. of Allergy & Asthma v. La. Health Serv. & Indem. Co.*, No. 18-399, 2020 U.S. Dist. LEXIS 127000 (E.D. La. July 17, 2020)..................................................................................... 7

*Armstrong v. Ashley*, 60 F.4th 262 (5th Cir. 2023).................................................................... 7

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)..................................................................................... 7

*Associated Gen. Contractors v. Cal. State Council of Carpenters*, 459 U.S. 519 (1983) ........... 14

*Associated Press v. United States*, 326 U.S. 1 (1945) ......................................................... passim

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ...................................................................... 7

*Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096 (9th Cir. 1999) .......................... 22

*BRFHH Shreveport, LLC v. Willis Knighton Med. Ctr.*, 176 F. Supp. 3d 606 (W.D. La. 2016) . 20

*Coalition for ICANN Transparency, Inc. v. VeriSign, Inc.*, 567 F.3d 1084 (9th Cir. 2009)......... 25

*Consol. Metal Products, Inc. v. Am. Petroleum Inst.*, 846 F.2d 284 (5th Cir. 1988) .................... 6

*Coughlin v. Capitol Cement Co.*, 571 F.2d 290 (5th Cir. 1978)................................................. 11

*Dedication & Everlasting Love to Animals v. Human Soc'y of the U.S., Inc.*, 50 F.3d 710 (9th Cir. 1995)...................................................................................................................... 25

*Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480 (5th Cir. 1984) ........................ 18

*Enigma Software Grp. USA, LLC v. Malwarebytes, Inc.*, 946 F.3d 1040 (9th Cir. 2019). .......... 22

*FCC v. National Citizens Committee for Broadcasting*, 436 U.S. 775 (1978)............................ 23

*Feminist Women's Health Center, Inc. v. Mohammad*, 586 F.2d 530 (5th Cir. 1978)................. 25

*Flying J Inc. v. TA Operating Corp.*, No. 1:06-CV-30, 2008 U.S. Dist. LEXIS 92852 (D. Utah Nov. 14, 2008) ................................................................................................................... 17

*Gelboim v. Bank of Am. Corp.*, 823 F.3d 759 (2d Cir. 2016) ............................................ 7, 11, 22

*Golden Bridge Tech., Inc. v. Motorola, Inc.*, 547 F.3d 266 (5th Cir. 2008)................................. 11

*Golden Bridge Tech., Inc. v. Nokia, Inc.*, 416 F. Supp. 2d 525 (E.D. Tex. 2006)........................ 19

*Golf City, Inc. v. Wilson Sporting Goods Co.*, 555 F.2d 426 (5th Cir. 1977)............................... 11

*Impax Labs., Inc. v. FTC*, 994 F.3d 484 (5th Cir. 2021) .................................................. 12, 22, 23

*In re London Silver Fixing, Ltd., Antitrust Litig.*, 332 F. Supp. 3d 885 (S.D.N.Y. 2018)............. 8

*In re Pool Prods. Distrib. Market Antitrust Litig.*, 988 F. Supp. 2d 696, 713 (E.D. La. 2013)7, 12, 19

*Jayco Systems, Inc. v. Savin Business Machines Corp.*, 777 F.2d 306 (5th Cir. 1985)................ 22

*Jien v. Perdue Farms, Inc.*, No. 1:19-CV-2521, 2021 U.S. Dist. LEXIS 45331 (D. Md. March 10, 2021) .................................................................................................................................. 6

*Jien v. Perdue Farms, Inc.*, No. 1:19-CV-2521-SAG, 2022 U.S. Dist. LEXIS 128686 (D. Md. July 19, 2022) ............................................................................................................................. 8

*Law v. NCAA*, 134 F.3d 1010 (10th Cir. 1998)....................................................................... 21

*MacDermid Printing Solutions LLC v. Cortron Corp.*, 833 F.3d 172 (2d Cir. 2016) ................. 23

*Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*, 29 F.4th 337 (7th Cir. 2022) ............. 5

*Marucci Sports, L.L.C. v. NCAA*, 751 F.3d 368 (5th Cir. 2014)................................................ 24

*Maryland v. United States*, 460 U.S. 1001 (1983)................................................................... 23

*Midland Telecasting Co. v. Midessa Television Co.*, 617 F.2d 1141 (5th Cir. 1980).................... 22

*MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835 (5th Cir. 2015)........................... 12, 14, 16

*Nat'l Soc'y of Pro. Eng'rs v. United States*, 435 U.S. 679 (1978) ............................................ 21

*NCAA v. Bd. of Regents*, 468 U.S. 85 (1984)......................................................................... 19

*New Orleans Ass'n of Cemetery Tour Guides & Co. v. New Orleans Archdiocesan Cemeteries*, 56 F.4th 1026 (5th Cir. 2023) ..................................................................................................... 7, 19

*Northwest Wholesale Stationers, Inc. v. Pacific Stationery Printing Co.*, 472 U.S. 284 (1985) .................................................................................................................................. passim

*NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128 (1998) ..................................................................... 13

*O.E.M. Glass Network, Inc. v. Mygrant Glass Co., Inc.*, 19-CV-00742, 2023 U.S. Dist. LEXIS 45497 (E.D.N.Y. Mar. 10, 2023) ............................................................................................ 18

*Ohio v. Am. Express Co.*, 138 S. Ct. 2274 (2018) ........................................................................ 19

*PharmacyChecker.com, LLC v. Nat'l Ass'n of Bds. of Pharm.*, 530 F. Supp. 3d 301 (S.D.N.Y. 2021) ................................................................................................................................ 15, 18

*PLS.COM, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824 (9th Cir. 2022). ........................... passim

*Reilly v. Hearst Corp.*, 107 F. Supp.2d 1192 (N.D. Cal. 2000) ..................................................... 23

*SC Innovations, Inc. v. Uber Techs., Inc.*, No. 18-cv-07440, 2021 U.S. Dist. LEXIS 89932 (N.D. Cal. May 11, 2021) .................................................................................................................. 25

*Southway Theatres, Inc. v. Ga. Theatre Co.*, 672 F.2d 485 (5th Cir. 1982) ................................ 10

*Spectators' Comm. Network, Inc. v. Colonial Country Club*, 253 F.3d 215 (5th Cir. 2001) 12,  13, 14

*St. Bernard Gen. Hosp., Inc. v. Hosp. Serv. Ass'n of New Orleans, Inc.*, 712 F.2d 978 (5th Cir. 1983) ........................................................................................................................................ 19

*Steering Comm. v. BP Exploration & Prod.*, 785 F.3d 1003 (5th Cir. 2015) .............................. 25

*Texas Indus. v. Radcliff Materials*, 451 U.S. 630 (1981) ............................................................... 6

*Toys "R" Us, Inc. v. Federal Trade Comm'n*, 221 F.3d 928 (7th Cir. 2000) .............................. 16

*Tunica Web Advertising v. Tunica Casino*, 496 F.3d 403 (5th Cir. 2007) ............................. passim

*United States v. AT&T Co.*, 552 F. Supp. 131 (D.D.C. 1982) ..................................................... 23

*United States v. Flom*, 558 F.2d 1179 (5th Cir. 1977) .................................................................... 6

*United States v. Realty Multi-List, Inc.*, 629 F.2d 1351 (5th Cir. 1980) .............................. 17, 20

*United States v. Sutherland*, 656 F.2d 1181 (5th Cir. 1981) ........................................................ 10

*Virginia Vermiculite, Ltd. v. W.R. Grace & Co.*, 156 F.3d 535 (4th Cir. 1998) ......................... 25

*W. Penn Allegheny Health Sys. v. UPMC*, 627 F.3d 85 (3d Cir. 2010) ................................. 10, 11

*Wilson P. Abraham Constr. Corp. v. Texas Indus., Inc.*, 604 F.2d 897 (5th Cir. 1979) ................ 6

*WWP, Inc. v. Wounded Warriors Family Support, Inc.*, 628 F.3d 1032 (8th Cir. 2011) .............. 25

## Statutes

47 U.S.C. § 230(c)(2) ..................................................................................................................... 21

The Clayton Antitrust Act of 1914, Pub. L. No. 63-212, 38 Stat. 730. ................................. 23, 25

The Sherman Act, 84 P.L. 135, 69 Stat. 282, 84 Cong. Ch. 281 .......................................... passim

## Other Authorities

U.S. HOUSE OF REP., SUBCOMMITTEE ON ANTITRUST, INVESTIGATION OF COMPETITION IN DIGITAL MARKETS (2020) ..................................................................................................................... 17

## Rules

Fed. R. Civ. P. 12(b)(6) ......................................................................................................... 2, 6, 7, 11

**Treatises**

P. AREEDA & H. HOVENKAMP, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND
THEIR APPLICATION (2022)..................................................................................... 22

**Constitutional Provisions**

U. S. Const. amend. I ............................................................................................ 23, 24

**PLAINTIFFS' BRIEF OPPOSING
DEFENDANTS' RULE 12(b)(6) MOTION TO DISMISS**

## INTRODUCTION

In 2020, some of the world's most prominent news organizations—including Defendants the BBC, the Washington Post, the Associated Press, and Reuters—joined together with Google, Facebook, Twitter and Microsoft to form a self-described "groundbreaking" "industry partnership" they called the "Trusted News Initiative" ("TNI"). The TNI is an online news censorship cartel. When rival online news publishers like Plaintiffs engage in reporting prohibited by the TNI, those rivals are censored—blocked, shadow-banned, "de-boosted," de-monetized or terminated—by the TNI's Big Tech members. (Complaint, ECF No. 1 ("Compl.") at pp. 41-49.)

Despite claiming to be a global online truth police, censoring only "harmful disinformation," the TNI in reality suppresses wholly legitimate, accurate reporting. (*Id*. at pp. 43, 49-55.) In fact, the TNI was deliberately created by Defendants to suppress what they themselves called their "real competition"—online news publishers representing an "existential threat" to the business model of legacy news organizations. In one of the most explicit, smoking-gun admissions of a horizontal agreement to suppress competition that any court is likely to see, a senior officer of the BBC (founder of the TNI) said this at a TNI gathering in March 2022:

> Of course the members of the Trusted News Initiative are peers and rivals. But . . . it's important that trusted news providers ***club together***. Because actually the real rivalry now is not between for example the BBC and CNN globally, ***it's actually between all trusted news providers and a tidal wave of unchecked [reporting] that's being piped out mainly through digital platforms*** . . . .  That's the ***real competition*** now in the digital media world . . . the ***existential threat*** . . . . So actually we've got ***a lot more to hold us together than we have to work in competition with one another***.

(*Id*. ¶ 19.) In other words, instead "compet[ing] with one another," Defendants agreed to "club together" to keep their "real competition"—the "tidal wave" of "unchecked" online news

publishers—off the world's largest Internet platforms unless they complied with TNI dictates.

Antitrust law has its own name for this kind of "industry partnership": it's called a group boycott, and it's a per se violation of the Sherman Act. As the Supreme Court held in another group boycott case almost 80 years ago (involving one of the same Defendants sued here), antitrust law fully applies to the news industry, not only to promote economic efficiency but also to ensure "the widest possible dissemination of information from diverse and antagonistic sources." *Associated Press v. United States*, 326 U.S. 1, 20 (1945).

This brief responds to Defendants' Rule 12(b)(6) motion. Defendants have every right to decide what they report, but no right to restrain what *others* report, and they violate the Sherman Act when they collude together to do so. "Freedom to publish is guaranteed by the Constitution, but *freedom to combine to keep others from publishing is not*." *Id*. (emphasis added).

## STATEMENT OF FACTS

Profound changes have disrupted the news industry in recent years. Over 85% of Americans now get news from digital sources. (Compl. ¶ 166.) A handful of behemoth Internet companies—due to their market power (often monopoly power) as "platform gatekeepers"—now have the ability to control and suppress the news content that hundreds of millions of Americans see and hear every day. (*Id*. ¶¶ 218-42.) At the same item, the Internet has produced an explosion of new journalism and new reporting from new sources, new voices, and new publishers online— a windfall for consumers and a boon to competition, but a deadly threat to traditional news organizations, which are now  in "economic freefall." (*Id.* ¶¶ 172-75.)

Legacy news publishers are well aware of this threat. As the BBC senior executive quoted above put it, "the real rivalry now is not between for example the BBC and CNN globally, it's actually between all trusted news providers and a tidal wave of unchecked [reporting] that's being

piped out mainly through digital platforms . . . . That's the real competition now . . . the existential threat." (*Id*. ¶ 19.) To combat this "existential threat," legacy news publishers faced a choice: outcompete their rivals in the free market, or violate the antitrust laws by joining forces to suppress them. Defendants chose the latter course.

Thus was born the TNI. The BBC decided to "club together" with Defendants the Washington Post, Reuters, the AP, and other globally prominent legacy news publishers (the TNI's "Legacy News Members"). (*Id*. ¶¶ 280-85.) Their plan was simple: stop rival news publishers from engaging in online reporting that the TNI prohibits (the "Prohibited Reporting"). But news organizations have no such ability, as BBC executive and former TNI director Jessica Cecil explained, "on our own." (*Id*. ¶ 267.) For this reason, the Legacy News Members needed to, and successfully did, entice the world's largest Big Tech platforms—Google, Facebook, Twitter, and Microsoft (the TNI's "Platform Members")—to join the TNI as well. (*Id*. ¶¶ 286-94, 305.)

The BBC hosted the first "trusted news summit" "behind closed doors" in June 2019, bringing "together global tech platforms and publishers." (*Id*. ¶ 260.) By September of that year, the TNI was running "fire drills." (*Id*. ¶ 295.) In March 2020, the TNI's members agreed to target online news relating to COVID-19. (*Id*. ¶ 263.) On March 19, 2020, reflecting their participation in the TNI, all four Platform Members issued a joint statement announcing that they were "working closely together" to "jointly combat[]" "misinformation about the virus." (*Id*. ¶ 264.) On March 27, 2020, the TNI declared that it had become operational and stated that its members were doing "everything we can, working together, to stop disinformation about Coronavirus in its tracks."[1]  In

---

[1] BBC, *Trusted News Initiative announces plans to tackle harmful Coronavirus disinformation* (Mar. 27, 2020), https://www.bbc.co.uk/mediacentre/latestnews/2020/coronavirus-trusted-news (hereafter "BBC, *TNI announces plans*"). The Court may take judicial notice of party admissions. *See, e.g.*, *Hernandez v. Wells Fargo & Co*, No. C 18-07354, 2019 U.S. Dist. LEXIS 114817, at

July 2020, the TNI announced that it was "extending the scope and ambition of its ground-breaking collaboration" to target reporting on the "US presidential election." (*Id*. ¶ 265.)

Contrary to Defendants' claims, the TNI is no mere information-sharing partnership. Its express purpose, from inception, was and is to "choke off" the reporting it deems "misinformation." (*Id*. ¶¶ 277, 296.) Crucially, all TNI members **committed themselves and agreed** to this common scheme—i.e., the scheme of collectively identifying and blocking supposed "misinformation" online—as revealed by numerous TNI admissions. The TNI was created, Ms. Cecil has said, so "that the world's biggest tech platforms from Google, YouTube, Facebook and Instagram to Twitter and Microsoft and major news organisations . . . can alert each other to . . . false stories . . . and stop them spreading." (*Id*. ¶ 293.) "***All participants signed up to clear set of expectations of how to act.***" (*Id*. ¶ 273 (emphasis added).) From the beginning, there were "agreed actions," which were specific and concrete: the TNI "tightly defines what cooperation and action looked like," and "without that core specificity the TNI would never have got off the ground." (*Id*. ¶¶ 269, 295, 274.) The necessary division of labor, as the TNI's membership sees it, is straightforward: "Tech companies obviously need responsible media to get to the truth and to sort fact from fiction," and news organizations need tech companies to block the reporting they wish to suppress. (ECF No. 41-2 at 6 (Defendants' Ex. A).) In other words, the agreement was that the Legacy News Members would tell the Platform Members what reporting should be Prohibited (through the TNI's "fast alert" system), and the Platform Members would then block such reporting by censoring, shadow-banning, "de-boosting," "de-monetizing," or terminating the accounts of publishers who engage in it. (Compl. ¶¶ 268, 297-304.)

---

*14-15 (N.D. Cal. July 10, 2019) ("party admissions may be judicially noticed for the truth of the matter if requested by the opposing party"). (*See also* Compl. ¶ 263 (quoting substantially similar TNI announcement).)

While the TNI proclaims that it is targeting only "misinformation," in reality it also suppresses true information, opinion and legitimate reporting on contested issues. (*Id*. ¶¶ 313-17.) What actually unifies all TNI Prohibited Reporting is that it contradicts and competes with TNI Legacy News Members' own reporting (or in some cases their lack of reporting). Thus, even as the TNI's Legacy News Members reported throughout 2020 that the lab-leak theory of COVID's origin was a "debunked" "conspiracy theory," the TNI's Platform Members collectively suppressed rival online news publishers who reported accurately on that theory. (*Id*. ¶¶ 332-46.) And even as the TNI's Legacy News Members declined in October 2020 to cover the Hunter Biden laptop story, the TNI's Platform Members suppressed online rival online news publishers who reported accurately on that story. (*Id*. ¶ 314(W).)

Plaintiffs are victims of this collusive censorship. Plaintiffs are non-mainstream online news publishers whose revenues depend heavily on traffic to their websites generated from social media, search, and news aggregation platforms operated and controlled by the TNI's Platform Members. The latter are so economically dominant online that being excluded from their platforms is devastating to small online news publishers, decreasing their traffic by 90% or more. (*Id*. ¶ 234.) As fully detailed in the Complaint, all Plaintiffs engaged in Prohibited Reporting, and as a result all suffered denials of access to the world's largest Internet platforms, causing damages ranging from tens of thousands to tens of millions of dollars. (*Id*. ¶¶ 39-115, 179-81, 363-481.)

## ARGUMENT

"To state a claim under Section 1 of the Sherman Act, a plaintiff must allege that the defendant[s] '(1) entered into an agreement that (2) unreasonably restrains trade in the relevant market and (3) caused the plaintiff an antitrust injury.'" *Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*, 29 F.4th 337, 349 (7th Cir. 2022) (citation omitted). An agreement is

"unreasonable" if it is either "per se" unlawful or a violation of "the rule of reason." *Consol. Metal Products, Inc. v. Am. Petroleum Inst.*, 846 F.2d 284, 289 (5th Cir. 1988). "Antitrust coconspirators are jointly and severally liable for all damages caused by the conspiracy to which they were a party," and plaintiffs "need not sue all coconspirators but may choose to proceed against any one or more of them." *Wilson P. Abraham Constr. Corp. v. Texas Indus., Inc.*, 604 F.2d 897, 904 & n.15 (5th Cir. 1979), *aff'd sub nom. Texas Indus. v. Radcliff Materials*, 451 U.S. 630 (1981).[2]

As will be shown below, Plaintiffs here have validly pleaded both a per se and a rule-of-reason claim, together with the requisite antitrust injury. Indeed, the TNI is a classic per se unlawful group boycott as defined by the Supreme Court: a "joint effort" by firms in competition with each other to "disadvantage [other] competitors" by "cut[ting] off access to a supply, facility, or market necessary to enable the boycotted firm to compete." *Northwest Wholesale Stationers, Inc. v. Pacific Stationery Printing Co.*, 472 U.S. 284, 294 (1985); *Tunica Web Advertising v. Tunica Casino*, 496 F.3d 403, 413 (5th Cir. 2007).

I. ***Standard of Review.***

Under the familiar Rule 12(b)(6) standard, "the court accepts all well-pled facts as true,

---

[2] For this reason, Defendants cannot hide behind the TNI's Platform Members, as they repeatedly try to do. (*See, e.g.*, ECF 42-1 at 2-3 ("The Complaint does not allege facts that [*sic*] any Defendant (as opposed to the Platforms) took any action against Plaintiffs whatsoever.").) An antitrust conspirator is liable for all acts "in furtherance" of the conspiracy, *United States v. All Star Indus.*, 962 F.2d 465, 478 (5th Cir. 1992) ("[i]t is well-established that, as a participant in [a bid-rigging] conspiracy, MIA is legally liable for all the acts of its co-conspirators in furtherance" thereof), "even if injury did not arise from [the] conspirator's own conduct" and "'he lacked knowledge of [his co-conspirators'] actions.'" *Jien v. Perdue Farms, Inc.*, No. 1:19-CV-2521, 2021 U.S. Dist. LEXIS 45331, at *30 (D. Md. March 10, 2021) (citations omitted). As the Supreme Court puts it, "the participation of each [co-conspirator] in the conspiracy may have varied. Some may have profited more than others; some may have caused more damage to the injured plaintiff. Some may have been 'leaders' and others 'followers'; one may be a 'giant,' others 'pygmies,'" *Texas Indus.*, 451 U.S. at 637, but all are jointly and severally liable. *Cf. United States v. Flom*, 558 F.2d 1179, 1183 (5th Cir. 1977) ("The heart of a Section One violation is the agreement to restrain; no overt act, no actual implementation of the agreement is necessary to constitute an offense.").

drawing 'all reasonable inferences in favor of the nonmoving party.'" *Armstrong v. Ashley*, 60 F.4th 262, 269 (5th Cir. 2023) (citations omitted). To survive dismissal, a complaint need only "plausibly suggest an entitlement to relief," *Ashcroft v. Iqbal*, 556 U.S. 662, 664 (2009), and cannot be dismissed merely because defendants proffer an alternative story. "The choice between two plausible alternative inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion." *In re Pool Prods. Distrib. Market Antitrust Litig.*, 988 F. Supp. 2d 696, 713 (E.D. La. 2013) (citation omitted); *Acad. of Allergy & Asthma v. La. Health Serv. & Indem. Co.*, No. 18-399, 2020 U.S. Dist. LEXIS 127000, at *22 (E.D. La. July 17, 2020) (same). "'[D]etailed factual allegations' are not required," and the complaint need only "include factual allegations that when assumed to be true raise a right to relief above the speculative level." *New Orleans Ass'n of Cemetery Tour Guides & Co. v. New Orleans Archdiocesan Cemeteries*, 56 F.4th 1026, 1035 (5th Cir. 2023) (citations omitted) (internal quotation marks omitted).

In antitrust cases, "'the plaintiff need not show that its allegations . . . rule out the possibility of independent action.'" *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 781 (2d Cir. 2016) (citation omitted). The Supreme Court's famous Rule 12(b)(6) case, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), was also a Sherman Act case, but the instant case presents precisely what the Court found lacking in *Twombly, see id.* at 557, 564: ***allegations of direct evidence of agreement,*** raising Plaintiffs' right to relief far above speculation. *See Tunica*, 496 F.3d at 409-11 & n.11 ("direct evidence" of "gentlemen's agreement" not to deal with plaintiff survives summary judgment).

II. ***Plaintiffs Plausibly Allege Agreement.***

Notwithstanding numerous public TNI admissions, quoted in the Complaint, of "club[bing] together," of "working closely together," of "collaboration," "partnership," and so on, Defendants

contend that Plaintiffs have somehow failed to allege agreement. (ECF 41-1 at 7.) Defendants concede (as they must) the existence of a TNI agreement to create a system of "alerts" through which TNI Legacy News Members notify the TNI's Platform Members of supposed "misinformation" circulating online. But, Defendants argue, Plaintiffs fail to allege any TNI agreement to "take action" against such "misinformation." (*Id*. at 2, 7.) According to Defendants, the Complaint merely alleges an information-sharing partnership and "fails to allege" an agreement that "the Platform[s] would take action as a result of TNI alerts." *Id*. at 7.[3]

This is fantasy. The Complaint expressly and in detail alleges that the TNI involved an agreement not only to share alerts, but to censor, with the Platform Members specifically agreeing to suppress the online publication of TNI-prohibited reporting:

> 294.    The TNI was not merely an information-sharing entity.  Its members agreed not only to share alerts, but to collaborate in deciding which (frequently accurate) reporting counted as "misinformation" and to take agreed-upon action against such reporting, including (in the case of the TNI's Big Tech Platform Members) by blocking and/or shadow-banning such reporting.

> 295.    From the beginning, the TNI's members committed to "moving quickly ***and collectively to undermine disinformation before it can take hold***."  BBC, *New collaboration steps up fight against disinformation*, Sept. 7, 2019, https://www.bbc.co.uk/mediacentre/ latestnews/2019/disinformation (emphasis added). To "ensure" the achievement of this goal, the TNI conducted "'fire drills' before we roll out the ***agreed actions***."  *Id.* (emphasis added). As noted above, in September 2021, Ms. Cecil stated of the TNI's members that "***all participants signed up to a clear set of expectations of how to act.***"  They collectively decided what counted as misinformation, and "***they decided what to do about it***."[4]  The agreement

---

[3] Defendants imply that a mere information-sharing agreement would be perfectly lawful. Not so. *See, e.g.*, *Jien v. Perdue Farms, Inc.*, No. 1:19-CV-2521-SAG, 2022 U.S. Dist. LEXIS 128686 at *53-54 (D. Md. July 19, 2022) (denying motion to dismiss where "Plaintiffs have plausibly pled that Defendants' information sharing had anticompetitive effects"); *In re London Silver Fixing, Ltd., Antitrust Litig.*, 332 F. Supp. 3d 885, 904 (S.D.N.Y. 2018) (allegations of "information sharing between horizontal competitors" for anticompetitive "purpose" state a claim).

[4] Out of all these statements, Defendants single out this one (leaving the others unrebutted) and claim that when Cecil said "they decided what to do about it," she meant "'*they* [i.e., individual members] decided what to do about it,' *i.e.*, acted independently." (ECF No. 41-1 at 11 (emphasis and bracket added by Defendants).) But Plaintiffs are entitled to every reasonable inference, and

entered into by the TNI's members "tightly defines what **cooperation and action** looked like," and "without that core specificity the TNI would never have got off the ground." Distinguishing the TNI from Facebook's oversight board, which "deals with" content-removal decisions on only "one platform," Ms. Cecil added, "clearly what I've been talking about is **cooperation across platforms as well**."

297.     Among the "clear . . . expectations," to which TNI members "signed up" at "closed door" meetings and/or in inter-firm communications were the following:

> A.     That the TNI's Big Tech Members would use their dominant platform power in the online news market to censor and silence online news publishers whose reporting was prohibited by the TNI or any of its members.
> B.     That the TNI's Big Tech Members would exclude from their platforms news content identified as prohibited by the TNI or any of its members.
> C.     That the TNI's Big Tech Members would take action injuring and disadvantaging publishers of prohibited content by censoring those publishers, demonetizing them, shadow-banning them, disparaging them, and/or de-platforming them entirely.

(Compl. ¶¶ 294-95, 297.)

In addition, the Complaint alleges that Ms. Cecil, former director of the TNI, expressly described it as media and Big Tech companies collaborating "to find *practical ways to choke off*" reporting deemed by the TNI to be misinformation. (*Id*. ¶ 277.) On March 16, 2020, reflecting their participation in the TNI, all four of the TNI's Platform Members issued a collective statement expressly announcing that they were "***working closely together***" to "***jointly*** combat[] fraud and misinformation." (*Id*. ¶ 264.) Less than two weeks later, on March 27, 2020, the TNI announced that it had begun operations and stated that its members were doing "***everything we can, working together, to stop disinformation about Coronavirus in its tracks***" and that the TNI's "collaboration of major news and tech organisations will ***work together*** to rapidly identify ***and***

---

it is certainly a reasonable interpretation—given the panoply of admissions of a joint commitment among TNI Members to "work together" to "choke off" misinformation—that Cecil meant "collectively," not individually. And even if the Platforms do decide individually "what to do" with TNI-reported misinformation, Defendants would still be liable for the Platforms' censorship decisions because and to the extent that the Platforms make those individual decisions (as the Complaint alleges they do (Compl. ¶¶ 320-21)) *in furtherance* of their TNI agreement.

*stop the spread* of harmful Coronavirus disinformation."[5] Cecil herself has said, "At its core [the TNI] is [an] *agreed* statement of what constitutes the most harmful disinformation, and *we agreed to act*" on it. (ECF 41-2 at 7 (emphasis added).) If all this were not enough, the TNI's *own "mission" statement* describes the TNI as bringing together "major news organisations and tech platforms to *work together*, at speed and in a fast-changing digital landscape, to share insights, look forward *and take action against the most harmful disinformation*."[6]

These are direct admissions of agreement to "take action against"—i.e., to block, demote, or shadow-ban—reporting the TNI deems "misinformation." Under well-established law, such admissions are by themselves sufficient to plead agreement. "A plaintiff may plead an agreement by alleging direct or circumstantial evidence, or a combination of the two. *If a complaint includes non-conclusory allegations of direct evidence of an agreement, a court need go no further on the question whether an agreement has been adequately pled*." *W. Penn Allegheny Health Sys. v. UPMC*, 627 F.3d 85, 99 (3d Cir. 2010) (emphasis added); *cf. Tunica*, 496 F.3d at 411 n.11 (reversing summary judgment where "the plaintiff has come forward with direct, rather than circumstantial, evidence of concerted action"). An admission of agreement or of concerted action is direct evidence. *See, e.g., id.* at 409-11 (admission by one party of "gentlemen's agreement" among competitors not to deal with plaintiff was direct evidence of agreement); *Southway Theatres, Inc. v. Ga. Theatre Co.*, 672 F.2d 485, 493 n.8 (5th Cir. 1982) ("Direct evidence" of a conspiracy is that which "explicitly refer[s] to an understanding between" the alleged conspirators.); *United States v. Sutherland*, 656 F.2d 1181, 1189 (5th Cir. 1981) (admission is direct evidence). Hence this Court "need go no further on the question whether an agreement

---

[5] BBC, *TNI announces plans*, *supra* note 1.
[6] BBC, Trusted News Initiative, https://www.bbc.co.uk/beyondfakenews/trusted-news-initiative/about-us ("Trusted News Initiative Mission") (last visited Aug. 12, 2023).

has been adequately pled." *W. Penn Allegheny Health*, 627 F.3d at 99.

On top of all this, the Complaint adds detailed allegations of parallel conduct by TNI members (Compl. at pp. 57-63), and plausibly alleges that censoring the Prohibited Reporting was against the individual economic self-interest of each TNI member. Because the Prohibited Reporting can draw large audiences, a single news organization censoring such content on its own stands to lose audience share to its rivals and thus acts contrary to its own individual economic self-interest. (*Id.* ¶¶ 500-04.) Only by colluding—by jointly agreeing that they would *all* censor the Prohibited Reporting—could the TNI's members overcome this problem. (*Id.*) *See Golf City, Inc. v. Wilson Sporting Goods Co.*, 555 F.2d 426, 435 (5th Cir. 1977) (sustaining group boycott claim) ("Actions against the apparent individual economic self-interest of the alleged conspirators may raise an inference of interdependent action.") (citation omitted).

Ultimately, Defendants' argument boils down to the claim that the Complaint does not rule out the possibility of independent action by the TNI's Platform Members. But as stated above, an antitrust complaint is not required to "rule out" independent action. *See Gelboim*, 823 F.3d at 781 ("To survive dismissal, 'the plaintiff need not . . . rule out the possibility of independent action, as would be required at later litigation stages such as a defense motion for summary judgment, or a trial.'") (citation omitted).[7] And contrary to Defendants' assertions (ECF No. 41-1 at 2, 7, 9), Plaintiffs are ***not*** required to plead or prove that the TNI's members were conscious that their scheme was unlawful. *See Coughlin v. Capitol Cement Co.*, 571 F.2d 290, 302 (5th Cir. 1978) ("the Sherman Act does not require any specific intent to violate the law"). In sum, Plaintiffs' detailed allegations of direct evidence, parallel conduct, and action against economic self-interest

---

[7] Defendants' reliance upon *Golden Bridge Tech., Inc. v. Motorola, Inc.*, 547 F.3d 266, 272 (5th Cir. 2008) is misplaced. *Motorola* involved summary judgment, not Rule 12(b)(6), where Plaintiffs are *not* required to "refute the likelihood of independent action." ECF No. 41-1 at 9.

are more than sufficient to survive dismissal. *See In re Pool Prods.*, 988 F. Supp. 2d at 716 (allegations of "parallel conduct," action "against" "self-interest," and "direct evidence" "render the [complaint] sufficient under *Twombly*").

III. ***Plaintiffs Have Validly Stated Both a Per Se and Rule of Reason Claim.***

"Whether a restraint on trade is per se illegal or is analyzed under the rule of reason is a key distinction in antitrust law." *MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 848 (5th Cir. 2015). In rule of reason cases, plaintiffs must, in general, carefully define the relevant market, and a fact-intensive "burden-shifting framework" determines if the agreement is anti-competitive. *Impax Labs., Inc. v. FTC*, 994 F.3d 484, 492 (5th Cir. 2021). By contrast, in per se cases, plaintiffs are not required to define the market,[8] and the agreement is "conclusively presumed to be unreasonable." *MM Steel,* 806 F.3d at 848 (citation omitted). Here, Plaintiffs have stated both a per se and rule of reason claim.

A. _Plaintiffs Have Pleaded All the Elements of a Per Se Unlawful Group Boycott._

The "Supreme Court has consistently held that the per se rule is applicable to group boycotts." *Id*. at 848. A classic per se unlawful group boycott involves "[1] joint efforts by a firm or firms to [2] disadvantage competitors by [3] 'either directly denying or persuading or coercing suppliers or customers to [4] deny relationships the competitors need in the competitive struggle,'" thereby [5] "cut[ting] off access to a supply, facility, or market necessary to enable the boycotted firm to compete." *Northwest Wholesale,* 472 U.S. at 294; *see Tunica*, 496 F.3d at 413; *Spectators' Comm. Network, Inc. v. Colonial Country Club*, 253 F.3d 215, 221-23 (5th Cir. 2001). All these elements are present and well-pleaded here.

---

[8] "A plaintiff is not required to define a particular market for a per se claim." *PLS.COM, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 838 (9th Cir. 2022).

*First*, the TNI involves [1] "joint efforts" by firms in competition with one another.  This element requires the existence of a "horizontal agreement," meaning that the boycotting group must include at least two firms competing with each other. *See NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 138 (1998) ("[a]ntitrust law does not permit the application of the *per se* rule in the boycott context in the absence of a horizontal agreement"); *Spectators' Comm.,* 253 F.3d at 224 (horizontal agreement present so long as boycotting group includes "more than one" firm in competition with each other). The TNI includes numerous horizontal competitors.

For example, the TNI's Legacy News Members, including all the Defendants in this case, compete with each other as original-content online news publishers. (Compl. ¶¶ 183-86.) The TNI's Platform Members compete with each other as, among other things, news aggregators, social media networks, and search engines. (*Id*. ¶¶ 203-16.) In addition, as news aggregators, the TNI's Platform Members compete with the TNI's Legacy News Members. (*Id*. ¶ 221.) Thus a horizontal agreement—indeed more than one—has been pleaded here.

*Second*, the TNI seeks to [2] "disadvantage [other] competitors." As alleged in the Complaint, the express goal of the TNI is to censor, suppress, cut off from their audiences, disparage, and thus disadvantage rival, non-mainstream online news publishers, like Plaintiffs, who engage in Prohibited Reporting, while thereby, at the same time, arrogating to TNI Members the brand image of being "trusted" news providers.  (*Id*. ¶¶ 285, 534-36.)

*Third*, to achieve this suppression, the TNI's Legacy News Members [3] "persuad[ed] suppliers" to join their agreement.[9] (*Id*. ¶ 265.) The TNI's Platform Members are Internet suppliers,

---

[9] Typically, a firm's competitors are not able to carry out the boycott on their own because they don't supply or buy from the boycotted firm, which is why in most cases they must "persuad[e] or coerc[e] suppliers or customers," *Northwest Wholesale*, 472 U.S. at 294, to join their agreement. *See, e.g.*, *MM Steel*, 806 F.3d at 848, 853 (finding per se unlawful group boycott where steel distributors persuaded steel manufacturer to refuse to sell to rival distributor).

providing both consumers and publishers with news aggregation services, social media networks, and search engines. Defendants brought these Platforms into the TNI specifically in order to gain the power to censor rival news publishers' content—a power the TNI's Legacy News Members do not have on their own. (*Id*. ¶¶ 273, 287.)[10]

*Fourth and fifth*, by denying them access to the world's dominant Internet platforms, the TNI [4] "den[ies] relationships [Plaintiffs] need in the competitive struggle," [5] "cut[ting] off access to a supply, facility, or market necessary to enable [Plaintiffs] to compete." Facebook, Google, Twitter, and Microsoft are "platform gatekeepers" for the online news industry (*Id*. ¶¶ 222-23) with the capacity to make or break online news publishers. (*Id*. ¶¶ 225-28.) When the Internet's "platform gatekeepers" close their gates, publishers are denied access to tens of millions of consumers. (*Id*.) Even established news publishers can lose 50% of their readers due to a change in Google's or Facebook's algorithms. (*Id*. ¶ 235-36.) When small publishers like Plaintiffs are cut off from the TNI Big Tech Members' platforms, they typically lose 90% or more of their audience—and suffer massive revenue loss as a result. (*Id*. ¶¶ 234, 363-481.) Needless to say, a news publisher that loses 90% or more of its market is unable to compete.[11]

---

[10] Plaintiffs are not required to allege that the TNI's Platform Members shared Defendants' anti-competitive motives. *See Spectators' Comm.*, 253 F.3d at 222  (fact that a "conspirator lacks a direct interest in precluding competition" is irrelevant to group boycott claim if that conspirator "is enticed … into knowingly curtailing competition by another conspirator who has an anticompetitive motive").

[11] Defendants claim that Plaintiffs have not been entirely "excluded" from the market because they still have "access to numerous other popular social media platforms, such as Gettr, Rumble, and Truth Social." (ECF No. 41-1 at 18.) This claim not only improperly asserts facts outside the pleadings, but misrepresents the law. "An agreement to restrain trade may be unlawful even though it does not entirely exclude its victims from the market." *Associated Gen. Contractors v. Cal. State Council of Carpenters*, 459 U.S. 519, 528 (1983); *see also Associated Press*, 326 U.S. at 17 (news publishers' concerted refusal to allow competitors to publish certain stories violated Sherman Act); *PLS.COM*, 32 F.4th at 835-36, 840-41 (group boycott claim stated even if the boycotters "do not completely cut off the competitor's access to inputs it needs" and even if rivals are not "driven

Thus Plaintiffs have fully pleaded all elements of a per se unlawful group boycott. *See, e.g.*, *MM Steel*, 806 F.3d at  848 (upholding finding of per se unlawful group boycott on basis of *Northwest Wholesale* elements); *PharmacyChecker.com, LLC v. Nat'l Ass'n of Bds. of Pharm.*, 530 F. Supp. 3d 301, 318, 344-45 (S.D.N.Y. 2021) (complaint stated per se group boycott claim where defendants allegedly acted in concert with "internet commerce gatekeepers, including Google, Microsoft, [and] Facebook," to suppress plaintiff's search results, causing more than 75% loss of traffic to plaintiff's website). In fact, the TNI boycott is a modern reincarnation of the exclusionary business practices condemned in *Associated Press*. *See* 326 U.S. at 20 (AP by-laws violated Sherman Act by restricting what rival news publishers could report, stifling the "widest possible dissemination of information from diverse and antagonistic sources").

## B. *The TNI Group Boycott Has Additional Traits Reinforcing Per Se Liability.*

As the Supreme Court and Fifth Circuit have stated, per se unlawful group boycotts "often" have the following additional "traits": [1] the "boycotting firms possess[] a dominant position in the relevant market"; and/or [2] the boycotting firms "control access to an element necessary to enable [plaintiffs] to compete." *Northwest Wholesale*, 472 U.S. at 294-96; *Tunica*, 496 F.3d at 414-15. Moreover, the existence of [3] "anticompetitive animus" further points to per se liability. *Northwest Wholesale*, 472 U.S. at 296; *PharmacyChecker*, 530 F. Supp. 3d at 344-45. Although "a concerted refusal to deal need not necessarily possess all these traits to merit per se treatment,"[12] and a District Court is ***not*** required to consider them,[13] all three are fully pleaded here.

---

from the market," especially if boycott puts "competing firm[s] at a severe competitive disadvantage") (citations omitted). In addition, Plaintiffs' social media accounts, when not removed entirely, have been so thoroughly de-boosted or shadow-banned as to constitute a denial of access to facilities and markets necessary to compete on equal terms. (Compl. ¶ 11 & n.1.)

[12] *Northwest*, 472 U.S. at 295, *quoted in Tunica*, 496 F.3d at 414.

[13] *See MM Steel*, 806 F.3d at 850 ("district court did not err by not applying these factors" or by not "instructing the jury to consider them before applying per se liability").

*First*, the TNI's Big Tech Members occupy an "overwhelmingly dominant position" in the relevant markets. (Compl. ¶ 233.) YouTube has "a market share of over 75% in the Internet video-hosting market," "Facebook has a market share of close to 100% in the online social networking market," "Google's search engine has a market share of over 90% [in] the online search market," and Google and Facebook are dominant news aggregators. (*Id*. ¶¶ 220, 230-32; *infra* note 14.) These monopoly or near-monopoly level market shares are more than sufficient to show a "dominant position." *See Toys "R" Us, Inc. v. Federal Trade Comm'n*, 221 F.3d 928, 936-37 (7th Cir. 2000) (20% nationwide market share showed dominance). As alleged in the Complaint, the TNI's Platform Members use their dominance in these markets to restrain trade in the online news market by refusing to deal with, and denying consumers access to, online publishers who engage in Prohibited Reporting. (Compl. ¶¶ 233, 306-10.)

Defendants argue that these massive market shares are somehow irrelevant on the ground that video-hosting, social networking, search, and news aggregation are "*other* unrelated markets." (ECF No. 41-1 at 15 (original emphasis).) But these markets are by no means "unrelated": dominance in these markets is precisely what allows the TNI's Big Tech Members to act as platform gatekeepers for the entire online news market. Whenever, as here, a per se unlawful group boycott takes the form of a group of competitor firms inducing "*suppliers*" to exclude other competitors, *Northwest Wholesale,* 472 U.S. at 294, dominance in the *suppliers' market* (not the competitors' market) is what gives the boycott its economic power (otherwise the targeted firms could simply buy the denied good from other suppliers). *See, e.g.*, *Tunica*, 496 F.3d at 413 (market in which boycotters were dominant (casinos) differed from plaintiff's market (web advertising); *Flying J Inc. v. TA Operating Corp.*, No. 1:06-CV-30, 2008 U.S. Dist. LEXIS 92852, at *33-37 (D. Utah Nov. 14, 2008) (market in which boycott group was dominant differed from market in

which anti-competitive effect was alleged). As the Fifth Circuit has stated, what matters in a group boycott case is whether the boycotting group is of "sufficient economic importance that exclusion results in the denial of the opportunity to compete effectively on equal terms." *United States v. Realty Multi-List, Inc.*, 629 F.2d 1351, 1373 (5th Cir. 1980) (citation omitted). That is exactly what Plaintiffs allege, and their allegations of dominance are confirmed by a Congressional report:

> "Several ***dominant*** platforms function as intermediaries to news online. . . . [N]ews organizations 'depend on a few big tech platforms to help them distribute their journalism to consumers.' . . . ***[T]he dominance of Google and Facebook allows them to 'pick winners' online by adjusting visibility and traffic. For example, an update to Google's search algorithm in June 2019 decreased a major news publisher's online traffic 'by close to 50%'* …. *[A] 'smaller business would have been crushed' by this decline***."

(Compl. ¶ 236 (quoting U.S. HOUSE OF REP., SUBCOMMITTEE ON ANTITRUST, INVESTIGATION OF COMPETITION IN DIGITAL MARKETS 63 (2020) (emphasis added) (hereafter "INVESTIGATION").)[14]

***Second***, the TNI members "control access to an element necessary to enable [Plaintiffs] to compete." As alleged in the Complaint, because of TNI Big Tech Members' power as "platform gatekeepers" for online news, access to their social media, search, and news aggregation platforms is essential for online news publishers to compete.  When denied access to these platforms, a small

---

[14] Defendants claim that this congressional report also refers to Amazon and Apple as occupying powerful positions online and that this somehow undercuts Plaintiffs' allegations of the TNI Platform Members' dominance. (ECF No. 41-1 at 15-16.) In fact, as Defendants surely know, the report does not suggest that Amazon or Apple is dominant in online news and repeatedly singles out Facebook and Google as *the* most dominant platforms with overwhelming market power to harm news publishers. *See* INVESTIGATION at 17 ("Google and Facebook have an outsized influence over the distribution and monetization of trustworthy sources of news online"), 62 (news "publishers . . . said they are 'increasingly beholden' to these firms, and in particular, Google and Facebook"), 62 n.287 ("most market participants do not view [Apple] as a critical intermediary for online news at this time"), 63 ("dominance of Google and Facebook allows them to 'pick winners' online"), 64 ("Every publisher knows that, at best, they are sharecroppers on Facebook's massive industrial farm. . . . And journalists know that the man who owns the farm has the leverage. If Facebook wanted to, it could quietly turn any number of dials that would harm a publisher—by manipulating its traffic, its ad network, or its readers."). The report specifically notes that the "dominant platforms," and especially Google, are the most "market dominant" in news aggregation. *See id*. at 59 & n.261.

online news publisher loses at least 90% (and probably more) of its traffic. (Compl. ¶ 234.) There can be no doubt that such a near-total a loss in viewership renders an online news publisher unable to compete effectively. *See PharmacyChecker.com,* 530 F. Supp. 3d at 318, 344-45 (holding this factor satisfied by allegation that boycotting group included "internet commerce gatekeepers, including Google, Microsoft, [and] Facebook," causing more than 75% reduction in traffic).

**Finally**, Plaintiffs have plausibly pleaded "anti-competitive animus." By their own admission, Defendants see "unchecked" online news publishers as their "real competition," posing an "existential threat" to their audience share and business model, and the TNI was created to attack that competition. (Compl. ¶¶ 279-85.) *See O.E.M. Glass Network, Inc. v. Mygrant Glass Co., Inc*., 19-CV-00742, 2023 U.S. Dist. LEXIS 45497, at *31 (E.D.N.Y. Mar. 10, 2023) ("Given that two of the [additional] *Northwest Wholesale* factors have been met, and anticompetitive animus has been found, the court finds that per se treatment applies.").

C.   *Plaintiffs Have Adequately Pleaded Relevant Markets.*

A "market" for antitrust purposes has "geographic dimensions and product dimensions." *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc*., 732 F.2d 480, 487 (5th Cir. 1984). As stated in the Complaint, the relevant market in this case is "the US online news market and specifically the US online market for COVID news and the U.S. online market for political news." (Compl. ¶ 136.) The Complaint explains these terms and alleges in detail all facts necessary to show that US markets for online COVID news and online political news are valid, cognizable antitrust submarkets of the much larger news market. (*Id*. at pp. 22-27.) In addition, the Complaint alleges (again in detail) that *zero-price* offerings within these online news markets make up another valid, cognizable submarket. (*Id*. at pp. 38-40.) For a per se claim, nothing more is required. "A plaintiff is not required to define a particular market for a per se claim." *PLS.COM, LLC*, 32 F.4th at 838

(citing *NCAA v. Bd. of Regents*, 468 U.S. 85, 100 (1984)); *see New Orleans Ass'n of Cemetery Tour Guides*, 56 F.4th at 1036 (plaintiff must "define a 'relevant market'" when challenging a "vertical agreement," as opposed to a horizontal, per se unlawful agreement). Plaintiffs' definition of the relevant markets is far more detailed than definitions deemed sufficient in similar cases. *See, e.g.*, *Golden Bridge Tech., Inc. v. Nokia, Inc.*, 416 F. Supp. 2d 525, 527, 533 (E.D. Tex. 2006) (finding that, for purposes of a per se group boycott claim, "worldwide" market in "cellular communication technology" "was a sufficient definition of the relevant market to overcome a 12(b)(6) motion to dismiss for failure to state a claim").

D. *Plaintiffs Have Also Stated a Rule of Reason Claim.*

If a group boycott is not found unlawful per se, it may still be held unlawful under the rule of reason. *St. Bernard Gen. Hosp., Inc. v. Hosp. Serv. Ass'n of New Orleans, Inc.*, 712 F.2d 978, 988 (5th Cir. 1983). To prevail under the rule of reason, plaintiffs must prove that a boycott harms competition through "anticompetitive effects." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018); *In re Pool Prods.,* 988 F. Supp. 2d at 708. Plaintiffs may make this showing either: (1) "directly," for example, by proving "***reduced output***," or (2) "indirectly," by defining the relevant markets and proving "market power." *PLS.COM, LLC*, 32 F.4th at 834 (emphasis added) (citations omitted).  Here, Plaintiffs have stated a claim under both these tests.

 As shown above, Plaintiffs have explicitly and plausibly pleaded that the TNI's group boycott reduced output by "removing reporting of the Prohibited Claims," "de-platforming online news publishers who engaged in Prohibited Reporting," and "dissuading . . . numerous other online news publishers from engaging in Prohibited Reporting." (Compl. ¶ 552.) Because reduction in output has been properly pleaded, together with all the other elements of an unlawful group boycott, a rule of reason claim has been stated, and "no 'inquir[y] into market definition and market

19

power' is required." *PLS.COM, LLC*, 32 F.4th at 834 (citations omitted). Nevertheless, Plaintiffs have defined in detail the relevant markets—the national market for online COVID-related news and online political news (and, more specifically, for zero-price offerings in those markets)—and have alleged near-monopoly-level market shares in markets giving TNI members "platform gatekeeping" power over the online news markets. (Compl. at pp. 21-40.) Accordingly, Plaintiffs have stated a valid rule-of-reason claim. *See, e.g.*, *Realty Multi-List, Inc.*, 629 F.2d at 1373 (holding that allegations of horizontal refusal to deal state a plausible rule-of-reason claim where boycotting group "is of sufficient economic importance that exclusion results in the denial of the opportunity to compete effectively on equal terms") (citation omitted).

### E. *Plaintiffs Were Not Required to Prove Absence of Procompetitive Justifications.*

Defendants claim that Plaintiffs have failed to "allege facts demonstrating that the TNI lacked any plausible procompetitive justifications." (ECF No. 41-1 at 19.) But Plaintiffs are not required to "demonstrate" anything here, and in any event, Defendants have it backwards. The supposed existence of pro-competitive justifications is an "*affirmative defense*" that *Defendants* must plead and prove. *BRFHH Shreveport, LLC v. Willis Knighton Med. Ctr.*, 176 F. Supp. 3d 606, 623 (W.D. La. 2016) (Erny Foote, J.) (emphasis added). Because it is an affirmative defense, the claim that a boycott is justified by "procompetitive" effects is "better suited for a summary judgment motion" and cannot serve as a basis for a 12(b)(6) dismissal unless "as a matter of law" the existence of "nonpretextual, procompetitive justifications" is proven "on the face" of the complaint. *Id*. at 623-25. Defendants do not and cannot claim that such is the case here.

Instead, Defendants argue (without evidence) that the TNI's group boycott is "pro-competitive" because it helps the Platforms "to restrict or to enable restriction of access to objectionable online material." (ECF No. 41-1 at 19.) That assertion not only assumes (wholly

20

improperly) outside-the-pleading facts; it is a claim that the TNI improves the *quality* of online news—i.e., making it less "objectionable." But a quality defense is *not* a pro-competitive justification. On the contrary, "justifying a restraint on competition based on an assumption it will improve a product's quality 'is nothing less than a frontal assault on the basic policy of the Sherman Act.' The antitrust laws assume that 'competition will produce not only lower prices, but also better goods and services.'" *PLS.COM,* 32 F.4th at 836 (quoting *Nat'l Soc'y of Pro. Eng'rs v. United States*, 435 U.S. 679, 695 (1978)); *see also, e.g.*, *Law v. NCAA*, 134 F.3d 1010, 1022 (10th Cir. 1998) ("policy goals such as protecting public safety and promoting ethical behavior do not qualify as legitimate procompetitive objectives"; "courts should 'not inquire whether the restraint promotes the "public interest" but only whether it increases competition'").

More fundamentally, what Defendants are calling a "procompetitive" effect is in fact the TNI's most anticompetitive effect. By collusively censoring so-called "objectionable" online reporting, the TNI suppresses genuine free-market competition in the news industry, which consists, as the Supreme Court said long ago, of the "widest possible dissemination of information from diverse and antagonistic sources." *Associated Press*, 326 U.S. at 20. The Complaint expressly and plausibly pleads the absence of pro-competitive justifications. (Compl. ¶¶ 526-29.) If Defendants want to assert such justifications, they must plead and try to prove them later, either on summary judgment or at trial.[15]

IV. ***Plaintiffs Have Pleaded Antitrust Injury and Antitrust Standing.***

    A. <u>*Targets of a Group Boycott Have Axiomatic Antitrust Injury*</u>.

---

[15] Another improperly asserted affirmative defense is Defendants' suggestion (ECF No. 41-1 at 19) that Section 230 somehow immunizes Defendants. Section 230 does not cover non-internet service providers, and in any event does not serve as a defense against antitrust claims. *See, e.g.*, *Enigma Software Grp. USA, LLC v. Malwarebytes, Inc.*, 946 F.3d 1040, 1050-51 (9th Cir. 2019).

It's axiomatic in antitrust law that the "targets of [a group] boycott" "suffer an antitrust injury." *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1103 (9th Cir. 1999) (plaintiffs "suffer an antitrust injury as the direct targets of the boycott"); *Jayco Systems, Inc. v. Savin Business Machines Corp.*, 777 F.2d 306, 313 (5th Cir. 1985) ("We grant, and Savin does not dispute, that if a [group boycott] violation is shown, Jayco's injuries, if any, are an 'antitrust injury.'"); *Midland Telecasting Co. v. Midessa Television Co.*, 617 F.2d 1141, 1145 (5th Cir. 1980) ("It is clear that in the present case the injury alleged flows directly from defendants' group boycott."). If Defendants' argument that Plaintiffs lack antitrust injury were taken seriously, virtually all group boycott law would have to be thrown out the window (because virtually all group boycott claims are brought by the boycott's targets).

      B.   *Harm to Competition Is Fully Pleaded Here.*

"[A]llegations pleading harm to competition are not required to withstand a motion to dismiss when the conduct challenged is a per se violation." *Gelboim*, 823 F.3d at 775. Nevertheless, antitrust harm to competition in the news market is fully pleaded here—harm in both the conventional economic sense, and harm to the vital public interest in a robust free press.

First, by alleging that the TNI's group boycott ***reduces output*** in the online news market[16] (Compl. ¶ 552), the Complaint states a paradigmatic injury to competition. *See Impax Labs., Inc. v. FTC*, 994 F.3d at 493 ("Anticompetitive effects are those that harm consumers. Think increased prices, ***decreased output***, or lower quality goods.") (emphasis added); *MacDermid Printing Solutions LLC v. Cortron Corp.*, 833 F.3d 172, 182 (2d Cir. 2016) ("reduced output" is "direct

---

[16] This allegation is plausible because the whole point of a group boycott is to reduce output. *See* P. AREEDA & H. HOVENKAMP, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION § 1911 (2022) ("term 'boycott'" refers to "practices that are designed to limit marketwide output by reducing the sales of competitors or excluding potential competitors").

evidence of harm to competition"). Because the TNI eliminates potential competition from the online news market, it is "by definition anticompetitive." *See Impax Labs.*, 994 F.3d at 493 ("Eliminating potential competition is, by definition, anticompetitive.").

Second, the Complaint alleges harm to competition in online news through the suppression of "diverse and antagonistic" viewpoints, which, contrary to Defendants' claims, is emphatically a cognizable Sherman Act harm in suits involving the news industry. *See Associated Press*, 326 U.S. at 20 (holding that group boycott by members of the Associated Press violated the Sherman Act in part because it "impose[d] restraints" on the "widest possible dissemination of information from diverse and antagonistic sources"); *see also, e.g.*, *FCC v. National Citizens Committee for Broadcasting*, 436 U.S. 775, 800 n.18 (1978) (reaffirming that "application of the antitrust laws to newspapers" is "supportive of the values underlying the First Amendment"); *Reilly v. Hearst Corp.,* 107 F. Supp.2d 1192, 1195 (N.D. Cal. 2000) (as applied to news publishers, "the Sherman Act and Clayton Act ***should be read bearing in mind the . . . encouragement of multiple sources of newspaper news, features and opinion***") (emphasis added); *United States v. AT&T Co.*, 552 F. Supp. 131, 184 (D.D.C. 1982), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001 (1983) ("the Court must take into account . . . the First Amendment principle of diversity in dissemination of information . . . . Consideration of this policy is especially appropriate ***because, as the Supreme Court has recognized, in promoting diversity in sources of information, the values underlying the First Amendment coincide with the policy of the antitrust laws***") (emphasis added).

As explained by Justice Frankfurter in *Associated Press*, news is not merely another commodity like "peanuts or potatoes." 326 U.S. at 28 (Frankfurter, J., concurring). A free press is "essential to the vitality of our democratic government," and the functioning of a free press "may be defeated by private restraints no less than by public censorship." *Id*. at 28-29. Hence, restraints

of trade in the news industry are "unreasonable" under the Sherman Act not only because they reduce economic welfare, but "because they offend the basic functions which a constitutionally guaranteed free press serves in our nation." *Id*. at 29. They violate the foundational premise of the American Constitution: that "'right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection. To many this is, and always will be, folly; but we have staked upon it our all.'" *Id*. at 28 (quoting *United States v. Associated Press*, 52 F. Supp. 362, 372 (S.D.N.Y. 1943) (Hand, J.)).

The contemporary framework for assessing horizontal agreements with manifestly anti-competitive effects is the per se rule, and *Associated Press* commands its application here. That case should be the *cri de coeur* of every news organization in America for its affirmation of the genius of a free-market press. Yet, stunningly, Defendants nowhere deal with *Associated Press* in their brief, even as they violate its central command. Certainly, *Associated Press* vitiates Defendants' assertions that Plaintiffs must "quantify this supposed reduction in output." (ECF No. 41-1 at 20.) It bears repeating that, under the First Amendment and the Sherman Act, "[t]ruth and understanding are not wares like peanuts or potatoes." *Associated Press*, 326 U.S at 28 (Frankfurter, J., concurring). Defendants' reliance (ECF No. 41-1 at 21) upon *Marucci Sports, L.L.C. v. NCAA*, 751 F.3d 368, 377 (5th Cir. 2014), where plaintiffs failed to allege factual information about the "diminution in the quality of [baseball] bats" is, for that reason alone, unpersuasive. Under *Associated Press*, competition in news reporting is categorically diminished when, as here, news publishers "combine to keep others from publishing." 326 U.S. at 20.

C.   *Plaintiffs CHD's and Dr. Tapper's Losses Are Recoverable.*

Defendants argue that specific injuries suffered by two Plaintiffs—Children's Health Defense ("CHD") and Dr. Ben Tapper—fall outside of antitrust law's protection.  Not so.

As to CHD, Defendants argue that lost donations are not "antitrust injury" (ECF No. 41-1 at 22), implying that nonprofits can never be antitrust plaintiffs. But numerous cases hold that nonprofits can sue for monetary losses caused by antitrust violations. *See, e.g.*, *Coalition for ICANN Transparency, Inc. v. VeriSign, Inc.*, 567 F.3d 1084 (9th Cir. 2009); *Feminist Women's Health Center, Inc. v. Mohammad*, 586 F.2d 530 (5th Cir. 1978).[17] As to Dr. Tapper, Defendants assert that his losses at his chiropractic clinic were "experienced in another market." (ECF No. 41-1 at 23.) But in antitrust cases, "damages outside the relevant product market" are recoverable so long as injury is alleged in the relevant market and "the additional out-of-market damages are a consequence of that injury." *SC Innovations, Inc. v. Uber Techs., Inc.*, No. 18-cv-07440, 2021 U.S. Dist. LEXIS 89932, at *3 (N.D. Cal. May 11, 2021).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully submit that Defendants' motion to dismiss must be denied.

---

[17] Defendants' single, inapposite Ninth Circuit case, *Dedication & Everlasting Love to Animals v. Human Soc'y of the U.S., Inc*., 50 F.3d 710, 712 (9th Cir. 1995) (hereafter *DELTA*), held that a nonprofit's soliciting of donations doesn't satisfy the Sherman Act's "trade or commerce" requirement. But that requirement, which applies to antitrust *defendants*, is not at issue here (because Defendants plainly engage in trade or commerce). Instead, the applicable injury requirement is the Clayton Act's requirement of loss to "business or property," and CHD's loss of donations satisfies that. *See Steering Comm. v. BP Exploration & Prod.*, 785 F.3d 1003, 1012-13 (5th Cir. 2015) (nonprofits are engaged in "business"); *WWP, Inc. v. Wounded Warriors Family Support, Inc.*, 628 F.3d 1032, 1042 (8th Cir. 2011) (state law claim) (nonprofit that lost donations was "injured in its business or property"). In any event, *DELTA* has not been followed outside the Ninth Circuit. *See, e.g.*, *Virginia Vermiculite, Ltd. v. W.R. Grace & Co.*, 156 F.3d 535, 540 (4th Cir. 1998) (declining to follow *DELTA*).

25

Dated: August 15, 2023

Respectfully submitted,


*/s/ G. Shelly Maturin, II*

_____
G. SHELLY MATURIN, II (# 26994)
WELBORN & HARGETT, LLC
1540 W. Pinhook Road
Lafayette, LA 70503
Telephone: (337) 234-5533
Facsimile: (337) 769-3173
shelly@wandhlawfirm.com
*Attorney for Plaintiffs*


JOHN W. HOWARD (CA 80200)
SCOTT J. STREET (CA 258962)
(*pro hac vice*)
JW HOWARD/ATTORNEYS, LTD.
600 West Broadway, Ste. 1400
San Diego, CA 92101
Telephone: (213) 205-2800
johnh@jwhowardattorneys.com
sstreet@jwhowardattorneys.com
*Attorneys for Plaintiffs*

JED RUBENFELD (NY 2214104)
(*pro hac vice*)
1031 Forest Rd. New Haven CT 06515
Tel.: (203) 432-7631
jed.rubenfeld@yale.edu

ROBERT F. KENNEDY, JR. (NY 1999993)
(*pro hac vice* forthcoming)
48 Dewitt Mills Rd., Hurley NY 12433
Tel: (845) 481-2622

ROGER I. TEICH (CA 147076)
(*pro hac vice* forthcoming)
337 Liberty St. San Francisco CA 94110
Tel.: (415) 948-0045
rteich@juno.com

*Attorneys for Children's Health Defense*

26

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on the 15th day of August, 2023, a true and correct copy of the above and foregoing was filed with the Clerk of Court using the CM/ECF system, which automatically sends an electronic notification to all attorneys of record.

*/s/ G. Shelly Maturin, II*

_____

G. SHELLY MATURIN, II