## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## MONROE DIVISION

| | |
|---|---|
| **Children's Health Defense, Trialsite, Inc., Creative Destruction Media, LLC, Erin Elizabeth Finn, Jim Hoft, Dr. Ben Tapper, Ben Swann, Dr. Joseph Mercola, Ty Bollinger, Charlene Bollinger, and Jeff Crouere**<br><br>*Plaintiffs,*<br><br>— against —<br><br>**WP Company, LLC (D/B/A The Washington Post), The British Broadcasting Corp., The Associated Press, and Reuters News & Media, Inc.,**<br><br>*Defendants.* | Civil Action No. 3:23-cv-00720<br><br>Judge Terry A. Doughty<br><br>Magistrate Judge Kayla D. McClusky<br><br>**DECLARATION OF CHRIS LOWETH** |

I, Chris Loweth, declare under 28 U.S.C. § 1746, as follows:

1.      I am the Director of Commercial, Rights, and Business Affairs for BBC News at the British Broadcasting Corporation ("BBC") where I have been employed since 2021. Before assuming my current role, I served for approximately ten years as the head of legal and business affairs for BBC Global News Limited, which was previously a subsidiary of BBC, and which is now owned by a different BBC subsidiary, BBC Studios.

2.      I was called to the Bar of England and Wales in 1996 following my studies at the Inns of Court School of Law. I also hold an LL.B. in Law from University College London.

3.      I submit this declaration in further support of BBC's motion to dismiss the Plaintiffs' complaint for lack of personal jurisdiction. The facts stated below are true based on

my own personal knowledge and belief, my review of records maintained in the ordinary course of business by BBC, or information made available to me by BBC.

4.      Defined terms used herein are the same as in the July 11, 2023 Declaration of Jonathan Munro (ECF 39-2) ("Munro Declaration").

5.      This declaration addresses new factual assertions made by Plaintiffs through the August 15, 2023 Declaration of Brian Creter ("Creter Declaration"). This declaration is not intended to be a complete refutation of all Plaintiffs' assertions, but focuses on the key facts about BBC that I understand are pertinent to the pending motion to dismiss.

## I.      U.K. Law Does Not Permit BBC to Engage in Foreign Commercial Activity

6.      Paragraph 7 of the Creter Declaration asserts:

> Under British law, the BBC cannot engage in for-profit activity *inside the United Kingdom*, but elsewhere it can and does (including in the U.S.), recording annual sales of approximately $2.0 billion worldwide. (Emphasis in original.)

7.      As indicated in the Munro Declaration, this is incorrect. *See* Munro Decl. ¶ 7 ("With a handful of exceptions that are inapplicable to this case, the BBC's Royal Charter restricts the BBC from conducting any commercial activities in relation to the media it produces. Rather, commercialization of the BBC's media is the domain of an independent subsidiary, BBC Studios, and BBC Studios' own subsidiaries.").

8.      Mr. Creter cites no authority concerning "British law." He merely cites an article that discusses revenues generated by BBC's independent commercial subsidiary, BBC Studios.

9.      Section 7.1 of BBC's Royal Charter prohibits BBC from conducting any "commercial activities"—except through "commercial subsidiaries"—and it does not contain any caveats about geographic limitations. BBC's Royal Charter is Exhibit 1 to the Munro Declaration.[1]

10.     BBC's primary regulator, the UK Office of Communications ("Ofcom") also closely monitors BBC and enforces the Royal Charter. Ofcom promulgates rules that BBC and its commercial subsidiaries must follow, the most recent set of which was published on February 11, 2019. A true and correct copy of those rules is attached as Exhibit 1 ("Ofcom Rules").[2]

11.     The Ofcom Rules do not indicate any geographic distinctions on the prohibition against commercial activity. The introduction to the Ofcom Rules states, without caveat, that "BBC may only carry out commercial activities through subsidiary companies." Ex. 1 at 2.

## II.   The Website bbc.com Is A News Website That Does Not Enable Transactions Between BBC And Readers

12.     Mr. Creter asserts in paragraph 12, without explanation, that the BBC somehow "transacts substantial business in the Western District of Louisiana through its news website, bbc.com." Relatedly, paragraphs 14-20 of the Creter Declaration claim that bbc.com is a "BBC business activity" from a "practical, non-technical point of view." These statements are false.

13.     Simply, bbc.com is a news website where news articles and related media are posted. All content posted to that website may be accessed free of charge. No "transactions" of any kind occur on bbc.com, which does not offer the sale of any products, paid subscriptions, or paid services, to anyone, anywhere.

---

[1]  The Royal Charter may also be downloaded here: http://downloads.bbc.co.uk/bbctrust/assets/files/pdf/about/how _we_govern/2016/charter.pdf

[2]  The Ofcom Rules may also be downloaded here: https://www.ofcom.org.uk/__data/assets/pdf_file/0018/136071/ BBC-commercial-trading-updated-requirements.pdf.

14.     Notably, the Creter Declaration does not contest the Munro Declaration's assertion that BBC Studios exclusively "commercializes" bbc.com.

15.     Indeed, BBC and BBC Studios have global licensing and services contracts, under which BBC Studios has the exclusive right to commercialize and operate bbc.com, the international-facing website. BBC also licenses all related intellectual property and the domain to BBC Studios. In exchange for a pre-set annual fee, BBC posts certain content to the website. BBC Studios also posts content. In a typical month, the BBC estimates over 5000 pieces of content are published to bbc.com.

16.     Thus, as reflected in the Munro Declaration, BBC's only practical public facing involvement with bbc.com is to post media to it.

17.     There are no similar arrangements concerning bbc.co.uk. The websites bbc.co.uk and bbc.com display some different content targeted for different geographies—the United Kingdom, and the rest of the world, respectively. Readers who attempt to visit bbc.co.uk from outside the United Kingdom are automatically redirected to bbc.com.

### III.    BBC World Service Does Not Transact Business With Red River Radio Or Its Listeners

18.     Paragraph 28 of the Creter Declaration claims that:

> the BBC World Service is broadcast every day—three hours a day on weekdays, and nine on weekends—on the Red River Radio Network, with 150,000 regular listeners, broadcasting out of Shreveport, Alexandria, and elsewhere.

19.     It is not true that the BBC World Service directly broadcasts radio news in the Western District of Louisiana on the Red River Radio Network.

20.     BBC World Service has no agreements or relationship of any kind with Red River Radio. BBC World Service does not transact any business with Red River Radio, or with Red River Radio's listeners. Rather, BBC World Service has an agreement with Minnesota Public

- 4 -

Radio d/b/a American Public Media ("APM"), which permits APM to distribute audio news media from the BBC World Service to public radio stations in the United States. APM is based in Minnesota, not Louisiana. BBC understands that Red River Radio pays APM, an independent third party, for the right to broadcast media that was originally generated by the BBC World Service to Red River Radio's own listeners.

21.     Further, although his declaration is unclear, Mr. Creter's statement about Red River Radio's listener numbers is not about BBC World Service, but is about the radio station itself.

**IV.     BBC Does Not Distribute the BBC America or BBC News Television Channels**

22.     Similarly, paragraph 33 of the Creter Declaration discusses television news channels and YouTube, and claims that:

> In the Western District of Louisiana, BBC news programming can be seen on television or by streaming Comcast Xfinity (channel 99), Direct TV (channel 346), AT&T (channels 207 and 1207), and a BBC YouTube Channel.

23.     Although Mr. Creter's declaration is unclear, he appears to reference two separate television channels, BBC America and BBC News (formerly known as BBC World News). BBC has no involvement with the distribution of either television channel in the United States. As Mr. Creter concedes, the right to distribute the BBC News television channel is owned by BBC Studios, and the BBC America channel is a joint venture between AMC Networks and BBC Studios. I understand that AMC Networks holds the licensing rights for both television channels. AMC would be the party that negotiates contracts with entities like Comcast, Direct TV, or AT&T and permits those entities to broadcast either channel to their own customers in the United States. I am not aware that the BBC has any relevant contractual relationship with Comcast, Direct TV, or AT&T; nor that that BBC has engaged in any related transactions with those entities.

24.     YouTube and BBC have a contract whereby BBC posts media to YouTube, which hosts and distributes that content globally to YouTube's own viewers. That contract prohibits BBC from selling advertising in relation to the media it posts on YouTube. BBC does not engage in transactions with people to whom YouTube distributes news media.

25.     I am not aware that any of the relevant Comcast, Direct TV, AT&T, or YouTube entities are based in Louisiana, and Mr. Creter presents no evidence to that effect. Either way, those entities, not BBC, make content available on their own platforms to their own customers throughout the United States. BBC does not transact business with those customers.

**V.     BBC and BBC Studios Are Legally Required to be Independent and Arm's Length**

26.     In paragraphs 45-48 of his Declaration, Mr. Creter falsely casts BBC as dominating BBC Studios and its commercial activities.

27.     Initially, Mr. Creter does not take issue with paragraph 8 of the Munro Declaration, which bears repeating:

> The BBC and BBC Studios have separate corporate existences, boards of directors, and executive teams, and have no overlapping employees. BBC Studios' management controls that entity's day-to-day decisions, business affairs, and operations.

28.     Mr. Creter is correct that the Royal Charter sets out certain supervisory responsibilities for the BBC's Board concerning BBC Studios, but those responsibilities do not support Plaintiffs' contentions that BBC controls and dominates BBC Studios operations.

29.     Mr. Creter fails to acknowledge the strict and detailed regulatory framework, which is a matter of public record, that requires BBC and BBC Studios to be "arm's length" and "independent" entities. As with BBC's restriction against commercial activity, Ofcom closely monitors and enforces the independence of BBC and BBC Studios.

30.     To take a few examples from the Ofcom Rules that BBC and BBC Studios are each required to follow, Part 2(A) of Ofcom's rules are titled "Separate subsidiary and operational separation requirements." They provide the following "requirements":

> A.1. The BBC must not directly undertake any Commercial Activities. All Commercial Activities must be undertaken through Commercial Subsidiaries at arm's length from the Public Service and on commercial terms.
>
> A.4. The Commercial Subsidiaries must be run by boards and executive committees of directors which are distinct and separate from the BBC Board and its executive committees. These boards and executive committees must also consist of an appropriate number of directors who are not members of the BBC Board and/or its executive committees.
>
> A.5. The BBC must have in place appropriate measures, controls and processes to ensure that where a director serves on the board and/or executive committee of both the Public Service and a Commercial Subsidiary or Joint Venture, any potential conflicts of interest are identified, recorded and addressed.

Exhibit 1 at 14.

31.     Further, as explained in a related section of the Ofcom Rules on "Governance arrangements":

> The purpose of Requirements A.4 and A.5 is to … ***ensure that the governance of the Commercial Subsidiaries is consistent with an arm's length relationship*** with the Public Service, and that Commercial Subsidiaries are ***sufficiently independent*** in objective setting, strategy and decision making.

Exhibit 1 at 16 (emphasis added).

32.     As a result of this regulatory and governance framework, BBC is highly limited in the extent to which it can exert control over BBC Studios' operations.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:   _29_ August 2023
London, England

Chris Lloweth

# Exhibit 1

## Ofcom Rules



# The BBC's commercial and trading activities: requirements and guidance

Statement on modifications to Ofcom's requirements and guidance

**STATEMENT:**

Publication Date: 11 February 2019

# Contents

**Section**

1. Overview                                      1

2. Introduction                                  3

3. Operational separation                        12

4. Supply and pricing of goods and services      38

5. Commercial rate of return                     54

6. Monitoring, reporting and transparency        62

# 1. Overview

**The BBC's role is to act in the public interest and serve all audiences with content which informs, educates and entertains. The BBC may only carry out commercial activities through subsidiary companies. The BBC's commercial subsidiaries exist to generate returns which can be reinvested in BBC programmes and services and supplement income from the licence fee. In carrying out their activities, the commercial subsidiaries may have access to certain services, information and infrastructure from within the licence fee funded part of the BBC (the Public Service). Because of these relationships, there is a risk that, without appropriate safeguards, the BBC's Public Service could be used to subsidise or benefit these subsidiaries, for example by offering services on favourable terms. To protect fair and effective competition we imposed a number of requirements on the BBC to ensure that its commercial and trading activities do not, as a result of their relationship with the Public Service, distort the market or create an unfair competitive advantage.**

This document sets out our decisions to modify these requirements following work we have undertaken to develop our understanding of the processes and practices around the operation of the BBC's commercial subsidiaries and their relationships with the Public Service. Alongside this document, we are also publishing an updated version of the requirements and guidance.

---

### What we have decided – in brief

We have clarified a number of the existing requirements and introduced some additional reporting measures to provide greater transparency of how the BBC is meeting our requirements:

*Operational separation*

The operational separation obligations require that the governance of the commercial subsidiaries is distinct and separate from the Public Service and place restrictions on the commercial subsidiaries accessing information regarding the Public Service's strategy, priorities and activities which is not available to third parties.

**We have broadly retained the existing requirements with some clarificatory amendments. We have also introduced new transparency and monitoring obligations, including a requirement on the BBC to publish an Annual Statement on operational separation.** This will give us and other stakeholders confidence that an appropriate internal framework has been developed to ensure compliance with the requirements around information sharing and governance.

BBC's commercial and trading activities: statement on Ofcom's requirements

*Supply and pricing of goods and services*

These requirements regulate the terms and conditions on which the Public Service and commercial subsidiaries sell goods and services to each other. They also cover goods and services sold by the Public Service to third parties.

**We remain of the view that the BBC should set prices for goods and services based on the relevant market price or market benchmark. Where there is no available or reliable market information, prices should be based on costs.** We have decided that prices for business support services that the Public Service only provides to the commercial subsidiaries, such as HR, IT, finance and legal, should be based on their long run costs of provision.

*Commercial rate of return*

The BBC is required to earn a commercial rate of return on its commercial activities. **We have clarified that the BBC must earn a commercial rate of return for each line of business as well as each commercial subsidiary.** We also clarified that the BBC must earn, assess and set a commercial rate of return over an appropriate period of time and that it must notify Ofcom and take appropriate steps if it considers a line of business is not expected to earn a commercial rate of return over an appropriate period.

*Monitoring, reporting and transparency*

The monitoring, reporting and transparency requirements support all the other requirements. **We have decided to introduce additional reporting requirements to provide us and other stakeholders with increased transparency.** We have also reduced the frequency of the existing quarterly reporting to biannual and provided further clarity for some of the reporting requirements. This will enable us to monitor the relationship between the Public Service and the commercial subsidiaries and to fulfil our duties more effectively.

*Other changes*

We have made it clear where appropriate that the requirements apply to joint ventures that the commercial subsidiaries have entered into. We have also made a number of changes so that the requirements are clearer, more precise and less repetitive and have included definitions of certain terms. Such changes should ensure that the BBC and other stakeholders better understand how the requirements and guidance apply to the BBC.

*Implementation timing*

**Our decisions take effect from the date of this statement**. It will therefore apply to the target rates of return information for the 2019/20 financial year to be provided to Ofcom by the end of March 2019 and information required at the same time as the BBC's Annual Report and Accounts for the 2018/19 financial year due in July 2019. The first Annual Statement on Operational Separation is also due in July 2019.

This overview is a simplified high-level summary only. The decisions we have taken and our reasoning are set out in the full document.

BBC's commercial and trading activities: statement on Ofcom's requirements

# 2. Introduction

2.1     The BBC's role is to act in the public interest and serve all audiences with content which informs, educates and entertains. Under the Charter[1] and Agreement[2] the BBC may only carry out commercial activities through subsidiary companies. The BBC's commercial subsidiaries exist to generate a return which can be reinvested in BBC programmes and services and supplement income from the licence fee.

2.2     In carrying out their activities, the commercial subsidiaries have access to certain services, information and infrastructure from within the licence fee funded part of the BBC. Therefore, there are flows of funds and assets between the licence fee funded activities and the commercial activities. Because of these relationships, there is a risk that, without appropriate safeguards, the BBC's public funding could be used to subsidise or benefit these subsidiaries, for example by offering services on favourable terms.

2.3     Competition concerns may arise if third parties are less able to compete effectively because of the relationship between the Public Service[3] and the commercial subsidiaries. For example, if the subsidiaries were able to sustain ongoing losses, they could offer goods and services below market prices (and their actual costs). Alternatively, if they had access to information about the Public Service's strategy and priorities that was not available to third parties, they may be in a better competitive position than their rivals. This may distort competition by giving the commercial subsidiaries an unfair competitive advantage compared to their rivals.

2.4     One of Ofcom's principal functions in regulating the BBC is to set requirements in relation to the interaction between the BBC and its commercial activities. We must set the requirements we consider appropriate to ensure that commercial activities do not, as a result of their relationship with the Public Service, trading activities[4] or non-service activities, distort the market or create an unfair competitive advantage.

2.5     We published requirements and guidance in respect of the BBC's commercial activities in March 2017[5] and the BBC's commercial and trading activities in July 2017[6] (the "2017

---

[1] In this document we refer to the Royal Charter for the continuance of the British Broadcasting Corporation as the "Charter", available at https://www.gov.uk/government/publications/bbc-charter-and-framework-agreement.

[2] The "Agreement" we refer to in this document is the Agreement between the Secretary of State for Culture, Media and Sport, and the BBC, available at https://www.gov.uk/government/publications/bbc-charter-and-framework-agreement.

[3] References to the 'Public Service' in the rest of this document should be read as references to BBC's UK Public Services, trading activities and non-service activities.

[4] "Trading activities" are activities which are commercial in nature but are not to be treated as commercial activities. Trading activities involve the provision of goods and services by the BBC to its commercial subsidiaries, third parties and the general public. Trading activities are set out in Clause 31(1) and 31(2) of the agreement and within Annex 1 of the 2017 Requirements defined in paragraph 2.5.

[5] Regulating the BBC's impact on competition: statement on requirements and guidance, 29 March 2017 is available at: https://www.ofcom.org.uk/__data/assets/pdf_file/0037/99577/BBCCompetitionStatement.pdf.

[6] The BBC's commercial and trading activities: A consultation on proposed modifications to Ofcom's requirements and guidance, 26 July 2017 is available at: https://www.ofcom.org.uk/__data/assets/pdf_file/0025/99412/bbc-commercial.pdf.

Requirements"). The 2017 Requirements form part of the BBC's Operating Framework.[7] In October 2017, we also set out deadlines regarding the BBC's publishing or providing of information to Ofcom in relation to the 2017 Requirements.[8] We noted at the time that we were undertaking further work to develop our understanding of the processes and practices around the operation of the BBC's commercial subsidiaries and their relationships with the Public Service and, if required, we would consult on revised requirements. This statement sets out our decisions, following a consultation in July 2018[9] ("July 2018 Consultation"), to modify the 2017 Requirements, given this additional work and our experience of how the current rules have worked in practice. Alongside this statement, we have published an updated version of the requirements and guidance[10] ("2019 Requirements").

## Role of the BBC and the commercial subsidiaries

2.6     The Charter and Agreement place a number of obligations on the BBC regarding commercial activities carried out by its commercial subsidiaries. It must ensure that these commercial activities fit with its Mission and Public Purposes, are commercially efficient, do not jeopardise the BBC brand and do not distort the market or gain an unfair competitive advantage as a result of their relationship with the Public Service. Together, these obligations are known as the commercial criteria.[11]

2.7     As part of its duty to ensure that the BBC fulfils the Mission and promotes the Public Purposes, the BBC Board sets a strategy for the BBC's commercial activities.[12] It must also consider proposals for material changes to these activities and assess them against the commercial criteria.[13]

2.8     The Public Service may carry out trading activities and the Charter places a number of duties on the BBC in relation to these activities.[14] The BBC must have regard, amongst other things, to the competitive impact of these activities.

---

[7] For details of the Operating Framework, see our website: https://www.ofcom.org.uk/tv-radio-and-on-demand/information-for-industry/bbc-operating-framework/operating-framework.

[8] BBC Commercial Activities: Statement, Deadlines for the publication and provision of information under the Monitoring, Reporting and Transparency requirements is available at: https://www.ofcom.org.uk/__data/assets/pdf_file/0026/107189/reporting-deadlines.pdf.

[9] The BBC's commercial and trading activities: A consultation on proposed modifications to Ofcom's requirements and guidance available at: https://www.ofcom.org.uk/consultations-and-statements/category-2/bbc-commercial-trading-activities.

[10] The BBC's commercial and trading activities: requirements and guidance, Ofcom's requirements and guidance, 8 February 2019. https://www.ofcom.org.uk/__data/assets/pdf_file/0018/136071/BBC-commercial-trading-updated-requirements.pdf.

[11] Agreement, Clause 23 (5).

[12] Charter, Article 20 (3) (j).

[13] Charter, Article 20 (5).

[14] Charter, Articles 9 to 17.

**BBC's commercial and trading activities: statement on Ofcom's requirements**

2.9     At the time of publication, the BBC undertakes commercial activities through three main commercial subsidiaries:[15]

   a)   BBC Studios, which produces programme content for the BBC and the wider market. BBC Studios also sells programmes and formats around the world, as well as carrying out a number of other activities. In April 2018, BBC Studios replaced two commercial subsidiaries: BBC Worldwide and the former BBC Studios.[16] As part of this merger, the BBC provided commitments[17] (the "Commitments") intended to preserve transparency over the relationship between the Public Service and the new Studios;

   b)   BBC Studioworks, which provides studio facilities and post-production services; and

   c)   BBC Global News, which operates the BBC's commercial international news TV channels and websites.

## Our role and duties

2.10    Ofcom's functions in relation to the BBC's commercial activities are limited to issues concerning the separation of the Public Service from the commercial activities carried out by the commercial subsidiaries.

2.11    Under the Agreement, Ofcom must set the requirements it considers appropriate to ensure separation between the Public Service and the commercial subsidiaries, which may include requirements to ensure that:

   •   relationships between the Public Service and the commercial subsidiaries operate at arm's length on commercial terms;
   •   commercial activities are carried out in accordance with normal market principles, including making a commercial rate of return; and
   •   the relationship between the Public Service and the commercial subsidiaries is appropriately transparent, including providing Ofcom with financial reports and the publication of information.

2.12    Under the Agreement, Ofcom must also set out how it will regulate the trading activities and the procedures to be followed, including such requirements as Ofcom considers appropriate to protect fair and effective competition.

2.13    Accordingly, and as discussed in paragraph 2.5, we published requirements in 2017. Our objective was to ensure that the BBC's commercial activities do not, as a result of their relationship with the Public Service, distort the market or create an unfair competitive

---

[15] Where we refer to commercial subsidiaries, we mean the three commercial entities and any which may come into existence in the future. Where we refer to commercial activities, we adopt the definition contained in the Charter and Agreement.

[16] The former BBC Studios produced programme content but was not involved in selling programmes and formats around the world.

[17] The merger of BBC Studios and BBC Worldwide. The BBC's Commitments are available at: https://www.ofcom.org.uk/__data/assets/pdf_file/0014/112334/BBC_commitments_to_Ofcom.pdf.

advantage. The requirements were also designed to protect fair and effective competition in relation to trading activities.

## Purpose of this statement

2.14 The 2017 Requirements were based primarily on the requirements previously put in place by the BBC Trust. As we explained at the time, we have undertaken further work engaging with stakeholders, and have developed our understanding of the processes and practices around the operation of the BBC's commercial subsidiaries and their relationships with the Public Service. We have also received information from the BBC under the requirements and have assessed whether they are practicable and enable us to fulfil our duties.

2.15 Based on this further work, in July 2018 we published proposals to modify the requirements. We received responses from the BBC, ITV, Pact and Sky[18] to our consultation.[19] The BBC welcomed many of our clarifications, but challenged most of our proposed new requirements, particularly the new reporting requirements, mainly on the basis that they were not proportionate. In general, other stakeholders were supportive of our proposals particularly regarding additional reporting requirements, welcoming as much transparency as possible.

2.16 In this statement, we set out our decisions to modify the 2017 Requirements. We have not modified all of the requirements and have not set out details where we have retained the existing requirements. In reaching our decisions we have carefully considered the responses to our consultation and evidence provided by stakeholders. We have broadly decided to adopt our consultation proposals with some modifications in a number of areas. We set out the basis for our decisions in this statement and consider the modifications are appropriate pursuant to our obligations under the Charter and Agreement.

2.17 In carrying out our role and making the decisions set out in this statement, we have had regard to our general duties under the Communications Act 2003 (the "Act") and under the Charter, including the requirement under Article 45(2) of the Charter to have regard to the desirability of protecting fair and effective competition in the United Kingdom.[20] We have also carefully considered the proportionality of our decisions in light of section 3(3) of the Act which requires us to ensure that our interventions must be targeted only at cases in which action is needed. We believe that our decisions meet all of the legal tests.

---

[18] As part of Sky's response to our consultation, it attached extracts from its response to Ofcom's consultation dated 28 February 2017, which responded to Ofcom's consultation on the proposals for the 2017 Requirements. We have re-considered Sky's response in light of our current understanding and current market context. Broadly, we believe our response to Sky's comments in 2017 still apply. Where this is not the case, we set out Sky's response and address the points raised in this statement.

[19] Non-confidential versions of the responses are available here: https://www.ofcom.org.uk/consultations-and-statements/category-2/bbc-commercial-trading-activities.

[20] The legal framework is set out in Sections 1 and 2 of the 2017 Requirements.

**BBC's commercial and trading activities: statement on Ofcom's requirements**

2.18    The requirements and guidance will be kept under review and amended as appropriate in light of any change to our powers and responsibilities. We will provide an explanation where we depart from the approach set out in the guidance.

## Competition concerns

2.19    We have considered and identified risks and competition concerns that the commercial subsidiaries could, as a result of their relationship with the Public Service, distort the market or gain an unfair competitive advantage. The requirements are ex ante rules which seek to address these risks and concerns.[21] In this statement, we explain the risks and concerns we are seeking to address through our revised requirements.

### Commercial activities

2.20    Competition concerns may arise if third parties are less able to compete effectively because the relationship between the Public Service and the commercial subsidiaries gives the subsidiaries an unfair competitive advantage.

2.21    This could occur, for example, if the subsidiaries had access to information about the Public Service's strategy and priorities that was not available to third parties. This may distort competition by giving the commercial subsidiaries an unfair competitive advantage compared to their rivals. Another concern might be that the subsidiaries could distort markets by offering goods and services at prices below cost, sustaining ongoing losses that would not be viable for commercial competitors.

2.22    In both of these cases, if the commercial subsidiaries receive an unfair competitive advantage, suppliers who compete with them may be less able to attract customers and/ or expand, or may be forced to exit the market entirely. This may lead to less innovation and investment, and ultimately worse outcomes for UK consumers in terms of their access to quality services.

### Trading activities

2.23    Concerns may also arise where the Public Service is offering goods and services to the wider market.

2.24    Competition concerns will vary depending on the nature and scope of the trading activity in question. However, they are likely to stem from one of the following concerns:

   a) Discriminatory pricing/access: when the BBC supplies products or services to third parties, it may do so in an unduly discriminatory manner. This could include charging different prices to different third parties for the same service, granting preferential access or refusing to supply to certain third parties. Trading in this way may put some parties at a competitive disadvantage.

---

[21] Our competition concerns are set out in paragraphs 3.6 to 3.14 of our 2017 Requirements.

BBC's commercial and trading activities: statement on Ofcom's requirements

b) Pricing below market norms: there is a risk that the Public Service offers goods and services to third parties at below market price, due to advantages that it may enjoy as a large publicly funded body, which could make it difficult for suppliers of similar services to compete.

2.25    The risk of adverse effects from this type of behaviour will depend on the nature of the activity in question.

## Developments since the 2017 Requirements were put in place and other related work

2.26    There have been several developments since the 2017 Requirements were put in place. As discussed in paragraph 2.9, the BBC merged two of its commercial subsidiaries creating the newly formed Studios in April 2018. The BBC assessed the proposed merger and concluded that it did not constitute a material change as defined in the Agreement. We considered that there might be some potential concerns arising from bringing the BBC's two largest commercial subsidiaries together, in particular in relation to transparency. As discussed above, the BBC provided Commitments in respect of the proposed merger. Taking the characteristics of the BBC's proposed change, our requirements, and the Commitments provided by the BBC together, we did not consider it would be appropriate to conduct a formal assessment of the change under the Agreement. We have announced a review of BBC Studios and we are planning to publish a document in relation to this review towards the end of 2018/19.

2.27    In relation to the monitoring, reporting and transparency requirements, since the 2017 Requirements came into effect, the BBC has published and submitted information to us including the Annual Report and Accounts for 2017/2018,[22] as well as its Annual Report and consolidated financial statements for its commercial subsidiaries.[23] We have worked with the BBC to understand this financial information, and have discussed and considered stakeholder concerns raised about the reporting requirements and the information the BBC has published. We said in our 2017 Requirements that reporting was an area that was likely to evolve over time as we develop our understanding.

2.28    There are also several related activities which we and other stakeholders have recently undertaken or are currently undertaking. We have considered the outputs of these related activities in reaching our decisions set out in this statement.

2.29    Schedule 3(7) of the Agreement places requirements on the BBC to ensure that more of the programmes and materials for its UK public services are made as a result of a contestable process on a fair, reasonable, non-discriminatory and transparent basis between different types of producer. Today, we have also published a statement setting

---

[22] See BBC Annual Report and Accounts, 2017/18
http://downloads.bbc.co.uk/aboutthebbc/insidethebbc/reports/pdf/bbc_annualreport_201718.pdf.
[23] See Commercial Holdings Limited Accounts 2017/18
http://downloads.bbc.co.uk/aboutthebbc/insidethebbc/reports/pdf/commercial_holdings_limited_accounts_201718.pdf.

8

out how we have decided to fulfil our role in assessing and enforcing these requirements (the "Commissioning Requirements").[24]

2.30    In March 2018, the National Audit Office ("NAO") published a landscape review of the BBC's commercial activities[25] and the Public Accounts Committee ("PAC") also published a report on the commercial activities in July 2018.[26]

2.31    The BBC was also required to carry out and publish a review of whether the commercial activities meet the commercial criteria by 31 December 2018 ("BBC Commercial Review"). As part of this review, the BBC was required to set and publish measures, and targets for those measures, for each subsidiary so that it could assess whether the activity is commercially efficient (subject to not jeopardising the ability of the subsidiaries to operate effectively in the market).[27] The BBC published its review of whether the commercial subsidiaries were meeting the commercial criteria (including a report from Ernst and Young ("EY") on 17 December 2018.[28] This review found that the commercial activities carried out through the BBC's commercial subsidiaries meet the four commercial criteria. However, EY set out a number of recommendations in certain areas in order to ensure ongoing compliance with the criteria. The BBC Board accepted these recommendations and has said it will begin implementation of the recommendations. The BBC also published its targets for each of its main commercial subsidiaries to achieve over a three to five year period.[29] We discuss the findings of the commercial review in the detailed sections of this statement as appropriate.

2.32    In addition, in December 2018 the BBC announced changes to the governance of the BBC commercial subsidiaries including changes to the membership and composition of the Commercial Holdings Board (the governance body with responsibility for the oversight of the commercial subsidiaries). We discuss the changes the BBC has made in Section 3 on operational separation.

2.33    On 5 February 2019, the BBC published the results of its transparency reviews for the Public Service and commercial activities, undertaken by Will Hutton and Chris Saul. These reviews concluded that the BBC already has, in recent years, built high levels of

---

[24] https://www.ofcom.org.uk/__data/assets/pdf_file/0024/134349/statement-bbc-commissioning-public-services.pdf.

[25] This report examined how the commercial activities are organised, overseen and regulated, how the activities have fared in terms of their commercial performance and contribution to the BBC's public purposes, and how the BBC is responding to the opportunities and challenges its commercial activities face. See, 'The BBC's Commercial Activities: A Landscape Review' NAO: https://www.nao.org.uk/wp-content/uploads/2018/03/The-BBCs-commercial-activities-a-landscape-review.pdf.

[26] This report considered that the BBC is facing increasing challenges from competitors and its commercial subsidiaries are working in increasingly competitive markets. It also noted that the commercial performance has been flat in recent years and the BBC faces significant risks to future performance. The report therefore considered that the licence fee payer has a fundamental interest in the value that the BBC's commercial activities deliver, for which the BBC Board is accountable. See: https://publications.parliament.uk/pa/cm201719/cmselect/cmpubacc/670/67003.htm#_idTextAnchor000.

[27] Agreement, Clause 29 (1) (4).

[28] Details of the review are available on the BBC website: https://www.bbc.co.uk/mediacentre/latestnews/2018/commercial-review.

[29] BBC Studios has an Earnings Before Interest, Tax, Depreciation and Amortisation ("EBITDA") margin target of 9-11%, BBC Global News has an EBITDA margin target is breakeven to 2% and BBC Studioworks has an EBITDA margin target of 8-10%.

transparency but made some recommendations on how it could go even further.[30] Chris Saul reviewed the BBC's approach to transparency in its commercial subsidiaries ("the BBC Commercial Transparency Review") and found that the overall level of transparency of the commercial subsidiaries in the areas of governance, regulation and pay and reward is at least as good as that to be found in peer businesses. The review also set out some recommendations for improvements in transparency in relation to governance, regulation and pay and reward. Following Chris Saul's review, the BBC has committed to a number of things including:

a)  Provide more detailed annual reporting and narrative on strategy for BBC Studios;

b)  Undertake further work in developing business performance measures for the commercial operations;

c)  Improve disclosure in relation to the commercial subsidiaries governance and regulation;

d)  Consider how to embed the new pay systems in the commercial side of the BBC; and

e)  Consider how to give more detail on BBC Studios overall spend on talent in its annual reporting.

2.34   We welcome the actions being undertaken by the BBC to improve transparency and discuss the findings of the review in the detailed sections of this statement as appropriate.

## Impact assessment

2.35   Impact assessments provide a valuable way of assessing different options for regulation and showing why the preferred option was chosen. They form part of best practice policy-making. This is reflected in section 7 of the Act, which means that generally we have to carry out impact assessments where our proposals would be likely to have a significant effect on businesses or the general public, or when there is a major change in Ofcom's activities. However, as a matter of policy Ofcom is committed to carrying out impact assessments in relation to the great majority of our policy decisions.[31]

2.36   We set out our impact assessment in the July 2018 Consultation. In this statement, we take into account relevant responses and set out our conclusions on the impact of the changes.

## Equality impact assessment

2.37   Ofcom is separately required by statute to assess the potential impact of all our functions, policies, projects and practices on race, disability and gender equality. Equality Impact Assessments ("EIA") also assist us in making sure that we are meeting our principal duty of

---

[30] BBC announces next steps to boost transparency available at:
https://www.bbc.co.uk/mediacentre/latestnews/2019/transparency-report.
[31] For further information about our approach to impact assessments, see the guidelines, Better policy-making: Ofcom's approach to impact assessment, which are on our website:
http://stakeholders.ofcom.org.uk/binaries/consultations/ia_guidelines/summary/condoc.pdf.

furthering the interests of citizens and consumers regardless of their background or identity.

2.38    It is not apparent to us that the decisions set out in this statement are likely to have any particular impact on race, disability and gender equality. Specifically, we do not envisage the impact of any outcome to be to the detriment of any group of society. Nor do we envisage any need to carry out separate EIAs in relation to race or gender equality or equality schemes under the Northern Ireland and Disability Equality Schemes. This is because we anticipate that our regulatory intervention will not have a differential impact in relation to people of different gender or ethnicity, on consumers in Northern Ireland or on disabled consumers compared to consumers in general. Similarly, we do not consider that our decisions will have a particular impact on consumers in different parts of the UK or between consumers on low incomes.

## Structure of this statement

2.39    The remainder of this document is organised as follows:

   a)  Section 3 sets out our decisions on the operational separation requirements;

   b)  Section 4 sets out our decisions on the supply and pricing of goods and services;

   c)  Section 5 sets out our decisions on the commercial rate of return requirements; and

   d)  Section 6 sets out our decisions on monitoring, reporting and transparency.

2.40    In Annex 1 we set out our decisions in relation to our proposed templates on monitoring, reporting and transparency (including a summary of stakeholder responses on this issue and our responses to these).

2.41    We have separately published our updated requirements and guidance incorporating the decisions made in this statement.

**BBC's commercial and trading activities: statement on Ofcom's requirements**

# 3. Operational separation

## Introduction

3.1     The operational separation requirements address 'non-financial' and structural aspects of the relationship between the Public Service and the commercial subsidiaries. They relate to the exchange of information and governance arrangements which we discuss in turn in this section.

3.2     As explained in Section 2, our competition concern is that third parties may be able to compete less effectively if the relationship between the Public Service and the commercial subsidiaries gives the subsidiaries an unfair competitive advantage. In the context of the operational separation requirements, we are particularly concerned that the commercial subsidiaries might have access to Public Service information not available to others, which may put them at a competitive advantage. Our requirements in this area are complementary to, and support compliance with, our other requirements that relate to the financial flows between the Public Service and the commercial subsidiaries.

3.3     In our consultation, we set out our proposals on whether, and to what extent, existing requirements need to be modified, or whether further guidance was required, to clarify our expectations. We also considered whether there was a need for greater transparency – for stakeholders and for us – regarding how the BBC is implementing its operational separation obligations.

3.4     In this section we set out our decisions to broadly maintain our 2017 Requirements on operational separation, although we are making some clarificatory amendments. We have also decided to introduce new transparency and monitoring obligations, including a new requirement on the BBC to publish an Annual Statement on Operational Separation.

3.5     We have also made explicit in the changes to the requirements and guidance that they apply to joint ventures[32] that the commercial subsidiaries participate in.

## Current requirements and duties on the BBC

3.6     The Agreement states that the BBC must not directly undertake any commercial activities, and they must instead be provided through one or more commercial subsidiaries.[33] The

---

[32] In the consultation we proposed to define joint venture by reference to shareholding. The BBC pointed out that there is an accepted definition of joint venture in the International Financial Reporting Standards (IFRS) which the BBC uses for its statutory reporting. That definition uses the concept of joint control and we have therefore aligned our definition in the requirements with the definition in the IFRS.

[33] Agreement, section 23, paragraph (4) and section 28, paragraph (1) (ii), http://downloads.bbc.co.uk/bbctrust/assets/files/pdf/about/how_we_govern/2016/agreement.pdf.

Operating Framework that we have put in place for the BBC includes a 'separate subsidiary' requirement which reflects this part of the Agreement.[34]

3.7   As set out in Section 2, the BBC is required to ensure that the commercial activities do not distort the market or gain an unfair competitive advantage as a result of their relationship with the Public Service.[35] The commercial activities must also fit with the BBC's Mission and Public Purposes and the BBC Board is responsible (amongst other things) for setting strategy and governance arrangements consistent with that aim and assessing their effectiveness.[36]

3.8   Our requirements on operational separation require an appropriate level of separation in the relationship between the Public Service and the commercial subsidiaries.[37] They cover two areas:

- Exchange of information – restrictions on information regarding the Public Service that is not available to third parties which can be accessed by the commercial subsidiaries and gives them a competitive advantage, and mechanisms to ensure that privileged information is only used for the specific purposes for which it was obtained; and

- Governance arrangements – requirements to ensure that governance of the commercial subsidiaries is distinct and separate from the Public Service governance, with measures in place to ensure that any potential conflicts of interest that arise from cross-directorships are identified and managed.

## Competition concerns and regulatory approach

3.9   In this sub-section we set out our competition concerns arising from the relationship between the Public Service and the commercial subsidiaries and outline our approach to regulating this relationship. This approach informs our decisions regarding the operational separation requirements and guidance, and the related reporting requirements, addressed in more detail below.

---

[34] We have modified the separate subsidiary requirement to make clear that the commercial subsidiaries should be at arm's length from the Public Service and have brought it together with the operational separation requirements. As the guidance related to the separate subsidiary requirement duplicated the requirement, we have decided to remove the guidance. We do not consider that any additional guidance is necessary.

[35] Agreement, section 23, paragraph (5).

[36] Charter, Article 20 (3) (j).

[37] We also note that operational separation is covered in the Commitments. The BBC Board and BBC Fair Trading Committee have committed to monitor operational separation and the external annual Fair Trading Audit considers the effectiveness of the BBC's controls including operational separation. The Auditor's report is published as part of the BBC Annual Report and Accounts (which was last published in July 2018). The Commitments also cover information flows between the Public Service and BBC Studios as well as conflicts of interest procedures in BBC Studios. The Commitments also required the BBC to publish a structure chart of BBC Studios.

BBC's commercial and trading activities: statement on Ofcom's requirements

## Summary of consultation proposals

3.10   Our primary concern in relation to operational separation was that the relationship between the Public Service and the commercial subsidiaries might distort competition by giving the commercial subsidiaries an unfair advantage compared to their rivals.

3.11   Specifically, we were concerned that the commercial subsidiaries, due to their relationship with the Public Service, may have access to information which is not available to their rivals and puts them at a competitive advantage. We identified a risk of information sharing both at governance and operational levels.

3.12   We also said there was a risk that the influence of the Public Service could shape the governance of the commercial subsidiaries in a way that could give them an unfair advantage.

3.13   We therefore considered that it was appropriate to continue to have rules in place to ensure that the Public Service has an arm's length relationship with its commercial subsidiaries, including restrictions on information exchange and governance requirements.

## Summary of stakeholder responses

3.14   Pact noted our competition concerns about the relationship between the Public Service and the commercial subsidiaries and agreed the relationship should therefore be at arm's length.[38]

3.15   The BBC set out two potential theories of harm in relation to information sharing. It recognised that the commercial subsidiaries may have access to information which could provide them with an unfair advantage (e.g. commissioning). The BBC also considered that the commercial subsidiaries may have access to information about their competitors which the Public Service holds through its business interactions (e.g. information about pricing from independent producers or studios facilities businesses) which could provide them with an unfair advantage.[39]

3.16   In addition, the BBC was concerned about several aspects of Ofcom's underlying rationale driving the operational separation proposals. In particular, the BBC argued that the reference to "arm's length on commercial terms" in the Agreement applies to financial separation rather than operational separation and governance.[40] It therefore did not agree that this was an appropriate starting point from which to consider the degree of separation between the BBC and its commercial subsidiaries.

3.17   The BBC was also concerned that our objectives in imposing operational separation regulations were more akin to monopoly regulation, rather than the state aid concerns

---

[38] Pact response to the July 2018 Consultation, paragraph 2.1.1, page 4.
[39] BBC response to the July 2018 Consultation, page 8.
[40] BBC response to the July 2018 Consultation, paragraph 1.1, page 5.

that underpin regulation of the BBC.[41] It said that the Openreach model is clearly not an appropriate one for the BBC.

## Our analysis and decisions

3.18   The Agreement provides that the Operating Framework for the BBC must include requirements Ofcom considers appropriate to address any risks of market distortion or creation of an unfair competitive advantage as identified by Ofcom. In particular, the requirements may include rules to ensure appropriate separation between the BBC and its commercial subsidiaries, including by requiring that the relationship between the BBC and its commercial subsidiaries is at an arm's length on commercial terms.[42] The Agreement does not specify that the arm's length principle applies only to financial separation, as the BBC argues. We consider that the provisions which refer to appropriate separation are sufficiently wide to include both financial and non-financial operational separation. As explained below, given the nature of our competition concerns, both forms of separation are necessary to address those concerns.

3.19   We remain concerned that the relationship between the Public Service and the commercial subsidiaries could distort competition by giving the commercial subsidiaries an unfair advantage compared to their rivals and therefore believe that the BBC should be subject to regulatory obligations. In particular, we consider that the requirements need to address the risks that:

- Public Service information is shared with the commercial subsidiaries at governance and/or operational levels which gives them a competitive advantage that is not available to third parties; and

- the influence of the Public Service controls or shapes the governance of the commercial subsidiaries in a way that does not support our information sharing and other requirements. Such undue influence could give the commercial subsidiaries an unfair competitive advantage, including by leading to activities not being carried out on a commercial basis.

3.20   If the BBC engages in these behaviours, rivals competing in markets with the commercial subsidiaries, who are equally or more efficient, may be at a competitive disadvantage.

3.21   We consider it is appropriate to require that the Public Service, as a licence fee funded organisation, does not distort the market in this way. Our requirements support competition in the markets in which the commercial subsidiaries and third parties operate, which should in turn lead to benefits for consumers in the form of higher quality, better value content.

3.22   Our competition concerns also reflect the ongoing relationship between the Public Service and the commercial subsidiaries and what we consider could happen if there was no regulation on the BBC. Articulating these concerns helps to shape the remedies that we

---

[41] BBC response to the July 2018 Consultation, page 6.
[42] Agreement, Section 28 (1)(a)(ii).

have put in place and seeks to ensure that they are the minimum necessary to respond to the potential problems we have identified.

3.23   The BBC broadly acknowledged the theories of harm in relation to the commercial subsidiaries having access to Public Service information that could provide them with an unfair advantage (both in relation to the Public Service's strategy and information about their competitors). We agree with the BBC that these are potential risks that our regulation is designed to address.

3.24   Our requirements have been specifically designed to address the competition concerns that we have identified with regard to the relationship between the Public Service and the commercial subsidiaries. It would not be appropriate for our regulation in this area to replicate what Ofcom has put in place for other sectors given the differences in the relevant markets and regulatory and legal frameworks. We have clearly set out in this statement our reasoning for the changes to the requirements in the context of the BBC and the Charter and Agreement, including the BBC's obligations to ensure that the commercial activities fit with the commercial criteria.

3.25   We therefore disagree with the BBC's suggestion that our regulation of the BBC may be based on objectives that more typically apply in monopoly regulation, rather than with the state aid concerns that underpin regulation of the BBC. Our operational separation requirements on the BBC differ substantially from our regulatory approach to the relationship between BT and Openreach for example.

3.26   We also note that the framework governing state funding of public service broadcasting as applied by the European Commission identifies the same concerns which underpin our operational separational requirements.[43] This framework emphasises that there should be a clear and appropriate separation between public service activities and non-public service activities, including functional or structural separation, and that public service broadcasters should maintain an arm's length relationship with their commercial subsidiaries.[44]

# Annual Statement on Operational Separation

## Summary of consultation proposals

3.27   Our main proposal in relation to operational separation was a new requirement on the BBC to produce an Annual Statement on Operational Separation. We proposed that this was necessary in order to increase the visibility of the BBC's approach to compliance with our operational separation requirements. We considered that it would also give us and stakeholders assurance that the risk of information exchange between the Public Service and the commercial subsidiaries that could result in a distortion of competition was being addressed.

---

[43] The Communication from the Commission on the application of State aid rules to public service broadcasting, 2009/C 257/01, which is available at: https://eur-lex.europa.eu/legal-content/EN/ALL/?uri=CELEX:52009XC1027(01).
[44] Paragraphs 60, 69 and 93 of the Commission's Communication.

**BBC's commercial and trading activities: statement on Ofcom's requirements**

3.28    We proposed that the Annual Statement should include:

- an overview of the processes the BBC has adopted in identifying areas of risk for information sharing;

- a description of all measures, internal controls and processes implemented to ensure compliance with the requirements. This should include any relevant internal codes or policies that the BBC may have put in place to ensure compliance;

- an account of how the governance of the commercial subsidiaries reflects our requirements, including our requirement for distinct and separate governance, and the processes in place to manage conflicts of interest and information sharing risks due to cross-directorships; and

- an explanation of any issues with the effectiveness of the BBC's controls during the previous financial year and what steps the BBC has taken to improve their effectiveness.

## Summary of stakeholder responses

3.29    In its response, the BBC stated that our proposal for an Annual Statement was disproportionate and not targeted to an evidenced area of risk.[45] It considered that the requirement to publish an Annual Statement amounted to Ofcom specifying the controls the BBC should have in place and that it was inappropriate for us to require this where there is no evidence that its controls were inadequate (e.g. from frequent upheld complaints and findings of regulatory breaches).[46]

3.30    The BBC also noted that it intended to provide greater transparency around governance by publishing further information on its website and it was therefore not necessary to include an account of how the BBC is meeting our requirement for distinct and separate boards in an Annual Statement.[47] The BBC has since published information on the composition of the Commercial Holdings Board, as well as an overview of the different subsidiaries and their executive committees.[48]

3.31    The BBC considered that its commitment to publishing an annual TV supply report (which will increase information around the commissioning process) and the Fair Trading Audit should give Ofcom and stakeholders sufficient transparency and assurance around the controls in place.[49] It also questioned whether we had fully considered what regulatory requirements should apply in the unique case of the BBC and claimed 'considerable annual effort' would be required to prepare and publish such a statement.

---

[45] BBC response to the July 2018 Consultation, page 4.
[46] BBC response to the July 2018 Consultation, page 28.
[47] BBC response to the July 2018 Consultation, page 26.
[48] See https://www.bbc.co.uk/corporate2/insidethebbc/whatwedo/commercialbusiness.
[49] BBC response to the July 2018 Consultation, page 27.

**BBC's commercial and trading activities: statement on Ofcom's requirements**

3.32    In contrast, Pact welcomed our proposal, noting that it would help alleviate the limited visibility of how the BBC complies with our requirements.[50] It considered that the statement should include information relating to the BBC presence in the nations and regions, such as measures to provide some level of physical separation between Public Service and BBC Studios employees.[51]

## Our analysis and decisions

3.33    The 2017 Requirements restrict the circumstances in which information can be shared between the Public Service and the commercial subsidiaries, to ensure that the subsidiaries do not have an unfair competitive advantage. As these requirements are behavioural in nature, there are challenges for the BBC in designing and implementing the necessary internal controls and for Ofcom and external stakeholders to monitor.

3.34    As part of our review of the requirements, we engaged with the BBC to gain a better understanding of the internal processes and procedures it has put in place to restrict the sharing of information. The BBC stated that it takes a risk-based approach to these requirements and confirmed that it had various procedures in place to mitigate risks around information sharing, including conflict of interest procedures, separation of access to various systems, and training and guidance for some staff.[52] These internal controls were also outlined in the BBC Commercial Review.[53] The Annual Statement will provide a framework for the BBC to provide an update on how its controls are evolving, and will allow us and stakeholders to assess if they are appropriate.

3.35    We welcome the additional transparency that the BBC has provided since our consultation of its governance arrangements for the commercial subsidiaries and commissioning processes. We have simplified the Requirement (D.2) that outlines the content of the Annual Statement, so the BBC will not be required to include an additional account of how the governance of the commercial subsidiaries reflects our requirements, provided that it describes relevant controls in relation to conflicts of interest and the governance arrangements.[54]

3.36    We also note that the Fair Trading Audit provides some independent assurance that the BBC has put in place internal controls to meet our requirements, although only a high level summary is published by the BBC as part of its Annual Report.[55]

3.37    However, we do not consider that additional transparency in relation to some areas is sufficient to allay our, or stakeholders', concerns. For example, a statement that sets out

---

[50] Pact response to the July 2018 Consultation, paragraph 2.1.2, page 4.
[51] Pact response to the July 2018 Consultation, paragraph 2.1.8, page 5.
[52] For example, as a result of the new regulatory framework, to ensure compliance with Ofcom's requirements the BBC said it has comprehensively reviewed and relaunched its target training programme for staff likely to encounter Fair Trading issues. See BBC Annual Report and Accounts 2017/18, page 122.
[53] BBC Commercial Review, pages 88 to 89.
http://downloads.bbc.co.uk/aboutthebbc/insidethebbc/howwework/reports/pdf/commercial_review_2018.pdf.
[54] We have also modified this requirement to make clear that the Annual Statement should include a description of the material risks identified as a result of the risk assessment.
[55] See also Section 6 for discussion about the assurance provided by the Fair Trading Audit.

the processes the BBC has put in place to prevent the sharing of information on the Public Service's confidential strategic programming priorities will provide greater assurance to production companies that they are operating on a level playing field. Similarly, an understanding of the processes the BBC has put in place to ensure members of its governance committees, who have responsibility across the Public Service and commercial subsidiaries, do not share confidential information and how conflicts of interest are dealt with, will enhance stakeholders' confidence.

3.38     We do not agree with the BBC that the preparation of an Annual Statement, which requires the BBC to articulate the measures, controls and processes it must have in place to comply with the operation separation requirements, is disproportionate. The BBC can, if it wishes to do so, include references to any information it has already published in relation to its compliance with the requirements in the Annual Statement.

3.39     In the BBC Commercial Transparency Review, Chris Saul set out his view that an Annual Statement may not be necessary, as he believed the work of the Fair Trading Committee and the Fair Trading Audit is already covered and described in the BBC's Annual Report. He suggested that the BBC could provide some "additional articulation of compliance measures in relation to separation" and publish it separately on its website. We consider that the best mechanism to achieve that additional disclosure of the measures, controls and processes in place to meet the operational separation requirements is through an Annual Statement published alongside the Annual Report.

3.40     It is also important to note that this requirement for an Annual Statement on operational separation does not mean that we will be approving or specifying the controls and processes the BBC should have in place. While our final Guidance (A.8) references areas the BBC may consider when determining the necessary measures, controls and processes it should have in place, it is for the BBC to undertake a risk assessment and put in place measures to minimise this risk. If the BBC's risk assessment establishes that some forms of intensive control are unnecessary and disproportionate, then we would not expect it to put in place those controls, or to reference controls that have not been implemented in the Annual Statement. Instead, it will be able to outline the risk assessment process it has conducted and the controls it has therefore put in place in the Annual Statement, which will need to be adequate to address the risks identified.

3.41     In response to Pact's comment, we consider that the Annual Statement should – at a high-level – describe measures, internal controls and processes implemented to ensure compliance with the requirements, across the UK. This should include any material differences in approach to controls in different nations and regions, such as in relation to physical separation of Public Service and commercial subsidiary staff within BBC buildings in different parts of the UK.

3.42     We remain of the view that the Annual Statement is necessary and proportionate to provide us and stakeholders with transparency and assurance that the BBC is complying with our operational separation requirements. We have considered the particular risks of market distortion arising from the relationship between the Public Service and the

19

**BBC's commercial and trading activities: statement on Ofcom's requirements**

commercial activities and have concluded that this reporting requirement will help us assess if our competition concerns are being addressed.

3.43    We have therefore concluded that the BBC should publish an Annual Statement on operational separation at the same time as it publishes its Annual Report and Accounts, starting in summer 2019.

# Exchange of information

3.44    We consider it necessary to have rules in place to address the risk that Public Service information is shared with the commercial subsidiaries at governance and/or operational levels where it gives them a competitive advantage that is not available to third parties. This sub-section covers our information exchange requirements; guidance on information sharing; and risks and controls in relation to information sharing.

## Information exchange requirements

### Summary of consultation proposals

3.45    We proposed to broadly retain our 2017 Requirements which restrict the circumstances in which information can be shared between the Public Service and the commercial subsidiaries. However, we proposed to amend the requirements to allow information sharing in specific circumstances where there is no risk to competition. We also proposed to continue to permit information sharing where it is required to ensure that the activities of the commercial subsidiaries fit with the BBC's Mission and Public Purposes, or for the fulfilment of a contract.

### Summary of stakeholder responses

3.46    Pact agreed that in the particular circumstances where the BBC can show that it has reasonably determined that there is no risk to competition, it should be permitted to share that information.[56] It also asked for more clarity on how the BBC will determine if information sharing is necessary to ensure the activities of the commercial subsidiaries fit with the BBC's Mission and Public Purposes.

3.47    The BBC said that the emphasis should be on preventing the sharing of information where there is a significant risk of market distortion and welcomed our clarification about the legitimacy of sharing information that carries no risk. However, the BBC considered that the proposals, which set out that the sharing of information is permitted only where there is no risk, were too restrictive.[57] It argued that the requirements should only prevent disclosure where there is a significant risk of market distortion.

---

[56] Pact response to the July 2018 Consultation, paragraph 2.1.5, page 5.
[57] BBC response to the July 2018 Consultation, page 9.

3.48    The BBC also asked for clarity on our use of the term "contract" in the proposed requirements, instead of "commercial relationship" which was used in the 2017 Requirements.[58] Specifically, the BBC asked whether the change of term would narrow the definition and whether it included the sharing of information to fulfil a commercial relationship that is not strictly covered by a contract (e.g. as part of a negotiation).

**Our analysis and decisions**

3.49    These requirements are intended to address our competition concern that third parties may be less able to compete effectively if information shared between the Public Service and the commercial subsidiaries gives the subsidiaries an unfair competitive advantage. The requirements are comprehensive in scope, relating to all types of information sharing and impact on all employees and directors of both the Public Service and the commercial subsidiaries.

3.50    While we consider that on the whole our 2017 Requirements on information exchange remain appropriate, we have concluded that they could be more clearly focused on addressing the competition concern we have identified. We are therefore amending the requirements to allow information sharing in the specific circumstances where there is no risk to competition, in line with our consultation proposal. This recognises that there could be some categories of information that would carry no risk of competitive advantage if shared between the Public Service and the commercial subsidiaries.

3.51    In relation to the points raised by the BBC, if the BBC can show that it has reasonably determined that there is no risk to competition from sharing information, then it would be permitted to share that information in those particular circumstances. However, we do not agree that the requirements should be redrafted to only prevent disclosure where there are significant risks of market distortion. We consider that there is a general ongoing risk that information exchange could give rise to an unfair competitive advantage, and it would not be feasible to identify and specify in advance all forms of information that present a risk, now and in the future.

3.52    We do not think that it is appropriate to restrict the requirements to 'significant' risks only. The Agreement provides that Ofcom must impose requirements it considers appropriate to address all competition risks we have identified and not only significant risks.[59] In relation to information sharing between the Public Service and the commercial subsidiaries, we nonetheless do consider that the competition concern that we have identified is significant. We are therefore imposing requirements to address this concern, and require the BBC to implement appropriate controls to address it. We recognise however that the nature and intensity of the controls that the BBC puts in place may vary according to the extent of the risk identified.

3.53    We continue to consider that it is appropriate to permit information sharing where it is required to ensure the activities of the commercial subsidiaries fit with the BBC's Mission

---

[58] BBC response to the July 2018 Consultation, page 39.
[59] Agreement, clause 28.

and Public Purposes or for the fulfilment of a contract. We have also provided some high-level guidance on some relevant considerations the BBC should take into account, as discussed below.

3.54   In relation to Pact's comment, the guidance includes an example in relation to BBC Global News, where the sharing of information might be necessary to ensure that the commercial activities fit with the Public Purposes.[60] We would expect the BBC to be able to clearly explain why information sharing was justified in such circumstances.

3.55   We regard "contract" to be the appropriate term to define the specific circumstances where information sharing would normally become appropriate. We do not expect this change to significantly narrow the current definition, as we assume that if a commercial relationship has been established between the Public Service and a commercial subsidiary, a contract would normally be in place. We consider that information necessary for the fulfilment of a contract can include information necessary for pre-contractual negotiations and that a contract can take the form of an oral or written contract. We have updated the guidance to reflect that.[61]

## Guidance on information sharing

### Summary of consultation proposals

3.56   In our consultation, we explained that we do not consider it feasible or desirable to provide exhaustive lists of the types of information that can or cannot be shared between the Public Service and the commercial subsidiaries. However, we considered it might be helpful to provide some guidance, including some examples of information sharing which could result in an unfair competitive advantage or market distortion.

3.57   We also recognised that it may be appropriate for the Public Service to share information with the commercial subsidiaries in some circumstances.

### Summary of stakeholder responses

3.58   Pact agreed that high level guidance would help with transparency in this area.[62] Responding to the part of the guidance that addressed information sharing in relation to shared services, Pact asked if this type of information exchange would be held to account and whether any relevant recommendations from Ofcom would be published.

3.59   The BBC accepted that commissioning could be an area of potential risk and noted that commissioning is subject to separate regulatory arrangements. However, the BBC disagreed with our other examples of types of information sharing which could risk distorting competition or leading to an unfair advantage.[63] The BBC suggested that, for

---

[60] 2019 Requirements, Section 4, Requirement A.11.
[61] 2019 Requirements, Section 4, Requirement A.12.
[62] Pact response to the July 2018 Consultation, paragraph 2.1.3, page 4.
[63] BBC response to the July 2018 Consultation, page 9.

example, we had not sufficiently clarified why there was a risk associated with the distribution of children's content.[64]

3.60    The BBC welcomed our recognition that Global News and BBC News may need to exchange some information to ensure that the output of Global News (such as BBC World News) fits with the BBC's Mission and Public Purposes.[65] It also welcomed our recognition that some information exchange may be appropriate in order to allow some shared business support functions to work effectively.[66]

### Our analysis and final guidance

3.61    We continue to consider it helpful to provide guidance on the information sharing requirements, including some examples of information sharing which could result in an unfair competitive advantage or market distortion. Based on responses to the consultation and further thinking, we have updated our guidance.[67]

3.62    We expect the BBC to consider all aspects of the information it holds, the interfaces between the Public Service and commercial subsidiaries and whether any information, if shared, would carry a risk of providing an unfair advantage to the commercial subsidiary. We note that there may be differences in risk across the types of information sharing and we would expect controls to be implemented which reflect the associated level of risk.

3.63    The commissioning of programming by the Public Service is an example of an area where information sharing could result in an unfair competitive advantage or market distortion. If BBC Studios has access to information regarding the commissioning strategies and needs of the Public Service in advance of other producers, it may be in a better position to prepare and submit tailored ideas and pitches and win commissions. Examples of information that could raise competition concerns include advance notice of plans to commission large amounts of programmes on a particular theme or changes to genre strategies. If information is shared in this way, it may also be a breach of the requirement that competition between BBC producers and external producers is conducted on a fair, reasonable, non-discriminatory and transparent ("FRNDT") basis.[68] This FRNDT requirement is consistent with our information sharing requirements.

3.64    We disagree with the BBC that commissioning is the only area of risk requiring regulation and we continue to believe that other types of information sharing are potentially relevant.

3.65    For example, Public Service viewer data and performance measures could pose a risk of unfair competitive advantage or market distortion. Producers and distributors within BBC Studios may be at an advantage relative to their competitors if they have access to viewer data and performance measures which are not available to third parties. For example, BBC

---

[64] BBC response to the July 2018 Consultation, page 40.
[65] BBC response to the July 2018 Consultation, page 10.
[66] BBC response to the July 2018 Consultation, page 8.
[67] 2019 Requirements, Guidance A.9 to A.11.
[68] As noted in Section 2, we have published a statement regarding our approach to assessing the BBC's compliance with requirements on commissioning set out in Schedule 3 of the Agreement, including the requirement to commission on a fair, reasonable, non-discriminatory and transparent basis.

Studios could be at an advantage relative to its competitors if it had preferential access to the depth and breadth of data which can be collected through the BBC iPlayer. This may provide BBC Studios with a competitive advantage by assisting it in securing future commissions to produce and/or distribute content for the BBC.

3.66    We also consider there may be risks associated with information sharing in relation to the sale of content rights. If, for example, BBC Studios had advance notice of the types of content rights the Public Service intends to make available to the commercial market, it could take account of this earlier than its rivals when planning whether or not to enter the market for those rights. This could give rise to an unfair competitive advantage as BBC Studios might be in a better position than alternative distributors.

3.67    We also consider that information sharing may present a risk in the context of studio rental and post-production services. For example, if BBC Studioworks had privileged knowledge of the Public Service's confidential production or commissioning plans, it could hold spare capacity specifically to tender for the Public Service contract to provide capacity/post-production services, giving it an unfair advantage compared to its rivals.

3.68    We remain mindful of the BBC's legitimate interest in sharing some information between BBC News and BBC Global News to ensure that the commercial subsidiaries fit with the BBC's Mission and Public Purposes. For example, the sharing of some information may be appropriate to ensure that the output of BBC World News fits with the BBC's Mission and Public Purposes (which includes the provision of impartial news and information, and reflecting the UK, its culture and values to the world).

3.69    In some circumstances, the commercial subsidiaries will have a commercial relationship in place with the Public Service. For example, BBC Studioworks may have entered into a contract to provide studio space for the Public Service. We consider that in such cases, the provision in our requirements permitting the exchange of information for the fulfilment of a contract could be relevant.

3.70    We recognise that some types of information are likely to carry lower or no risks. We continue to believe that it is appropriate to allow the Public Service to share information with the commercial subsidiaries where it can reasonably determine that there is no risk of providing an unfair advantage to the commercial subsidiary. We also consider that where the risk is reasonably determined to be low, this should be taken into account when designing the appropriate controls and processes.

3.71    For example, we recognise that some BBC employees have responsibilities which cover both the Public Service and the commercial subsidiaries. This may include shared services such as HR functions where the Public Service provides services to the commercial subsidiaries. We recognise that administrative information associated with shared services (e.g. payroll administration information) may be an example of a type of information which carries little or no risks. In response to Pact's comment regarding information exchange and shared services, this (and all) types of information exchange will be subject to our monitoring of the BBC's compliance with our requirements, including assessment of the Annual Statement.

24

BBC's commercial and trading activities: statement on Ofcom's requirements

## Risks and controls on information exchange

### Summary of consultation proposals

3.72   We proposed the information exchange requirements should make clear that the BBC must have appropriate "measures, controls and processes", so that the commercial subsidiaries do not have access to Public Service information that is not available to third parties.[69]

3.73   We also proposed guidance on compliance with this aspect of the information exchange requirements, including stating our expectation that the BBC will need to carry out, and keep updated, a comprehensive risk assessment.

### Summary of stakeholder responses

3.74   Pact agreed that the BBC should conduct a risk assessment when complying with our information exchange requirements. However, it asked for clarity on what will happen if the BBC contravenes the operational separation requirements.

3.75   The BBC said that it already has rigorous procedures in place to identify BBC Public Service information that may give rise to a risk of market distortion, and robust procedures to manage such information.[70]

### Our analysis and decisions

3.76   Our analysis has highlighted the importance of having measures, controls and processes in place if the BBC is to mitigate the risk that the commercial subsidiaries have access to information that puts them at a competitive advantage. The BBC should already have put in place an appropriate internal framework to ensure compliance with the existing requirements, and we consider it proportionate and practical to reflect this in the requirements. We have therefore decided to implement our consultation proposal to modify the information exchange requirements to make clear that the BBC must have appropriate "measures, controls and processes", so that the commercial subsidiaries do not have access to the Public Service information that is not available to third parties (apart from in the limited circumstances where information sharing is permitted).

3.77   While we have decided not to prescribe these measures, controls and processes in detail at this point, we provide guidance on relevant considerations below.[71] If we found the BBC's measures, controls and processes to be inadequate in mitigating our competition concern, we can step in, if appropriate. In paragraph 5.29 we set out our general approach to investigating compliance with the BBC's competition requirements. We would also

---

[69] Our 2017 Requirements stated the BBC must ensure that such information was not shared between the Public Service and the commercial subsidiaries, without reference to the measures, controls and processes that are necessary to deliver on this outcome.
[70] BBC response to the July 2018 Consultation, page 8.
[71] 2019 Requirements, Guidance A.6 to A.13.

25

consider the option of proposing revisions to the requirements to prescribe more specific measures, controls and processes.

3.78   In order to comply with the information exchange requirements, we expect that the BBC will need to carry out, and keep updated, a comprehensive risk assessment. This would allow it to identify the areas which could present a risk of an unfair competitive disadvantage or market distortion and to consider the measures, controls and processes that it should implement to ensure that information flows are controlled in these circumstances. At a minimum any such risk assessment should include:

- identification of all interfaces between the Public Service and the commercial subsidiaries where information is (or could be) shared;

- assessing what types of Public Service information, not available to others, could put the commercial subsidiaries at an unfair competitive advantage or lead to market distortion; and

- determining if the information sharing is necessary to ensure that the activities of the commercial subsidiaries fit with the BBC's Mission and Public Purposes or for the fulfilment of a commercial contract.

3.79   To comply with our requirements (including in relation to the Annual Statement), the BBC will need to develop and tailor mechanisms specifically to mitigate the risks identified in the risk assessment, including developing controls to ensure that information that has been shared is only used for the specific purpose for which it was obtained. We anticipate that such measures, controls and processes might include:

- Training of staff and internal guidance: to ensure that the staff of the Public Service and commercial subsidiaries have a strong awareness of what information could be shared and what should not be shared. This should include training of members of boards and executive committees, as well as guidance on their roles and responsibilities.

- Location of staff: to consider what controls are appropriate to manage information flows where Public Service and commercial subsidiary staff are co-located.

- IT system controls: to ensure that there are controls in place restricting staff access to information systems which contain information that could put the commercial subsidiaries at a competitive advantage. Controls could include restricted access to ICT systems that contain such information for commercial subsidiaries staff.

- Conflicts of interest procedures: to ensure that there are procedures in place to manage conflicts of interest and risks of information sharing that may arise from cross-directorships.

- Internal compliance checks: of its risk assessment and the controls in place to manage information sharing risks.

3.80   As we outlined above, to provide us, and stakeholders, with greater transparency and assurance, we have decided that the BBC should publish an Annual Statement on

Operational Separation. This should include an overview of its approach to risk assessment, an explanation of material risks identified and a description of the measures, controls and processes it has implemented to ensure compliance with our information sharing processes.

## Governance

3.81    Effective and independent governance arrangements for the commercial subsidiaries are an important component of ensuring that the commercial activities are not undertaken directly by the Public Service, and that the relationship between the Public Service and the commercial subsidiaries does not distort the market. In our consultation, we considered whether the requirements and guidance that relate to operational separation require any clarification and what transparency and reporting requirements are needed. In light of stakeholder responses and our engagement with the BBC, we have concluded that our governance requirements remain largely fit for purpose. We have also decided to implement our proposals on conflicts of interest arising from cross directorships and to enhance transparency. In some instances, we have modified our proposed changes to the guidance. Our analysis and decisions on the governance requirements and guidance are set out in detail below.

### BBC governance arrangements

3.82    The BBC Board is responsible for the overall oversight of the BBC's commercial activities. The Fair Trading Committee – a BBC Board sub-committee – is responsible for overseeing the BBC's compliance with its regulatory obligations for trading and separation between the Public Service and the commercial subsidiaries.

3.83    The Commercial Holdings Board is the main governance body for the commercial subsidiaries and is ultimately accountable to the BBC Board.[72] Its role and membership were expanded in October 2017[73] and it is currently made up of nine directors, including four BBC Public Service executives, four executives from the commercial subsidiaries and one independent non-executive director (although until recently there were two independent non-executive directors).[74]

3.84    The BBC Board has recently announced changes to the composition of the Commercial Holdings Board. From April 2019 it will be chaired by a non-executive director from the BBC Board, Elan Closs Stephens. It will consist of ten directors, including a further non-executive director from the BBC Board (who will also be a member of the Fair Trading Committee), two independent non-executive directors, the BBC Director-General, the BBC Deputy

---

[72] The boards of the commercial subsidiaries have statutory functions such as approving financial statements, dividends and the appointment and resignation of directors. The boards are not involved in the day to day operation of the commercial subsidiaries (BBC response to information request sent on 6 November 2018).
[73] National Audit Office, *The BBC's commercial activities: a landscape review*. https://www.nao.org.uk/wp-content/uploads/2018/03/The-BBCs-commercial-activities-a-landscape-review.pdf, page 19.
[74] A further independent non-executive director, Howard Stringer, resigned from the Commercial Holdings Board in October 2018.

BBC's commercial and trading activities: statement on Ofcom's requirements

Director-General, two commercial subsidiaries directors and two BBC Staff Directors (who are not on the BBC Board or Executive Committee).

**Figure 3.1: Current BBC governance arrangements**



**Summary of consultation proposals**

3.85    In our consultation, we set out our view that the requirement for distinct and separate governance is important in ensuring that the commercial subsidiaries operate at arm's length from the Public Service. The subsidiaries should have some independence in setting strategy and decision making, and carry out their activities on a commercial basis, as required by the Charter and Agreement.

3.86    We noted in our consultation that given the activities of the commercial subsidiaries are required to fit with the BBC's Mission and Public Purposes, there are legitimate reasons why the BBC Board should have some influence over the commercial subsidiaries. The Charter states that in order to ensure that the BBC fulfils its Mission and promotes the Public Purposes, the Board should set strategy and governance arrangements for the BBC's commercial activities and for assessing the effectiveness of those activities.[75] It is therefore appropriate for the BBC Board to have a certain level of input into the strategy and participation in the governance of the commercial subsidiaries.

3.87    We noted that the BBC would undertake a review of the composition of the Commercial Holdings Board and said that we would continue to monitor the BBC's compliance as its governance arrangements evolve.

---

[75] Charter, Article 20 (3) (j).

3.88    We proposed to retain the 2017 Requirements with no substantive modifications. We said that it is for the BBC Board to decide how to structure the boards and executive committees of the commercial subsidiaries in a way that complies with our requirements.

**Summary of stakeholder responses**

3.89    The BBC supported our proposal not to deviate in substance from the existing regulatory requirements on governance, and the additions to the guidance which clarify our concerns.

3.90    However, the BBC raised various concerns regarding our approach to the governance requirements. On the role of the BBC Board, the BBC emphasised its primacy over the governance of the BBC's commercial arm, in order to fulfil its duties set out in the Charter. Since the Commercial Holdings Board is the body through which the BBC says the BBC Board exercises control over the commercial activities, the BBC said that it is not appropriate for the Commercial Holdings Board to operate independently of the BBC executive, or at arm's length from the BBC.[76]

3.91    The BBC added that Ofcom's regulation should be aligned with the findings of the PAC and the NAO landscape review of the BBC's commercial activities, which indicated an expectation of BBC Board oversight over the BBC's commercial activities.[77]

3.92    In line with this, the BBC disagreed with the deletion of text in the guidance setting out the potential legitimacy of BBC Board oversight of the commercial subsidiaries and requested clarity from Ofcom on the reason for the proposed change.[78]

3.93    Further, the BBC stated that the Charter envisages that the BBC's Public Service and commercial activities will both contribute to the fulfilment of a single set of public service goals, which reflect the nature of the Public Purposes themselves.[79] The BBC cited the example of the international commercial activities of BBC Studios and BBC Global News Limited, which it said clearly play a role in the delivery of the fifth Public Purpose, as does the World Service. Following this reasoning, the BBC argued that the Public Purposes apply across the whole of the BBC's activities, including commercial activities.

3.94    The BBC believed that the BBC Public Service, as defined by Ofcom, is not the same thing as the BBC legal entity. It said that clarity in this area is important to ensure the BBC Board and directors are not inappropriately constrained in their ability to exercise oversight duties. The BBC set out that the Director General and BBC Board directors have a remit for all of the BBC group, rather than a purely Public Service remit.[80]

3.95    Pact welcomed our proposals, although it was keen to ensure greater separation in terms of governance between the Public Service and the commercial subsidiaries and said that its preference was for no overlap of BBC Studios executives on the main Board.[81] It also

---

[76] BBC response to the July 2018 Consultation, paragraph 1.1, 1(a), pages 5 to 6.
[77] BBC response to the July 2018 Consultation, paragraph 1.1, 1 (c), page 6.
[78] BBC response to the July 2018 Consultation, page 40.
[79] BBC response to the July 2018 Consultation, paragraph 1.1, 1(b), page 6.
[80] BBC response to the July 2018 Consultation, paragraph 1.1, 2, page 7.
[81] Pact response to the July 2018 Consultation, pages 4 to 6.

argued that there should be a clear line of communication between the BBC Board and the Commercial Holdings Board that is objective and crucially independent. It added that oversight of the BBC executives on the Commercial Holdings Board should come from non-executives from the BBC Board, who are not employees of the BBC or BBC Studios.

3.96    Pact also asked how Ofcom will monitor the degree of influence the Public Service has on its commercial subsidiary governance and decision making, and with what frequency this will be conducted.

**Our analysis and decisions**

*Legal framework*

3.97    We explain above (in the Competition concerns and regulatory approach sub-section) that the Agreement envisages that Ofcom may need to put in place operational separation requirements, and the competition concerns that underpin the requirements we have put in place. We noted in that context that the framework governing state funding of public service broadcasting as applied by the European Commission identifies the same concerns and refers to functional or structural separation as representing best practice in this area.

3.98    The Agreement states that the BBC as a corporation must not directly undertake any commercial activities and that they must be undertaken instead by commercial subsidiaries.[82] The Charter and Agreement do not, however, define a particular form of separation. It would not be consistent with the Charter and Agreement for separation to be limited only to technical legal separation, with the same persons operating both Public Service and commercial activities. That would not avoid the Public Service being directly involved in the carrying out of commercial activities. At the same time, it is clear that the Charter and Agreement envisage that the BBC Board has a role in relation to commercial activities, and this is recognised in both the Board's duties and the content of the four commercial criteria.

3.99    The form of operational separation must therefore be consistent with both the competition concerns underpinning the separation requirements in the Agreement and Operating Framework, and the BBC Board's role under the Charter.

*BBC Mission and Public Purposes*

3.100   We disagree with the BBC's view that the activities undertaken by the commercial subsidiaries must contribute to the 'fulfilment' of the Public Purposes. The Agreement only requires that the commercial activities should 'fit' with the Public Purposes.[83] In setting out what this means, the Agreement provides that a commercial activity should be carried out in association with the fulfilment of the Mission and promotion of the Public Purposes, and be connected (in ways other than merely financial terms) with the ways in which the BBC

---

[82] Agreement, Clause 23(4).
[83] Agreement, Section 23, paragraph (5)(a).

does this. The Agreement does not therefore require that the commercial activities must actively contribute to the fulfilment of the Public Purposes.[84]

3.101   This is consistent with the European Commission guidance on state aid in the broadcasting sector, which provides that "whilst public service broadcasters may perform commercial activities such as the sale of advertising space in order to obtain revenue, such activities cannot be viewed as part of the public service remit".[85]

3.102   The BBC also appears to be arguing that there is, in any event, a form of implicit requirement for the commercial activities to contribute to the fulfilment of the Public Purposes. To do so, the BBC cited the international commercial activities carried out by BBC Studios and BBC Global News which it said plays a role alongside the World Service in delivery of the fifth Public Purpose, namely, to reflect the United Kingdom, its culture and values to the world. We do not agree that the position in relation to international commercial activities supports the existence of such an implicit requirement applicable to all Public Purposes, because there is a distinction between the treatment of the fifth Public Purpose and the other Public Purposes in the Charter and Agreement:

a)   Under the BBC operating licence Ofcom assesses whether the UK Public Services fulfil the first four Public Purposes. The performance of the commercial activities is not taken into account by Ofcom in the assessment of whether the BBC has fulfilled those Public Purposes.

b)   The regulation of the World Service, which principally delivers the fifth Public Purpose, is through a separate licence set and published by the BBC under Clause 34 of the Agreement. It is for the BBC to decide whether the fifth Public Purpose has been fulfilled and whether to take account of international commercial activities as part of that assessment.

*Our governance requirements*

3.103   We consider that the significant presence of cross-BBC executives[86] on the commercial subsidiaries' boards, particularly the Commercial Holdings Board, could give rise to the competition concerns set out above. It could increase the risk that Public Service information is shared with the commercial subsidiaries at a governance level and the risk that the influence of the Public Service shapes the governance of the commercial subsidiaries in a way which gives them an unfair competitive advantage. Our requirements seek to address these concerns by requiring distinct and separate governance of the commercial subsidiaries and adding that there should be an appropriate number of directors who are separate from the BBC Board and its executive committees.

3.104   We note that in the BBC Commercial Transparency Review, it was observed that the Commercial Holdings is not a "normal" subsidiary; it is owned by the BBC but operates in a

---

[84] Agreement, Section 23, paragraph 8 (a) and (b).
[85] The Communication from the Commission on the application of State aid rules to public service broadcasting, paragraph 49.
[86] Individuals who serve on the boards and/or executive committees of both the Public Service and the commercial subsidiaries.

regulated environment designed to ensure that dealings with its parent are at an arm's length. He added that this is a very different relationship to the one which would exist between other parent and subsidiary companies, where the latter are not subject to a separate regulatory regime. We agree that this has implications for the appropriate composition of the governance bodies.

3.105    By requiring more independent and effective governance, our requirements also contribute to the BBC's compliance with our other trading and separation requirements.[87] For example, in regard to our requirement for the commercial subsidiaries to generate a commercial rate of return, distinct and separate governance will help ensure that the governance of the commercial subsidiaries is appropriately focused on the need to generate returns and profits, rather than considering only whether they fit with the Public Service Mission and Public Purposes. Meanwhile, sufficient separation from the commercial subsidiaries at the governance level also helps to ensure that the Public Service is appropriately focused on delivery of its Public Service roles and requirements, which is distinct from the roles and strategy of the commercial subsidiaries.

*Role of the BBC Board*

3.106    We acknowledge that the BBC Board and some senior executives have responsibilities across the Public Service and commercial subsidiaries. We also recognise that the BBC Board has duties which legitimise the need for some oversight of the governance of the commercial subsidiaries. Hence, our requirements permit a reporting line between the BBC Board and the Commercial Holdings Board and allow for the presence of some BBC Board member(s) or executives with Public Service roles on the Commercial Holdings Board, provided that the BBC ensures compliance with all of the requirements. In line with this, we have decided to amend the guidance accordingly.[88]

3.107    However, given the separation requirements we have in place, we would not expect the relationship between the BBC Board and Commercial Holdings Board to be characterised as one of full "control", as suggested by the BBC in its consultation response.

3.108    We have taken account of the NAO and PAC reports on the commercial activities, including references to the BBC Board's oversight role in relation to the commercial subsidiaries, and we do not consider there to be any misalignment between these reports and our requirements for distinct and separate governance.

*Composition of the Commercial Holdings Board*

3.109    While the BBC argued there is a category of "BBC Group" activities and some executives (or other employees) may have roles that include both Public Service and commercial subsidiaries responsibilities, we stress that the way in which the BBC carries out its activities is governed by the Charter and Agreement and our requirements, and the risks to competition arising from cross-BBC roles must be identified and managed.

---

[87] We have modified our Guidance (A.14) in the 2019 Requirements to make this clear.
[88] 2019 Requirements, Guidance A.15.

**BBC's commercial and trading activities: statement on Ofcom's requirements**

3.110    It is necessary for the BBC to be alert to the risks of information exchange that may result from cross-directorships. In addition to getting the right balance in the composition of the Commercial Holdings Board, the BBC should put procedures in place to ensure that cross-directorships do not result in market distortion or a competitive advantage to the commercial subsidiaries.

3.111    During the course of our review of the requirements, we have been working with the BBC Board and the Fair Trading Committee to consider how the BBC ensures compliance in this area. We had raised some concerns with the BBC regarding its governance arrangements for the commercial activities, particularly with respect to the composition of the Commercial Holdings Board.

3.112    We agree with Pact that oversight of the commercial subsidiaries could partially come from BBC Board non-executive(s) sitting on the Commercial Holdings Board, provided the composition of the board as a whole meets our requirements. The BBC Board non-executives could provide a strategic link between the BBC Board and Commercial Holdings Board, while presenting a lesser risk of exchanging Public Service information than BBC executives with Public Service roles (given their more limited role in the day to day strategy, priorities and operational activities of the Public Service). We have amended the guidance to reflect the possible participation of two categories of non-executives – independent non-executives and BBC Board non-executives – in commercial subsidiary governance.[89]

3.113    As discussed in paragraph 3.84, the BBC has recently announced changes to the composition of the Commercial Holdings Board. From April 2019 it will be chaired by a BBC Board non-executive, rather than the BBC Director-General and there will be a larger share of non-executive directors. The new composition addresses to some extent our previous concerns, although we consider that effective governance is also dependent on how the board operates in practice and whether it is consistent with our requirements. We will closely monitor how the new structure operates.

3.114    Pact asked about our approach to monitoring the degree of influence that the Public Service has on commercial subsidiary governance and decision-making. In addition to the conflicts of interest and new reporting requirements which relate to commercial subsidiary governance that we are imposing, we will continue to engage with the BBC to help us evaluate its compliance with all the requirements. As explained in paragraph 5.29, in the event that we consider there are grounds for concern, we would consider whether to investigate in line with our procedures for enforcement of the BBC competition requirements.

---

[89] 2019 Requirements, Guidance A.16.

**BBC's commercial and trading activities: statement on Ofcom's requirements**

## Conflicts of interest

### Summary of consultation proposals

3.115    There are a number of cross-directorships, where BBC Board members and/or Public Service executives also sit on the commercial subsidiary boards and/or executive committees. In our consultation, we said that we expect the BBC to have processes in place to manage potential conflicts of interest arising from cross-directorships, so that it can ensure that it is meeting our requirements.[90] We considered that our 2017 Requirements on conflicts of interest arising from cross directorships were not as comprehensive as they could be and put forward some proposals, including a new reporting requirement for the BBC in relation to conflicts of interest.

### Summary of stakeholder responses

3.116    Pact supported our proposals to amend the conflicts of interest requirement and the new reporting requirement for the BBC to provide detail of any potential or actual conflicts of interest relevant to operational separation recorded and addressed in the previous year.[91] Sky said that this information should be published, rather than requiring the BBC to provide it privately to Ofcom.[92]

3.117    The BBC said that it already has procedures in place to identify and manage conflicts of interest at all levels and is happy to report on conflicts of interest to Ofcom where relevant.[93] It also clarified its understanding that our proposed reporting requirement would be to only report the "regulatory" conflicts of interest arising in the boards and executive committees Ofcom had identified in the consultation.

3.118    The BBC also commented on our proposed revision to the requirements to take into account joint ventures. It said that as joint ventures have shared control, it is impossible for the BBC to directly impose requirements on their governance and reporting.[94] The BBC asked us to clarify if it would be required to report on conflicts of interest at boards and/or executive committees that are not part of the BBC, or if this proposed revision would only extend to any governance arrangements, and reporting thereon, within the BBC group.

### Our analysis and decisions

3.119    The BBC is correct in its understanding that our proposed requirement in this area was only intended to refer to conflicts of interest arising from Public Service and commercial

---

[90] In the Commitments, the BBC said it would maintain its rigorous conflict of interest procedures. It also said that where executives of the BBC's commercial subsidiaries are also directors of the Corporation's main Board or Executive Committee, the BBC will ensure that they do not participate in discussions or decisions about individual programme commissions or tendering decisions for the Public Service.
[91] Pact response to the July 2018 Consultation, paragraph 2.1.7, page 5.
[92] Sky response to the July 2018 Consultation, page 1.
[93] BBC response to the July 2018 Consultation, paragraph 1.2, page 8.
[94] BBC response to the July 2018 Consultation, page 40.

subsidiary cross-directorships, rather than other types of conflict, such as political or personal business interests.

3.120    Given the range of cross-directorships, conflicts of interest may arise at the Commercial Holdings Board and BBC executive committee levels, in addition to the BBC Board level. Therefore, we have decided to amend the current conflicts of interest requirement to make clear that it applies to members of the Public Service and commercial subsidiary executive committees, in addition to members of boards, where there are cross directorships.[95]

3.121    We note that the BBC has said that it has procedures in place, but more information is required about what these measures consist of, so that we and stakeholders can understand how the BBC has implemented the requirement relating to the management of conflicts of interest arising from cross-directorships. In the BBC Commercial Transparency Review, Chris Saul considered it would be appropriate to disclose a description of the processes in place to identify and manage conflicts of interest.[96] Our requirement for the BBC to produce an Annual Statement on Operational Separation aims to address this.

3.122    While the BBC has general guidance on conflicts of interest for staff and a BBC Board Code of Practice,[97] we have not seen guidance on conflicts of interest specific to cross-directorships. We would expect the Annual Statement to outline any guidance that the BBC has put in place for directors of all relevant governance bodies which specifically addresses the cross-directorship risks and competition concerns detailed above.

3.123    Furthermore, we have decided to adopt our proposals and introduce a reporting requirement for the BBC to provide us with details of any potential or actual conflicts of interest relevant to operational separation recorded and addressed in the previous year.[98] This information will give us an understanding of when, how often and what types of conflicts arise, on which governance bodies and how they are managed by the BBC. We only require the BBC to provide us with details of specific conflicts of interest (rather than requiring external publication). We do not agree with Sky that this information should be published, given conflicts management within BBC governance bodies may relate to confidential information. This information will provide us with some insight into how the BBC is complying with the conflicts of interest requirement, which is important in addressing our competition concerns in relation to cross-directorships. In line with our amendment to the conflicts of interest requirement set out above, this reporting requirement would relate to all governance bodies for the Public Service and commercial

---

[95] 2019 Requirements, Requirement A.5.
[96] The BBC Commercial Transparency Review, paragraph 51.
[97] BBC Board Regulation: Board Code of Practice, http://downloads.bbc.co.uk/aboutthebbc/insidethebbc/managementstructure/boardregsandpolicies/board_code_of_practice.pdf.
[98] The BBC has an existing Commitment to record identified conflicts of interest in the minutes of BBC Board meetings, which are published on the BBC's main website.

subsidiaries where there are cross-directorships, including the Commercial Holdings Board.[99]

3.124    In response to the BBC's comments about joint ventures, we consider it necessary to take into account joint ventures in our conflicts of interest requirement, in order to address the risk that they may gain a competitive advantage if BBC Public Service executives/board members involved in the governance of joint ventures share information about the Public Service. Our intention is to regulate the declaration and management of relevant conflicts of interest by cross-directors when participating in governance, rather than directly regulating the joint venture itself. To clarify, we are not requiring the BBC to report on conflicts of interest identified by the governance bodies of joint ventures.

## Transparency of governance

### Summary of consultation proposals

3.125    We noted in our consultation that there was limited information in the public domain regarding the governance of the commercial subsidiaries and how their boards/executive committees and the BBC Board interact in practice. We considered that the governance of the commercial subsidiaries could be more transparent. To mitigate our concerns, we proposed to introduce a requirement that the BBC increase transparency by publishing more information around the governance of the commercial subsidiaries.

### Summary of stakeholder responses

3.126    Pact supported the new requirement for the BBC to publish more information on the Commercial Holdings Board, having found the information on governance arrangements to be lacking.[100]

3.127    The BBC recognised that it could be more transparent in this area and committed to publishing additional information related to governance.[101] In November 2018, the BBC published some additional information on the BBC website. This included information about the role and membership of the Commercial Holdings Board, and the executive committees of each of the commercial subsidiaries, including the Terms of Reference for each body.[102]

### Our analysis and decisions

3.128    We welcome the additional information on commercial subsidiary governance that the BBC has published. However, we still consider it necessary to introduce a transparency requirement, to assure both ourselves and stakeholders that the relevant information will

---

[99] 2019 Requirements, Requirement D.3. This information should be provided to Ofcom at the same time as the BBC Annual Report and Accounts is published.
[100] Pact response to the July 2018 Consultation, paragraphs 2.1.7 and 2.1.9, pages 5 to 6.
[101] BBC response to the July 2018 Consultation, paragraph 4.2, pages 26 to 27.
[102] https://www.bbc.co.uk/corporate2/insidethebbc/whatwedo/commercialbusiness [accessed 6 February 2018].

**BBC's commercial and trading activities: statement on Ofcom's requirements**

be published on a regular basis and kept up to date. We believe that this will give us and stakeholders greater confidence that the BBC is complying with its requirements. The BBC Commercial Transparency Review made similar recommendations to enhance disclosure in relation to governance, which the BBC Board has accepted.[103] As such, we have decided to introduce a requirement that the BBC should publish:

i) the roles, responsibilities and remit of the Commercial Holdings Board (and other commercial subsidiary governance bodies) as a whole, and its individual members, including whether they are Public Service or commercial employees. The BBC should provide and update information about the terms of reference and membership of commercial subsidiary governance bodies on an ongoing basis on appropriate BBC website(s); and

ii) the reporting lines and relationship between the Commercial Holdings Board, the BBC Board, the BBC Executive Committee and other commercial subsidiary governance bodies. The BBC should provide and update information about the reporting lines of commercial subsidiary governance bodies on an ongoing basis on appropriate BBC website(s).

3.129   This information should be published as we do not consider that there is any reason for it to be treated as confidential. We also consider that it is important that stakeholders have easy access to information regarding the governance of the commercial subsidiaries.[104]

---

[103] The BBC Commercial Transparency Review,
http://downloads.bbc.co.uk/aboutthebbc/insidethebbc/howwework/reports/pdf/bbc_transparency_review_christopher_s aul.pdf. BBC Transparency Reviews – Board Response,
http://downloads.bbc.co.uk/aboutthebbc/insidethebbc/howwework/reports/pdf/bbc_transparency_review_board_respo nse.pdf.
[104] The transparency requirement is set out in Requirement D.4 in the 2019 Requirements. Following our consultation, we have decided to simplify this Requirement. In our consultation we proposed that the BBC must also publish this information each Financial Year at the same time as the BBC Annual Report is published for that Financial Year. We consider that it is not necessary for us to require the BBC to publish this information separately, given our requirement for the BBC to provide and update this information on an ongoing basis on appropriate BBC website(s).

# 4. Supply and pricing of goods and services

## Introduction

4.1     The BBC sells a range of goods and services to the market and its commercial subsidiaries. This includes licence fee funded content which could be sold for further exploitation to its commercial subsidiaries and/or other market participants and the provision of business support services (such as HR, IT, legal and finance) which are only shared by the Public Service with the commercial subsidiaries. The 2017 Requirements set out a number of obligations on the Public Service in relation to the price and non-price terms and conditions of goods and services which cross the Public Service boundary.[105]

4.2     In this section, we set out details of our decisions to modify the existing requirements. This includes allowing for different approaches to transfer pricing to be taken given the nature of the goods and services provided and the related competition concerns. We have broadly adopted our consultation proposals and address the issues raised by respondents in this statement.

4.3     In summary we have decided that in general the Public Service should set prices for goods and services based on the relevant market price or market benchmark as appropriate. As there may be instances where market information is not available, or it would be disproportionate to undertake specific benchmarking (i.e. for one off, immaterial transactions), we retain the fall back option for the Public Service to set prices based on costs where there is no available, reliable, market information. We set out that the relevant cost-based price should proxy a market price and therefore the prices set by the Public Service should include the long run incremental cost of provision together with a contribution to capital and common costs and an appropriate margin. Where the Public Service provides business support services such as HR, IT, legal and finance, that it shares only with the commercial subsidiaries, and it would not otherwise supply externally, we have decided that it should set prices based on long-run incremental costs.

4.4     We also make it explicit where our modified requirements and guidance apply to pricing of goods and/or services sold by the Public Service to joint ventures that the commercial subsidiaries participate in.

## Current requirements

4.5     In addition to obligations requiring the supply of goods and services to be on arm's length and commercial and non-discriminatory terms, the Public Service is required to set market prices for goods and services supplied to commercial subsidiaries or third parties using an open market process, where appropriate.[106] However, the 2017 Requirements recognise

---

[105] By that we mean goods and services which are supplied from the Public Service to the commercial subsidiaries, and those which are supplied from the commercial subsidiaries to the Public Service.
[106] The requirement that arrangements are made on arm's length commercial terms also applies to transactions where the Public Service is buying goods and services from its commercial subsidiaries.

**BBC's commercial and trading activities: statement on Ofcom's requirements**

that for some types of goods or services it is not always possible or practicable to derive a market price in this way, and that absent an open market process, prices and terms must be set using benchmarking of market prices or market practices.

4.6     Where market pricing or benchmarking are not possible, the Public Service must set prices using a cost-based approach. The 2017 Requirements set out that these costs should cover direct costs and an appropriate contribution to relevant overheads, capital costs, and reinvestment in Public Service activities. The 2017 Requirements also specified that where the Public Service is using a cost-based approach, it must only set prices at the level of incremental cost where it can demonstrate this conforms to market practice and cannot price below incremental costs under any circumstances.

4.7     The 2017 Requirements also stated that the BBC must use consistent pricing approaches for similar goods and services including the BBC brands.[107]

## Competition concerns including no undue discrimination

### Summary of consultation proposals

4.8     In our consultation, we set out two main risks in relation to how the BBC supplies products[108] to others. We identified a risk that the Public Service sets prices for products which are supplied as inputs to the commercial subsidiaries that are too low. This could disadvantage other commercial suppliers in a way that harms fair and effective competition if those suppliers cannot match the Public Service prices.

4.9     We also identified discrimination as another risk – the Public Service could discriminate in the prices or terms and conditions it offers for products supplied as inputs to the commercial subsidiaries compared to third parties in a way that distorts the market and/or provides an unfair advantage. Alternatively, the Public Service could discriminate between different third parties in a way that harms fair and effective competition because one party would then have better terms than the other which could translate into lower prices for the products it sells downstream.

4.10    We also considered that where the Public Service buys products from the commercial subsidiaries, an unfair competitive advantage could arise if the Public Service paid a price that is too high compared to the market. This could allow the commercial subsidiaries to set lower prices that distort the market for other products in such a way that harms fair and effective competition or results in artificially high returns for the subsidiaries or lines of business within the subsidiaries.

---

[107] In addition, the BBC committed to applying pricing methodologies consistently across all the commercial subsidiaries and the lines of business within its commercial arm and to setting out in its published documents how payment for the use of the brands applies to the different commercial activities.

[108] We refer to the combination of assets, services and goods that the Public Service sells to its commercial subsidiaries and/or third parties as "products" in the remainder of this section.

BBC's commercial and trading activities: statement on Ofcom's requirements

## Summary of consultation responses

4.11    The BBC had some concerns[109] with the justifications for our transfer pricing requirements which it considered were also the basis for our additional reporting requirements.[110] The BBC considered that our reference to downstream markets "seem[s] more reflective of the regulatory interventions Ofcom may impose on companies with significant market power like BT or Royal Mail"[111] and not, in its view, the BBC, which it argued lacked the ability to distort the market in the way described.[112] It said that Ofcom's duties under the Charter and Agreement arise from concerns in relation to market distortion and the state aid regime, not a competition prohibition on the abuse of dominance. The BBC noted that we had not presented any evidence that the BBC is dominant or holds significant market power in any of the markets it operates in.[113]

4.12    In addition, the BBC argued that discrimination is not in and of itself likely to cause harm where there are clearly differentiated requirements such that those parties are not in equivalent positions to each other. It considered that it was only undue discrimination that could distort a market.[114]

## Our analysis and decisions

4.13    We agree with the BBC that our duties set out in the Charter and Agreement stem from market distortion and state aid concerns. Under the Charter and Agreement, Ofcom must set the requirements it considers appropriate to prevent an unfair competitive advantage or market distortion arising as a result of the relationship between the Public Service and the commercial activities, and in the case of trading activities to protect fair and effective competition. Our requirements derive from the competition concerns we have identified in fulfilling our role under the Charter and Agreement. We have not therefore approached this analysis as if we were putting in place obligations on an operator with significant market power or dominance, nor would it be appropriate for us to do so.

4.14    As the BBC points out, there may be reasons why different parties are charged different prices for the same or similar products. We acknowledged this in our consultation and continue to recognise this in our requirements and guidance. We agree that there may be cases where there is a fair and objective justification for offering different prices to

---

[109] The BBC also noted that we had amended Requirement B.1 in our July 2018 Consultation from 'arm's length commercial terms' to 'at arm's length … and on commercial terms' and welcomed clarification on the change. This amendment was made to align our requirements more closely with the wording in the Agreement, which had always been our intention.
[110] We address all the responses on reporting in Section 6 of this statement.
[111] BBC response to the July 2018 Consultation, page 13.
[112] The BBC provided an illustration on this point using the sale of BBC office space as an example.
[113] BBC response to the July 2018 Consultation, Section 2.2, pages 13 to 14.
[114] BBC response to the July 2018 Consultation, pages 12 to 13.

different parties or refusing to supply to certain parties.[115] For that reason, our requirement obliges the BBC not to discriminate unduly as to terms and prices.[116]

4.15    As set out in our consultation, given the competition concern we have identified around undue discrimination we consider that it is appropriate to require the Public Service to set prices in such a way that does not unduly discriminate between its commercial subsidiaries and third parties or between third parties. We continue to consider that the outcome of any undue discrimination could impact markets that third parties and the commercial subsidiaries participate in.

4.16    We have decided that our competition concerns as summarised in paragraphs 4.8 to 4.10 remain appropriate and provide requirements and guidance around discrimination.[117]

# Market based pricing and market benchmarks

## Summary of consultation proposals

4.17    We set out that the relevant economic concept for setting prices was the "opportunity cost" to the Public Service. That is that the Public Service should set transfer prices based on market prices, with those prices representing the revenue forgone from not selling the product to another customer. We considered that this approach should apply where the Public Service supplies products to the commercial subsidiaries and/or third parties where the alternative choice is for the Public Service to sell the product to a different customer.

4.18    In relation to the use of market-based transfer prices, we considered it appropriate to give equal weight to market benchmarking as a way for the Public Service to identify a market-based price in the proposed modifications to the requirements, rather than maintain the current hierarchy which requires the BBC to first consider an open market process. We also considered that there may be some rare cases where the Public Service is unable to identify appropriate, reliable benchmarking data or where it may not be proportionate to undertake benchmarking, for example for immaterial, one off transactions. We therefore proposed to retain the option for the Public Service to set prices based on its costs in the absence of other market information.

---

[115] July 2018 Consultation, paragraph 3.45, and our 2019 Requirements, Requirement B.2 and Guidance B.12.

[116] 2019 Requirements, Requirement B.2. In relation to the guidance we provide on discrimination, we consider it is appropriate for the commercial subsidiaries to benefit from certain legitimate advantages where these services are replicable by comparable third parties. We have decided that being replicable is not a necessary part of our reasoning and that it is enough for the commercial subsidiaries to benefit from the scope and scale of the Public Service. We have therefore removed what was the last sentence to paragraph B.13 of our proposed guidance (from Annex 1 of our July 2018 Consultation). We have also changed the order the two paragraphs of guidance on discrimination in our modified guidance for clarity (see Guidance B.12 and B.13 of the 2019 Requirements).

[117] 2019 Requirements, Requirement B.2 and Guidance B.12 and B.13.

## Summary of consultation responses

4.19    The BBC welcomed the clarification that the requirements apply to transactions between the BBC and its commercial subsidiaries where the Public Service[118] is both a buyer and seller of services, which it noted reflects how the BBC has complied with the 2017 Requirements.[119] The BBC considered that "opportunity cost" is a helpful lens to consider transfer pricing. However, it disagreed that a "hypothetical rational private investor" would not also act strategically. It considered that "the strategically best decision for any organisation would also likely be the most rational, as strategy is how an investor seeks to achieve its goals, even if that involved charging below cost for access to services in different parts of the group." For example, the BBC argued legitimate strategic and rational reasons for cross-subsidisation between legal entities might include circumstances where the entities wanted to develop new products or pursue reputationally important activities that were not profitable but benefit the business overall.[120]

4.20    The BBC set out examples of charging principles it expects to apply for different categories of products it provides to its commercial subsidiaries and vice versa, namely:

a)   Market based pricing and market benchmarks approach for intangibles or marketable media services (e.g. BBC IP, BBC Studioworks selling studio space to the Public Service), and other services for which the Public Service is not the sole source of supply (e.g. production facilities in the nations and regions); and

b)   Relevant direct cost pricing approach for other services provided by the Public Service to the commercial subsidiaries and third parties, for which the BBC is the sole source of supply (e.g. BBC Integrated production sites).[121]

4.21    In addition, the BBC asked for clarification on our proposed requirement that benchmarks are reviewed regularly in line with market practice. It noted that the majority of its peers are not required to undertake regulatory benchmarking so it may be problematic to define market practice in this area. The BBC considered that the type of good or service as well as changes in the relevant markets should inform the frequency of updates to the benchmarking data.[122]

---

[118] The BBC considered that our reference to the Public Service as the provider of inputs to the BBC's commercial arm should be the BBC as the seller of services and not the Public Service. It welcomed clarification on this guidance (see BBC response to the July 2018 Consultation, page 41). Our definition of Public Service captures the BBC's Public Service as well as Trading Activities and Non-Service Activities i.e. all of the activities undertaken by the BBC except for the commercial activities. Given this, we do not it consider it necessary to change our guidance to refer to the BBC.

[119] BBC response to the July 2018 Consultation, page 11. The BBC also welcomed Ofcom's simplification and clarification of the mechanisms the BBC could use to determine a 'market price' discussed at paragraphs B.3 a, B.16 and B.17 of Annex 1 of the July 2018 Consultation (BBC response to the July 2018 Consultation, page 40).

[120] BBC response to the July 2018 Consultation, pages 41 to 42 referring to Ofcom's July 2018 Consultation, Guidance B.11 of Annex 1.

[121] BBC response to the July 2018 Consultation, page 15. The BBC also set out that it expects to set prices based on long run costs where BBC group business services are provided to the commercial subsidiaries.

[122] BBC response to the July 2018 Consultation, page 41.

4.22    Pact agreed with Ofcom that content rights and licensing of the BBC brands (discussed further below) should be priced at market rates.[123] ITV and Pact were surprised that we proposed giving equal weight to benchmarking and market-based pricing rather than maintaining the current hierarchy which requires the BBC to first consider a market price. ITV noted that it is a very well-established principle in EU state aid law that open market processes are more preferable to establish the right price for a state-owned asset.[124] Pact argued that this change in the hierarchy should only be confirmed if Ofcom is confident that it will ensure that the BBC avoids indirect or direct state aid.[125] It also considered that benchmarking should include overheads and a contribution to the Public Service.[126]

## Our analysis and decisions

4.23    The objective of the transfer pricing requirements is to ensure that the commercial subsidiaries pay a "fair" price for any inputs they receive from, or any outputs they provide to, the Public Service. We continue to consider that a "competition on the merits" approach is the relevant starting point for how a significant, publicly funded organisation, such as the BBC, should set prices for its products sold to third parties or its commercial subsidiaries. This approach allows the commercial subsidiaries to benefit from legitimate advantages of scale and/or scope enjoyed by the Public Service.

4.24    We also continue to consider that the relevant economic concept for the pricing of products the Public Service is selling to others is the opportunity cost to the Public Service. This approach best reflects the operation of an undistorted, competitive market in which firms are acting rationally (i.e. profit-maximising). As set out in our consultation, we would not expect a rational firm to set prices (for intercompany transfers or otherwise) in a way as to fulfil strategic aims such as improving the profitability of its commercial subsidiaries. In this context we are contrasting the situation in which a firm acts rationally with one in which a firm is seeking to gain a strategic advantage other than through competing fairly e.g. by moving profits between different parts of its business just to take advantage of the tax regime. We consider that a hypothetical rational commercial company would not sell a product to its commercial subsidiary below the price it could receive from supplying a third party because that would reduce its profits. Even if there are some circumstances where a rational investor would act strategically to favour its commercial subsidiaries (as suggested by the BBC), the BBC is not permitted to cross-subsidise its commercial subsidiaries from activities funded by the licence-fee.

4.25    Since our consultation, we have simplified our guidance to bring out the point that where the Public Service supplies a commercial subsidiary rather than a third party, it is giving up the market price it could get from supplying that third party instead. In these circumstances, a transfer charge based on opportunity cost should reflect the market price,

---

[123] Pact response to the July 2018 Consultation, paragraph 3.1.2.
[124] ITV response to the July 2018 Consultation, pages 1 to 2.
[125] Pact response to the July 2018 Consultation, paragraph 3.2.2.
[126] Pact response to the July 2018 Consultation, paragraph 3.1.3.

either directly in terms of actual market prices or benchmarks, or where market prices/benchmarks are not available, using cost as a proxy for market price. For products that the Public Service would only ever share with its commercial subsidiaries, the Public Service is incurring incremental costs in providing these products and a transfer charge based on opportunity cost should represent those additional costs.[127]

4.26    As explained in our consultation, under an opportunity cost framework the Public Service should set the majority of transfer prices based on market prices. Where the BBC has conducted an open market process and therefore already knows what the market price is, it should use that price.[128]

4.27    We agree with ITV that an open market process is the most accurate way of identifying a market price given it clearly demonstrates what a customer is willing to pay for the product in question. However, the hierarchy in the existing requirements effectively requires the BBC to ensure it can justify why it is not using an open market process before it uses benchmarking to determine its transfer prices. We considered in our consultation it was appropriate to give more flexibility to the BBC to determine which approach to calculating transfer prices is appropriate in different circumstances. As previous open market processes are likely to be one of the key inputs into a benchmarking exercise, the BBC is likely to need to continue to undertake market processes at regular intervals in any event. Therefore, we have decided to adopt our consultation proposals that allow the BBC to set market prices using an open market process or benchmarking.

4.28    Where the BBC uses market benchmarking to determine the prices it is charging for its products, this is a proxy for the market price and we would not expect that this would result in any state aid to its commercial subsidiaries. As discussed below, it is important that the BBC uses relevant and up to date evidence to determine its benchmark prices.

4.29    The BBC also asked for clarification about how often it should update benchmarking information. As set out in our consultation, it is important for the BBC to show that it has gathered relevant, verifiable and comparable evidence on prevailing market practices (including both prices and terms) for the benchmarks it is using to ensure that the market prices are robust and do not confer an unfair competitive advantage. It should consider how representative the benchmark is in relation to the good or service in question and how recently that benchmarking analysis was undertaken. As discussed above, historic open market sales are a good source of benchmarking information.

4.30    Given the number of different products that are already, or may be in the future, provided by the Public Service to the commercial subsidiaries and/or third parties, we do not consider that it is appropriate to set out a prescriptive method for the BBC to follow when conducting benchmarking exercises or a timeframe for updating the benchmarking information. However, we agree with the BBC that the type of product in question and any changes in the relevant product market since the benchmarking exercise was undertaken are relevant factors the BBC should consider when it is determining whether benchmarking

---

[127] 2019 Requirements, Guidance B.11 and B.25-30.
[128] 2019 Requirements, Guidance B.14.

data needs to be refreshed. In addition, as benchmarking is used to determine a market price, we do not consider that it would be appropriate for the Public Service to add a margin (as suggested by Pact).

4.31    The BBC set out the different charging principles that it applies and considers that it is appropriate to continue to apply to different types of products. We agree with the BBC that is it appropriate to set prices for intangibles or marketable media services and other services where it is not the sole source of supply, on the basis of open market process or benchmarks.

4.32    Where there are dedicated production facilities[129] (such as the set for Eastenders), it seems appropriate to consider the use of those facilities as an integral part of the cost of production and therefore part of the commissioning process. As such, we assume that the charge for such specialised production facilities would fall outside of the transfer pricing framework.

4.33    In all other cases, even where the BBC is the sole supplier, we would first expect it to attempt to identify a market price either through an open market process or a market benchmarking exercise (the latter being relevant if it can identify a close enough comparator). If market information was not available, then it is acceptable for the BBC to set prices with reference to its own long-run incremental costs.

4.34    Taking all these factors into account, we have decided that it is appropriate that in the first instance the BBC should look to set prices based on open market processes or market benchmarks (aside from shared business support functions, discussed below).

# Prices based on cost

## Summary of consultation proposals

4.35    As discussed in paragraph 4.18, we proposed retaining the option for the Public Service to set prices based on costs in the absence of information on market price or benchmarking. The intention of this cost-based price was to proxy the market price and we did not propose to alter the method of calculating the cost set out in the 2017 Requirements.

## Summary of consultation responses

4.36    ITV recognised that there may be occasions where the fall-back option of cost-based transfer prices should be used but considered that this should be the exception. It suggested that the BBC should notify Ofcom whenever it uses this pricing methodology.[130] ITV also considered that Ofcom should provide more detail about how the BBC should

---

[129] By which we mean facilities which cannot be utilised by third parties unless they were awarded the commission for the production of the programme.
[130] ITV response to the July 2018 Consultation, page 2.

determine what an appropriate contribution for reinvestment in Public Service activities is. It assumed that this was another way of referring to a margin.[131]

4.37 Pact reiterated its support for the 2017 Requirements and considered that where market pricing or benchmarking is not possible, the Public Service should set prices based on cost. It also welcomed the method for calculating costs in these circumstances – i.e. including all direct costs, relevant contribution to overhead, capital costs and an appropriate reinvestment in Public Service activities.[132]

4.38 The BBC welcomed our clarification that it may be appropriate in certain circumstances for prices to be based on cost rather than market price or benchmarks. It noted that as it has commercial agreements in place for all products traded internally, this was most likely to apply to ad hoc trading activities (such as spare capacity sales). The BBC, however, sought further engagement on how to interpret material in this context.[133]

4.39 The BBC asked for clarification on the definitions of the various cost terms used in the requirements and guidance such as 'long-run costs of provision', 'long-run incremental cost' and 'direct long-run costs'.[134] It welcomed the proposed modifications to the guidance that set out that it may be appropriate for the BBC to set transfer prices lower than long run incremental costs in certain ad hoc circumstances as long as they were greater than short-run incremental costs. The BBC requested further clarification on the circumstances where it may be acceptable to set prices on this basis; it was particularly concerned that it would be considered to not be treating parties consistently.[135]

4.40 The BBC was also concerned about the need to add a margin or contribution to the Public Service, for products where they were the sole source of supply. It considered that there was no discernible market for these products to allow a market price or benchmark to be determined and adding a "wholly notional margin" to "mimic a non-existent competitor" would only increase prices for end users which may include the BBC.[136]

## Our analysis and decisions

4.41 All stakeholders supported our proposal to retain the option for the Public Service to use prices based on long-run costs as a proxy for the market price in certain rare cases (such as for immaterial, one-off transactions). However, some stakeholders asked for clarity about the costing methodologies to be used in this circumstance and what was meant by, and the merits of, the inclusion of a contribution for reinvestment in the Public Service activities.

4.42 As set out in our guidance,[137] we consider that using a long-run measure of cost will be relevant in most cases because prices based on long-run incremental cost ("LRIC") will allow for a sustainable recovery of costs over time. Using a LRIC measure takes account of

---

[131] ITV response to the July 2018 Consultation, page 2.
[132] Pact response to the July 2018 Consultation, paragraphs 3.1.1 and 3.2.1.
[133] BBC response to the July 2018 Consultation, page 42.
[134] BBC response to the July 2018 Consultation, pages 41 to 43.
[135] BBC response to the July 2018 Consultation, pages 42 to 43.
[136] BBC response to the July 2018 Consultation, Section 2.4, pages 15 to 16.
[137] 2019 Requirements, Guidance B.23.

the resources used to provide a good or service and includes the fixed costs which are specific to that good or service and needed to produce it. In the context of long-run incremental cost measures, the long-run is the time period over which costs can be considered to be variable (i.e. changing according to the change in output) and so will be dependent on the increment in output being considered. However, LRIC does not include the common costs which a service may share with other services and the recovery of these common costs through mark-ups over incremental cost would therefore usually be seen as necessary for sustainability. This is why in our requirement to proxy a market price, the BBC must set prices that cover all LRIC together with a contribution to common and capital costs and appropriate margin. We have revised the description of how the Public Service should calculate a cost-based price in the absence of market information in our 2019 Requirements. We have clarified that to proxy a market price the Public Service should set prices that cover all long-run incremental costs of providing the product, together with an appropriate contribution to the relevant common and capital costs and an appropriate margin.[138] We have adjusted the language of what was B3b(i) in our consultation to be clearer that a *"contribution for reinvestment into the Public Service"* is the equivalent of a margin given the objective of this requirement is to proxy how a commercial operator would behave in a competitive market.

4.43    As set out above, Requirement B3(b) requires the BBC to set cost-based transfer prices as a proxy for market price. As a minimum this needs to include all relevant long-run incremental costs and the BBC must determine (and if necessary justify) the level of contribution to common and capital costs and what an appropriate margin should be for the relevant products. Requirement B3b(ii) from our consultation explicitly allowed the BBC to price down to LRIC where it could demonstrate that this was in line with market practice. However, we consider that this situation is already captured within Requirement B3(b) and to simplify the requirements and avoid potential confusion, we have therefore removed what was Requirement B3b(ii) in our consultation.

4.44    We have also changed the example in our modified guidance[139] of the limited circumstances where it might be appropriate for the BBC to price lower than LRIC. This now refers to unexpected ad hoc spot sales of studio space – for example, if a customer has cancelled its studio space booking at very short notice. In this instance, if the studio space would otherwise be left vacant, it may be appropriate to set transfer prices lower than LRIC as long as they at least cover short-run incremental costs (and there is no repeated pattern of such sales).

4.45    The BBC asked for further engagement on the interpretation of "material" in relation to the application of this pricing rule. What is considered immaterial is likely to differ depending on the market in which the product is being offered and we do not consider it would be appropriate to provide additional guidance on this point. However, we will consider any proposals the BBC wishes to make in this regard. We do not consider that the

---

[138] This includes modifying the drafting to only refer to either long-run or short-run incremental costs. See 2019 Requirements, Requirement B.3.

[139] 2019 Requirements, Guidance B.24.

**BBC's commercial and trading activities: statement on Ofcom's requirements**

limited circumstances where the BBC can price lower than LRIC contradicts the requirement for it not to unduly discriminate between its commercial subsidiaries and third parties (or between different third parties) as we would expect any of the BBC's customers would be able to access the low prices in these exceptional circumstances.

4.46    In relation to the points raised by ITV, we agree that it is important for both Ofcom and other stakeholders to understand where the BBC has utilised the fall-back option, especially given this is where market information is not available and therefore we expect it to be used in limited circumstances. However, we consider a notification process would be too burdensome for both Ofcom and the BBC. Instead, we have introduced a requirement that the BBC's published group trading manuals make clear the basis on which transfer prices for each category of goods and/or services provided to the commercial subsidiaries have been set.[140] We consider that this is a proportionate way to enhance transparency and allow stakeholders greater visibility of the pricing methodologies used by the BBC.[141]

## Pricing for shared business support functions

### Summary of consultation proposals

4.47    Shared business support services including HR, IT, legal and finance, are services that the Public Service provides to the commercial subsidiaries but which it does not, and is not expected to, supply to third parties in future. We proposed that transfer prices for these services should be based on the long-run costs that the Public Service incurs to provide these service(s) to the commercial subsidiaries.[142]

### Summary of consultation responses

4.48    The BBC welcomed the clarification that business support functions should be charged on the basis of cost. It noted that in a number of instances this would involve the Public Service passing through to the commercial subsidiaries the market price it pays to third party providers.[143] The BBC asked for confirmation on what costs should be included in the 'long run cost of provision' and said it expected it would include: salary costs, salary related overheads (including pension contributions and national insurance) and relevant non-salary overheads including IT costs (e.g. laptops, IT support, accommodation).[144] It also

---

[140] Under Requirement D.5(a)(i), the BBC must specify for each category of goods and/or services provided by the Public Service to the commercial subsidiaries whether transfer prices have been: (i) set using an open market process or market benchmark in accordance with Requirement B.3(a), or (ii) set using cost as a proxy for market prices in accordance with Requirement B.3(b), or (iii) set so as to at least cover the long-run incremental cost of providing those goods and/or services in accordance with Requirement B.4.

[141] 2019 Requirements, Requirement D.5a(i) and (ii).

[142] Unlike transfer prices that are only based on cost where there is no appropriate market price or benchmark, we did not propose that business support services needed to include an appropriate margin because they were not intended to be acting as a proxy for market pricing.

[143] BBC response to the July 2018 Consultation, Section 2.3, page 15.

[144] BBC response to the July 2018 Consultation, Section 2.3, page 14.

argued that the long run cost of provision should exclude 'capital costs' or 'contribution for reinvestment' because these are not services provided to the market.[145]

4.49    For pension contributions the BBC considered its costs may be higher than those a competitor would face due to the number of its staff working in the commercial subsidiaries that are on legacy defined benefit schemes. The rate of employer contributions is dependent on a number of factors and the BBC said it would charge the commercial subsidiaries the full cost of these contributions.[146]

4.50    Pact disagreed with our proposal to set transfer prices for business support services at LRIC. It questioned why capacity was being maintained in the Public Service for such services to be provided to its subsidiaries and noted that LRIC would not represent the full cost of these services (which could result in a subsidy to BBC Studios). Pact considered the BBC should remove the excess capacity in the Public Service and TUPE relevant staff across to BBC Studios as required.[147]

4.51    Pact also considered it was unclear how Ofcom would measure the proposed cost standard for business support functions. In particular, it questioned whether this would include an overhead and a return to the Public Service.

## Our analysis and decisions

4.52    We continue to consider that it is appropriate for the commercial subsidiaries to benefit from certain legitimate advantages of scale and scope enjoyed by the Public Service.[148] It is likely that this is how comparable commercial third parties would operate, and we do not consider that it would be efficient for the BBC to replicate the same functions across both the Public Service and the commercial subsidiaries (as suggested by Pact) as long as the BBC are complying with our requirements.

4.53    Under our opportunity cost framework if the BBC was to stop supplying these services to the commercial subsidiaries, it would be likely to scale back (e.g. administrative functions such as HR services) or discontinue the activity (rather than supply a third party). We therefore continue to consider transfer prices should be based on the long-run costs of providing that product.

4.54    However, we recognise that further clarification on the definition of the long-run costs of provision and additional guidance on how this cost should be calculated is appropriate. As set out above, conceptually, the long run cost of provision should be the LRIC incurred by the Public Service of providing the good or service.[149] As explained in paragraph 4.42 long-run incremental costs include both variable costs and fixed costs that are specific to the provision of the good or service in question. This means that when the Public Service sets

---

[145] BBC response to the July 2018 Consultation, page 41.
[146] BBC response to the July 2018 Consultation, Section 2.3, pages 14 to 15.
[147] Pact response to the July 2018 Consultation, pages 8 to 9.
[148] As discussed in footnote 116.
[149] Or the long-run costs avoided if the Public Service no longer provided the goods and/or services to the commercial subsidiaries which would be expected to give an equivalent outcome.

prices based on this measure of cost, it will recover the full cost of providing those goods or services. Because the objective of this aspect of pricing methodology is not to proxy a market price, we do not require the Public Service to include a share of common costs, capital costs or a margin. Following the request for clarification made by the BBC, we have provided an example for shared support services where the Public Service supplies staff on a temporary basis, to further explain how a long-run incremental cost price should be calculated.[150]

4.55    We also acknowledged in the 2019 Requirements that in practice it may not be possible to set transfer prices on a pure, LRIC basis or that it may not be proportionate to do so. For example, reliable data may not be available on the level of the LRIC. In these cases, a fully allocated cost measure derived from the BBC's internal cost information systems could act as a reasonable proxy for one based on long-run incremental costs as it would be verifiable and would typically be expected to be above long-run incremental costs, therefore ensuring that the prices set are not too low.[151]

4.56    We agree with the BBC that these requirements mean that it should charge the full cost of pension contributions to employees in the commercial subsidiaries.

## Interaction with rate of return requirement

4.57    As set out above, the main competition concerns we have identified relate to the risk that the Public Service sets transfer prices that are too low or unduly discriminate between its customers. We therefore clarified in our consultation that our requirements do not prevent the Public Service from charging higher prices than what is suggested through market pricing, benchmarking or the relevant cost methodologies.[152]

4.58    The BBC welcomed this clarification but asked whether Ofcom would take this into account in our monitoring of rates of return, if it was to do this.[153]

4.59    As the BBC pointed out in its response, if it was to charge a higher price than that indicated by our transfer pricing rules, this would impact the rate of return that is earnt by the line of business or commercial subsidiary in question. In the first instance, it is for the BBC to make a judgement on whether or not to charge higher prices to its commercial subsidiaries given our requirement that they and their lines of business should earn a commercial rate of return. As part of this, the BBC would need to make a judgement as to the extent to which different levels of transfer prices were capable of making a difference to whether or not it would achieve a commercial rate of return. For instance, if the product in question only made up a small proportion of the input costs to a commercial subsidiary or line of business, a higher price would be unlikely to have an effect on whether the subsidiary or line of business achieved a commercial rate of return. Accordingly, we have updated our

---

[150] 2019 Requirements, Guidance B.28.
[151] 2019 Requirements, Guidance B.30.
[152] July 2018 Consultation, paragraph 3.46 and Guidance B.28 of Annex 1.
[153] BBC response to the July 2018 Consultation, page 16 and page 43.

guidance to make clear that setting transfer prices higher than the market price or cost cannot be used by the BBC as a justification for either planning to earn a rate of return below the commercial rate of return, or earning less than a commercial rate of return when assessed on an ex post basis.[154]

# BBC brands

## Summary of consultation proposals

4.60    We proposed that the value of the BBC brand should be determined by market pricing (either through a competitive process if the BBC licenses the brands externally, or through market benchmarking). We recognised that this is an area where establishing an appropriate transfer price may be difficult. We also explained that the BBC's current approach of setting transfer prices for the use of the BBC brand as a proportion of the revenues that are directly linked to the use of the brand (e.g. BBC Studios competing for commissions from third party broadcasters), could be a reasonable proxy for the value of the use of the brand.

## Summary of consultation responses

4.61    The BBC welcomed our clarification on the rationale of the brand fee but it considered that the BBC brand is a BBC group, rather than Public Service, asset, and gave examples of commercial subsidiary activity that contributes to the value of the brand. This included BBC World News, run by BBC Global News Limited, BBC Studios and Global News Limited.[155]

4.62    The BBC argued that its main BBC brand is not necessarily a driver of sales in all of the markets in which the BBC undertakes commercial activities. It set out reasons why, including that in TV production, brand is not a significant determinant in winning a commission.[156]

4.63    The BBC also noted the difficulty in identifying the market price for the BBC brand. This included the difficulty of finding suitable comparators and said that "intra-group charging of this nature is often a function of financial manipulation (i.e. for tax reasons) rather than to reflect a fair value being paid to use a brand." The BBC also did not consider that the opportunity cost to the BBC is necessarily the value of the BBC brand to an unrelated third party. It believed that any benchmarking would have to take into account the contribution back to the BBC of the additional value realised by its commercial subsidiaries' operations.[157]

4.64    Pact agreed with our approach but sought further clarification on how the use of the brand is identified. It also considered Ofcom should undertake further work to ensure the BBC's approach is sufficiently robust and argued that brand transfer pricing should be based on a

---

[154] 2019 Requirements, Guidance B.31.
[155] BBC response to the July 2018 Consultation, Section 2.4, pages 16 to 17.
[156] BBC response to the July 2018 Consultation, Section 2.4, page 17.
[158] Pact response to the July 2018 Consultation, paragraph 3.1.4.

proportion of revenues from all lines of business and not just the revenue from direct commissions from third party broadcasters. For example, Pact considered it was unclear whether the revenue from distribution or merchandising operations is subject to a brand fee. It noted that the BBC has exclusion clauses which are unclear and too vague and that until Ofcom is confident that the transfer prices include all possible revenue streams it cannot use the proportion of revenues based on this as a reasonable proxy for the value of the use of the brands.[158] Pact referred to the Ernst and Young review of transfer pricing in 2016 where it made recommendations on branding contracts and how brand fees are calculated.[159]

## Our analysis and decisions

4.65    We have decided to adopt our proposal that BBC brand should be valued by reference to market pricing or market benchmarks. We recognise the difficulties the BBC highlighted regarding identifying suitable comparators, and acknowledge that the commercial subsidiaries may be prevented from doing anything which might devalue the BBC brand. In this context and given our expectation that the BBC will set brand related transfer prices based on market prices/benchmarking, the BBC should take a range of different factors into account when arriving at an approach to determining the brand fees that must be paid by the commercial subsidiaries. We would expect the BBC to be able to provide suitable evidence to justify why it has set the brand fees on the basis that it has. As part of that, we would expect that the calculation of the fee based on a proportion of revenue (or any future calculation) is either market tested or supported by market benchmarking.

4.66    Similarly, if the BBC excludes certain activities or revenue streams from the calculation of the brand fee, we would expect it to provide sufficient evidence to explain how this aligns to market practice or is supported by market benchmarking.

4.67    As noted in our consultation, the development and maintenance of the BBC brand has been funded by the licence fee, we therefore consider that as a starting point the BBC brand belongs to the Public Service. We have adjusted our guidance to make clear that the fee for the use of the BBC brand should reflect any restrictions that might apply to the use of the BBC brand by the commercial subsidiaries.[160]

4.68    We will consider whether to undertake further specific work on the approach to the use of the BBC brand and the methodology for setting the level of brand fees as part of our work scoping the review of BBC Studios.

---

[158] Pact response to the July 2018 Consultation, paragraph 3.1.4.
[159] Pact response to the July 2018 Consultation, paragraph 3.2.1.
[160] 2019 Requirements, Guidance B.15b.

**BBC's commercial and trading activities: statement on Ofcom's requirements**

# Supply of products from the commercial subsidiaries to the Public Service

## Summary of consultation proposals

4.69    We clarified in our consultation that our approach also applies for services provided by the commercial subsidiaries to the Public Service, in addition to services provided by the Public Service to the commercial subsidiaries.[161]

## Summary of consultation responses

4.70    The BBC welcomed the clarification which it noted reflected the BBC's current practice. It was, however, concerned about the practicality of the requirement that, effectively, the BBC must assure itself it is paying a market price for access to commercial subsidiaries' products. It considered that this requirement would mainly apply to purchases by the Public Service from Studioworks and asked for clarification on what evidence it would need to satisfy Ofcom that the it had paid a market price.[162] The BBC also noted that the Public Service transactions are scrutinised by the NAO as part of its Regulatory and Value for Money audit and there were therefore sufficient safeguards to prevent any cross-subsidy.

## Our analysis and decisions

4.71    We consider that it remains necessary to require the Public Service to ensure that it pays market prices for products it buys from the commercial subsidiaries, given the competition concern we identified that the Public Service could pay a price that is too high and therefore subsidise the commercial activities. We have therefore decided to adopt our consultation proposals to make it clear that the requirements apply to products that the commercial subsidiaries supply to the Public Service.[163]

4.72    With respect to the issue raised by the BBC about what evidence it would need to prove it had not paid a price that was higher than a market price, we would expect to see evidence that the pricing system Studioworks (or any other commercial subsidiary) has in place for the BBC is the same as it would use for third-party customers. In other words, that the starting rates are comparable by customers and that there is appropriate evidence of commercial negotiation to agree a final price. We also recognise, as set out by the BBC, that the Public Service is subject to additional scrutiny over its purchasing decisions by the NAO and is subject to procurement regulations.

---

[161] July 2018 Consultation, Requirement B.5 and Guidance B.29 to 31 of Annex 1.
[162] For example, the BBC asked whether the confidential rate cards it has negotiated with Studioworks would be sufficient. BBC response to the July 2018 Consultation, Section 2.1, pages 11 to 12.
[163] 2019 Requirements, Guidance B.5 and B.32 to B.33.

# 5. Commercial rate of return

## Introduction

5.1    The rate of return requirements, in conjunction with our transfer pricing rules, act as an important safeguard to prevent the commercial subsidiaries from gaining an unfair competitive advantage or distorting the market due to their relationship with the Public Service. The requirements also help to ensure that commercial activities are undertaken at arm's length and on commercial terms in accordance with normal market principles.

5.2    These requirements help to ensure that the Public Service acts like a rational private investor, on the basis that if a commercial rival was engaged in activities that were not expected to generate sufficient returns to justify the risks associated with those activities, it would take steps to modify or stop those activities.

5.3    If those activities were able to continue without a realistic chance of making a commercial rate of return, or were only able to make a reasonable rate of return through the provision of goods or services by the Public Service at below normal market rates, this could reduce the ability of their rivals to compete effectively and cause customers to make inefficient choices, e.g. choose to purchase services from the most efficient provider.

5.4    In this section, we set out our decisions to modify the rate of return requirements and accompanying guidance. We have decided to amend elements of the 2017 Requirements to ensure that stakeholders better understand our approach, in particular that:

   a)   the requirement to earn a commercial rate of return applies to each subsidiary that carries out commercial activities and each line of business within it;

   b)   a commercial rate of return should be earned and assessed over an appropriate time period; and

   c)   the BBC must take appropriate steps where a subsidiary, and/or line of business within it, is not earning or expected to earn a commercial rate of return.

5.5    In this section we summarise the current requirements, outline our consultation proposals in each area together with stakeholder comments and conclude with our reasoning and decisions.

## Current requirements

5.6    The 2017 Requirements state that the BBC must earn a commercial rate of return on its commercial activities. We also require it to assess what an appropriate commercial rate of return is for each line of business, and to consider the steps it should take, should a line of business not make a commercial rate of return.

5.7    In the first instance, the requirements put the onus on the BBC to determine what the lines of business and appropriate rates of return should be. We explained in our guidance that a new line of business may not make a commercial rate of return in the early years of

operation. We noted that if we had concerns about the forward looking or actual rate of return, or the lines of business for which the BBC sets rates of return, we may intervene and, if appropriate, issue a direction. We also put in place reporting requirements to allow us to monitor actual performance against the BBC's forward-looking rates of return.

# Our analysis and decisions

5.8    Informed by responses to our consultation, we set out below our decisions relating to the rate of return requirements, as follows:

    a)  The way activities should be grouped for the purposes of assessing the rate of return;

    b)  The appropriate time period for assessing the rate of return;

    c)  The steps to be taken by the BBC when it does not expect an activity to make a commercial rate of return;

    d)  Defining the lines of business and notifying Ofcom of changes; and

    e)  The use of benchmarking when determining a commercial rate of return.

5.9    Each section below outlines our proposals, stakeholder comments on those proposals and our final analysis and decisions.

## Earning, assessing and setting a rate of return at the subsidiary and line of business levels

5.10   In our consultation, we explained that the current requirement to earn a commercial rate of return on "activities" was not sufficiently clear about what group of activities we expect the BBC to earn a commercial return on.

5.11   We therefore proposed to modify the 2017 Requirements so that:

    a)  the obligation to earn, assess and set the commercial rate of return applies at the level of each commercial subsidiary and each line of business within the commercial subsidiaries; and

    b)  the process that the BBC must follow if it does not earn or expect to earn a commercial rate of return applies at the level of each commercial subsidiary and each line of business within the commercial subsidiaries.

5.12   Pact[164] and the BBC were largely supportive of this proposal. We continue to believe that to understand whether a line of business is underperforming it may not be sufficient to only assess rates of return at a subsidiary level. However, we recognise that there may be a limited number of costs incurred at the subsidiary level that the BBC does not consider can be allocated to individual lines of business in a meaningful way. In the event that some costs are not allocated across individual lines of business, this could distort the reported

---

[164] Pact response to the July 2018 Consultation, paragraph 4.1.1, page 9.

returns of those businesses. We have therefore decided that the BBC must assess rates of return across both individual lines of business and its commercial subsidiaries.

5.13 The BBC was concerned however that the proposals could be interpreted to mean that each of its 110 legal entities were required to earn a commercial rate of return. The BBC proposed we amend the definition to include only its main subsidiaries (i.e. Studios, Studioworks and Global News).[165]

5.14 We recognise that there may be entities which are owned by the BBC that have a specific purpose other than conducting commercial activities (e.g. BBC Natural History and Factual Productions Limited, which is a special purpose company that allows the BBC to access tax credits from the UK government on its productions) or may not trade (i.e. they are a dormant company) and therefore would not be expected to earn a commercial rate of return. We have therefore decided to revise the proposed definition of commercial subsidiary in light of the BBC's comments to ensure that our requirements apply to the subsidiaries which carry out commercial activities.[166]

5.15 However, we are conscious that the definition of commercial subsidiaries applies to all of our requirements, including transfer pricing and operational separation rules. We do not agree that only the main subsidiaries which carry out commercial activities should be subject to our regulation. Under the Charter and Agreement, we have a duty to regulate all commercial activities.[167] If we limited the definition to main commercial subsidiaries, this could create a risk that the activities of smaller subsidiaries could, as a result of their relationship with the Public Service, distort the market or create an unfair competitive advantage. We have therefore decided to adopt a broad definition of commercial activities. However, in relation to the rate of return requirements specifically, we have provided that where a commercial rate of return which a particular smaller commercial subsidiary earns is consolidated into an overall rate of return achieved by one of the one of the main trading commercial subsidiaries (currently BBC Studios Group Limited, BBC Studioworks Limited and BBC Global News Limited), the BBC is not required under our rules to i) assess what an appropriate commercial rate of return is for that smaller commercial subsidiary; or ii) provide to us the targets it sets. We have made this clear in the 2019 Requirements.[168]

5.16 The BBC disagreed with our proposal to report target rates of return over a period aligned with its business plans on the grounds that it would not be proportionate or targeted regulatory intervention.[169] It also argued that we should not require any information about missing its own targets as long as the actual rate of return is above the commercial rate of return. These issues are dealt with in Section 6 as they refer to the reporting requirements relating to the rate of return.

[165] BBC response to the July 2018 Consultation, Section 3.3, pages 22 and 23.
[166] 2019 Requirements, Section 4, Part 1: Definitions and Interpretation, paragraph 1.
[168] 2019 Requirements, Requirement C.3.
[168] 2019 Requirements, Requirement C.3.
[169] BBC response to the July 2018 Consultation, Section 3.2, pages 21 and 22.

## Assessment over an appropriate time period

5.17    In our consultation, we proposed to modify the 2017 Requirements to make it clear that the BBC's commercial activities should earn a commercial rate of return over an appropriate time period. We did not set out what an appropriate time period would be as we considered this would vary depending on the nature of the activities within the lines of business or subsidiaries.

5.18    Pact, ITV and the BBC[170] were all supportive of our proposal. Pact emphasised the importance of the commercial subsidiaries adhering to the rigour of the commercial world and argued that all commercial activities should aim to generate a profit every year, particularly if they were new activities.[171] Pact also asked what time period we would consider is appropriate, emphasising that it believed the BBC had a mature set of businesses.[172] ITV argued that an appropriate time period must be compared to acceptable investment horizons in the UK commercial media sector.[173]

5.19    With regards to Pact's view that all lines of business and subsidiaries should generate a profit in each year, we continue to consider that there may be situations where a rational investor[174] would accept losses as long as it expected the business to achieve a commercial rate of return over an appropriate time period. For example, this could be the case in the start-up phase of a business or for individual years in a mature business if for example there was a significant investment, as long as that business can demonstrate a clear plan to move to earning a commercial rate of return within a reasonable period.

5.20    We continue to consider that an assessment of the BBC's rates of return must be carried out over an appropriate period of time. What that period is in a particular case will vary depending on the characteristics and nature of the activities within the lines of business, as well as how mature the line of business is (e.g. a new activity might be expected to have a longer appropriate period where as we would normally expect a mature activity to have a shorter period over which to earn a commercial rate of return). We do not therefore consider that it would be appropriate to define in advance what constitutes an appropriate period in the requirements or accompanying guidance. However, we believe the rational private investor principle is relevant to the consideration of an appropriate time period. We consider that this is consistent with ITV's view that the time period should be comparable with acceptable investment horizons in the UK commercial media sector and Pact's view that the commercial subsidiaries should adhere to the rigour of the commercial world.

5.21    We will continue to monitor target rates of return and actual performance through our reporting regime[175] to ensure the BBC is complying with our requirements.

---

[170] BBC response to the July 2018 Consultation, Section 3.2, page 21.
[171] Pact response to the July 2018 Consultation, paragraph 4.1.1, page 9.
[172] Pact response to the July 2018 Consultation, paragraph 4.1.3, page 9.
[173] ITV response to the July 2018 Consultation, page 2.
[174] A rational private investor would make decisions which maximise its value over a period it considers appropriate.
[175] 2019 Requirements, Requirements D.10 to D.23.

**BBC's commercial and trading activities: statement on Ofcom's requirements**

## Failure to earn a commercial rate of return

5.22   The current requirements state that the BBC must review performance of a line of business and consider any steps necessary to move to earning a commercial rate of return, where this is not the case.

5.23   In our consultation, we proposed clarifying that the BBC should carry out this review when it identifies that a line of business is not likely to earn a commercial rate of return, rather than waiting until the line of business is not achieving this level of return. Further, we clarified that we did not consider that it was enough for the BBC to just consider the steps; instead, we proposed that the BBC should be required to implement those steps as soon as practicable so that it could improve its performance and earn a commercial rate of return.

5.24   We also proposed to make clear that a non-commercial rate of return could not be justified on the grounds of assisting the delivery of the Public Purposes, given the commercial activities must be separate from the delivery of the Public Purposes and are only required to fit with the Mission and Public Purposes. However, in considering whether to investigate a potential breach of the rate of return requirements and whether to impose a penalty in the event that a breach is found, we would take into consideration, among other factors set out in our Enforcement Procedures,[176] any link between the commercial activity in question and the other activities carried out by the BBC which were subject to the regulatory regimes established by the Operating Framework.

5.25   ITV was supportive of our proposal to amend the 2017 Requirements. It considered that Ofcom should have the power to look carefully at any changes proposed by the BBC to make an activity acceptably profitable.[177] However, it was concerned that the proposed new guidance could excuse underperformance of BBC Studios, provided it could argue the underperformance was as a result of helping the BBC to meet its Public Purposes.[178]

5.26   Pact wanted clarity on what would happen if the BBC kept failing to earn a commercial rate of return, in particular whether Ofcom would direct the BBC to take remedial action.[179] It also wanted to know who Ofcom considered should have responsibility for ceasing operations if this was required.

5.27   The BBC is already required to provide Ofcom with a business plan and any other supporting information to show how a line of business will return to a commercial rate of return (where it is currently earning or forecast to earn less than this rate). We continue to consider that the requirement for the BBC to provide Ofcom with its business plan and supporting information is sufficient to enable Ofcom to monitor the performance of a subsidiary or line of business, in the event that returns which are lower than a commercial

---

[176] Statement on Procedures for enforcement of BBC competition requirements which is available at: https://www.ofcom.org.uk/__data/assets/pdf_file/0011/102521/Statement-on-Procedures-for-enforcement-of-BBC-competition-requirements.pdf.
[177] ITV response to the July 2018 Consultation, page 2.
[178] ITV response to the July 2018 Consultation, page 2.
[179] Pact response to the July 2018 Consultation, paragraph 5.1.13, page 13.

level are temporary. However, how the BBC addresses its poor performance (and who within the BBC is responsible for making this decision), is a matter for the BBC.

5.28    If there was a situation where a line of business was consistently not achieving, or was not expected to achieve, a commercial rate of return, we would be likely to look at a number of different factors before deciding what, if any, further action might be appropriate. This could include:

a)    review of the life-cycle of the specific activities, including whether the longer-term business plan shows the line of business achieving a commercial rate in the future; and

b)    an assessment of what may have caused the low returns, including a consideration of market circumstances that might mean that achieving a commercial rate of return was not realistic in the short term.

5.29    In the event that we believed there were grounds for concern, we would consider whether to investigate in line with our procedures for enforcement of the BBC's competition requirements.[180] Should we investigate and find that the BBC has failed to comply with the relevant requirement(s), we would consider whether to:

a)    direct the BBC, or accept undertakings from the BBC, to take such steps we consider will remedy the failure to comply and/or ensure that the BBC complies with their requirements properly in future; and/or

b)    require the BBC to pay a specified penalty.

5.30    In line with our consultation proposal, we have therefore decided to clarify that the BBC should undertake a review and implement steps to ensure a line of business or subsidiary earns a commercial rate of return.[181] We consider that our requirements and enforcement procedures are sufficient to address the situation where a line of business is consistently earning below the commercial rate.

5.31    With regards to ITV's concern that our change to the guidance could be used to excuse underperformance if the BBC could argue that it was as the result of helping it to meet its Public Purposes, our intention in making this change is to make it clearer that this, or similar arguments, cannot be used as a justification for not earning a commercial rate of return. However, we remain of the view that in deciding what action would be appropriate in relation to a potential breach of the rate of return requirements, we would not do this in isolation but would take into account any link between the commercial activity in question and the other activities which are subject to the BBC's regulatory requirements.

## Setting appropriate lines of business and informing Ofcom of any changes

5.32    Under the 2017 Requirements, the BBC is required to propose to us how it would define specific lines of business. Since this time, the BBC has merged its production and

---

[180] See Procedures for enforcement of BBC competition requirements:
https://www.ofcom.org.uk/__data/assets/pdf_file/0010/102520/Procedures-for-enforcement-of-BBC-competition-requirements.pdf
[181] 2019 Requirements, Requirement C.4.

distribution subsidiaries but has maintained the current lines of business as required under the terms of the Commitments.

5.33    In our consultation, we proposed to require the BBC to inform Ofcom of any changes that it makes to the current lines of business within its commercial subsidiaries.

5.34    The BBC were supportive of this change, although it queried whether Ofcom's intention was to capture changes to the composition of lines of business, rather than all changes.[182] Other stakeholders did not comment on our proposal.

5.35    It is important that if the BBC decides to change the composition of any of its lines of business, it should inform Ofcom of this change. This will allow us to consider the impact of the new lines of business on the transparency of the commercial activities for both Ofcom and the market. We continue to consider that this additional requirement is appropriate. We have clarified that the notification requirement applies to any change to the composition of any of the lines of business.[183]

5.36    We also proposed to make clear that where a commercial subsidiary had entered into a joint venture, the revenues and costs associated with this joint venture should be included in the relevant lines of business. Stakeholders did not comment on this in their responses.

5.37    It is important that the results of joint ventures are captured in the appropriate line of business to ensure that the target and actual rates of return cover all relevant commercial activities and therefore we have decided to implement our consultation proposal.

## Use of benchmarking information to assess commercial rates of return

5.38    In addition to making it clear the BBC should use benchmarking to assess commercial rates of return, we proposed a change to our guidance to make it clear that, where the BBC was not able to use or source appropriate benchmarking data or wished to supplement benchmarking with other data sources, it could use other appropriate information to assess whether its lines of business are making returns in line with market norms.

5.39    We note that the BBC has recently outlined its targets for its commercial subsidiaries as part of the BBC Commercial Review. It stated these targets are based on the long-range plan for each commercial subsidiary alongside average results from benchmarking analysis.[184] We also note the EY report commissioned by the BBC as part of the BBC Commercial Review.[185]

5.40    Pact disagreed with our proposal and argued that Ofcom must check any additional data sources used by the BBC for benchmarking. It pointed out that many commercial

---

[182] BBC response to the July 2018 Consultation, Section 3.3, page 22.
[183] 2019 Requirements, Requirement C.5.
[184] Target for the BBC's commercial subsidiaries - December 2018, page 1.
http://downloads.bbc.co.uk/aboutthebbc/insidethebbc/howwework/reports/pdf/commercial_targets_2018.pdf
[185] A review of the BBC's commercial subsidiaries – December 2018, pages 65, 69 and 72.
http://downloads.bbc.co.uk/aboutthebbc/insidethebbc/howwework/reports/pdf/commercial_review_2018.pdf

companies use market and acquisition activity to predict how their companies compare with others.[186]

5.41    We reiterate that we expect the BBC to use benchmarking when assessing and setting an appropriate commercial rate of return for a line of business. However, there may be some limited instances where the BBC will be unable to find suitable benchmarks based on publicly available information. In these circumstances the BBC may have to use other information such as industry knowledge and its own judgement to assess and set an appropriate commercial rate of return. The BBC is required to provide this assessment to Ofcom as part of its reporting requirements. We will review the BBC's submissions and evidence to determine whether the rates of return proposed are commercial. We have therefore decided to implement our consultation proposal.

---

[186] Pact response to the July 2018 Consultation, paragraph 4.14, pages 9 and 10.

**BBC's commercial and trading activities: statement on Ofcom's requirements**

# 6. Monitoring, reporting and transparency

## Introduction

6.1     The monitoring, reporting and transparency requirements ("reporting requirements") support the other substantive requirements. They enable us to monitor the effectiveness of the other requirements and provide stakeholders with relevant information and transparency of the BBC's activities.

6.2     We said in the 2017 Requirements that reporting was an area that was likely to evolve over time as we developed our understanding of the BBC's processes and practices for its commercial subsidiaries and their relationship with the Public Service.

6.3     Since the 2017 Requirements came into effect, the BBC has published and submitted information to us to comply with the reporting requirements. We have engaged with the BBC to improve our understanding of its businesses, activities and how the relationship between the Public Service and the commercial subsidiaries[187] works in practice. We have also engaged with other stakeholders and considered the concerns they have about the reporting requirements and the information the BBC has published.

6.4     Ahead of our consultation, we assessed the information we currently receive from the BBC against what we consider is required to monitor the other substantive requirements. We also reviewed the information that the BBC publishes as part of its statutory and other regulatory obligations.

6.5     This exercise led us to identify gaps in the existing reporting requirements and areas where further information or explanation is required, and we proposed changes to the reporting requirements to address that. This included cost information for transfer charges and more supporting information on rate of return. However, we also identified some areas where we do not require the information as frequently as specified in the 2017 Requirements. Finally, in light of discussions with the BBC in connection with some of their submissions to meet the reporting requirements, we sought to provide additional clarity in the modified requirements.[188]

6.6     Following our consultation, we have amended some of the proposed requirements in areas where we consider that the information we had proposed to publish may be commercially sensitive. Further, in areas where we consider the cost to the BBC to produce a report may be considerable, we have slightly simplified the report.

6.7     In this section we summarise the proposed changes to the reporting requirements (as set out in our consultation), the responses received, our further analysis and our decisions. We

---

[187] In this section, where we refer to reporting requirements by a commercial subsidiary, we mean reporting requirements by the commercial subsidiary itself as well as all of its subsidiaries and any joint ventures in which the subsidiary may participate.
[188] We summarise the reporting requirements we have decided to impose in Tables 6.1 to 6.3 at the end of this section. These tables include references to the relevant requirements and guidance set out in the 2019 Requirements.

do this by reference to each of the four substantive requirements. However, before we do this, we first consider the general issues that affect all aspects of the reporting requirements.

# General themes

6.8    Our proposals and stakeholders' responses identified a number of issues that apply to the reporting requirements as a whole:

a)    Public vs private reporting;

b)    The application of our requirements to material items only;

c)    The frequency of reporting;

d)    Record keeping; and

e)    Definition of a commercial subsidiary for the purposes of reporting.

6.9    The BBC also commented on the adequacy of the justification for our proposals in our consultation. We discuss these issues in turn below.

## Public vs private reporting

6.10    For each reporting requirement we considered whether the information should be published or only provided to Ofcom. In all cases, in light of our duty to ensure transparency,[189] our starting point is that the information should be published unless there are reasons why this would not be appropriate or proportionate. For example, publication may be inappropriate if it would impact the ability of a commercial subsidiary to compete in a market.

6.11    We consider that the purposes of these different types of reporting are as follows:

a)    **Published information**: It is important that sufficient information is published to inform stakeholders and enable them to contribute to the development of robust regulatory decisions by allowing them to review and potentially challenge the data on which those decisions are made. Publication should also provide stakeholders with a level of assurance about the relationship of the commercial activities with the Public Service and how we are monitoring the BBC's compliance with the requirements, while protecting commercially sensitive information.

b)    **Private information**: Appropriately specified reporting requirements enable us to make informed regulatory decisions, monitor the relationship between the commercial activities and the Public Service and how the BBC is meeting the requirements, ensure that the requirements continue to address the underlying competition concerns. We recognise that reporting cannot provide all the information necessary to demonstrate the BBC's compliance. However, it is a useful source of information which serves as an

---

[189] Agreement, Section 28, paragraph (1).

anchor point to reconcile other data to, which we are able to request through our formal information gathering powers to support our decision making.

6.12    Stakeholders did not comment on the objectives of the reporting regime and we consider that they remain relevant and appropriate to our assessment of the reporting requirements.

## Materiality

6.13    We recognised that for our reporting requirements to be proportionate they must apply to material items of information. We therefore proposed to require the BBC to include and/or take account of all material items of information in complying with the reporting requirements. We proposed to define the materiality principle as follows: a material item of information is such an item that is reasonably expected to affect the views of a competent user of the reports which the BBC is required to provide under the reporting requirements. We did not propose to define a quantitative threshold for materiality because we considered such a fixed threshold would lack the flexibility needed when materiality is applied in different areas of reporting.

6.14    When considering in our consultation what further information we may require for our monitoring and for transparency, for each proposed modification we took into account any additional reporting burden that these may place on the BBC. We considered the information the BBC already produces and proposed to use that where appropriate. We identified where we required further detail and/or a different breakdown of the information. Where we proposed to require additional reporting, we expected the BBC to apply the materiality principle. Where appropriate we also expected the BBC to use its judgement in defining the key categories of information it reports (subject to minimum requirements necessary to fulfil our duties).

6.15    We explained for each requirement why we considered the additional reporting to be proportionate. We considered that further transparency about how the BBC goes about complying with our substantive requirements not only helps us monitor the compliance, but also allows other stakeholders to contribute more effectively to that process. This additional transparency would also benefit the BBC as the stakeholders' confidence in its reporting and compliance is enhanced as a result.

6.16    The BBC welcomed the clarification relating to materiality applying to all our reporting requirements. It noted that "the absence of a current threshold for reporting risks placing disproportionate requirements on the BBC".[190] However, the BBC requested clarification of what a reasonable approach may be and the appropriate level of materiality.

6.17    We understand the BBC's concerns but do not consider that it would be appropriate to set a fixed level for materiality. Materiality is likely to change depending on circumstances and we therefore consider that the BBC is best placed to apply the materiality principle explained above, in the first instance. However, we would engage with the BBC if needed

---

[190] BBC response to the July 2018 Consultation, Table 1, page 49.

to ensure that it establishes a reasonable approach for applying a materiality principle to all our reporting requirements.

6.18    We have therefore decided to require the BBC to apply our proposed materiality principle and include and/or take account of all material items of information in complying with the reporting requirements.

## Frequency

6.19    In our consultation, we set out the frequency we proposed for each of the reporting requirements. The 2017 Requirements set out that the BBC should provide us with information quarterly as well as annually. We have decided to reduce the frequency with which detailed information should be provided. For the requirements set out below, we proposed that the BBC should provide the information to us biannually. All other reports are required to be provided annually or notified to us in the specified circumstances:

   a)   Notification of changes to transfer pricing methodologies;

   b)   Detailed transfer charges; and

   c)   Detailed financial performance.

6.20    The BBC welcomed our proposal to reduce the frequency, however, it argued that "annual reporting, combined with an obligation for the BBC to inform Ofcom as soon as practical if the BBC expects a commercial subsidiary or line of business would fail to make a commercial rate of return within a given financial year or over an appropriate period, would be more proportionate".[191]

6.21    The other argument that the BBC made concerned the seasonal nature of the activities carried out by the subsidiaries. The BBC explained that "revenue earned in nearly all (five out of seven) business areas is cyclical in nature, for example, almost half of content sales occur in the final quarter".[192] It therefore considered that biannual reporting was "not necessarily indicative of trends across the financial year, and therefore cannot make a meaningful contribution to Ofcom's ability to discharge its regulatory functions in this area."

6.22    We consider that biannual reporting is necessary to enable us to form our own view of the BBC's progress on rates of return and be kept updated of how the commercial subsidiaries are evolving in a timely manner and is more proportionate than the current quarterly reporting. It is particularly important that the frequency of reporting provides sufficient transparency to Ofcom and sufficient assurance to the industry while the new regulatory regime is being embedded.

6.23    Biannual reporting would also allow us to identify and, if necessary address, any accounting issues (for example changes in rate of return metrics, cost allocation, and

---

[191] BBC response to the July 2018 Consultation, Section 4.1, page 25.
[192] BBC response to the July 2018 Consultation, Section 4.1, page 25.

transfer pricing methodologies) faster than annual reporting. This should reduce the risk of the full year reports having to be restated and, in some cases, republished.

6.24    We understand that some of the BBC's commercial activities are cyclical. However, we do not consider this to be a reason not to provide information that is relevant to our understanding of the business (including the cyclical nature), particularly in the early stages of our monitoring regime. We consider biannual reporting is appropriate at least until we have a better understanding of the BBC's commercial activities and its new group structure, and we have adequate confidence in the quality and reliability of the reporting.

6.25    We have therefore decided to require the BBC to provide reports to us biannually in some areas (specifically set out below). However, we will keep the frequency of the reporting obligations under review to ensure that these obligations remain appropriate and proportionate.

## Record Keeping

6.26    There is currently a requirement that the BBC must maintain records of its trading activities with third parties. We explained in our consultation that it is important that the BBC records data and maintains those records to such an extent to enable it to provide an adequate explanation of how it has complied with the substantive requirements. We proposed to impose a requirement on the BBC to keep records for a period of six years in line with standard practice for public companies.

6.27    Stakeholders did not comment on this proposal. We have therefore decided to adopt our proposal to include a general requirement for the BBC to maintain records of all of its trading and commercial activities. This will replace the current specific record keeping requirement for trading activities with third parties.

## Definition of a commercial subsidiary for the purposes of reporting

6.28    As noted in Section 5, we have decided to adopt a broad definition of commercial subsidiaries for the purposes of all of our requirements. However, in relation to the reporting requirements specifically, we have provided that where information relating to a commercial subsidiary or a joint venture has been consolidated into reports and accounts for one of the main trading commercial subsidiaries (currently BBC Studios Group Limited, BBC Studioworks Limited and BBC Global News Limited), the BBC is not required to publish or provide separate reports and accounts for the smaller commercial subsidiary or that joint venture.

## The reporting requirements

6.29    In the remainder of this section, we set out the changes we have made to the reporting requirements based on the substantive requirements set out elsewhere in this document, under the following headings:

a)    Separate subsidiary;

b)  Supply and pricing of goods and services; and

c)  Commercial rate of return.

# Separate subsidiary

6.30    The separate subsidiary requirements set out that the BBC must not directly undertake any commercial activities and that all commercial activities must be undertaken through the commercial subsidiaries.[193]

### Summary of consultation proposals

6.31    In our consultation, we explained that there was a risk that activities which should be viewed as commercial activities were instead inappropriately treated as trading activities.[194] We considered that a reasonable understanding of the scale and nature of the BBC's most significant trading activities was needed to help us monitor whether these activities were treated correctly.

6.32    We therefore proposed that the BBC should publish annually the total revenues the Public Service receives from trading activities with third parties, split by key categories.

### Summary of consultation responses

6.33    The BBC noted that this information is already provided in the BBC Annual Report and Accounts and confirmed that it was happy to commit to continue to provide this information.[195]

6.34    Pact supported our proposals in relation to separate subsidiaries.[196] However, it also asked for clarity on "who will be following up on these activities and if something is found how this will be dealt with in the future".[197]

### Our analysis and decisions

6.35    In response to Pact, it is for the BBC in the first instance to ensure that all commercial activities are treated appropriately. We consider that our proposals will give us enough information to be able to monitor that the correct process is being followed. In the event that we consider that there are grounds for concern, we could request additional information using our information gathering powers and investigate in accordance with our enforcement procedures.

6.36    We have therefore decided to require the BBC to publish annually the total revenues the Public Service receives from trading activities with third parties, split by key categories. The

---

[193] Our decisions on the operational separation requirements including reporting are set out in Section 3. We do not discuss our decisions again in this section except for the summary Tables 6.1-6.3 which we have included for completeness.
[194] As explained in Section 2, trading activities are activities undertaken by the Public Service that are commercial in nature but not treated as commercial activities. They are defined in the Agreement (Clause 31(1) and 31(2)).
[195] BBC response to the July 2018 Consultation, page 44.
[196] Pact response to the July 2018 Consultation, paragraph 5.1.1, page 10.
[197] Pact response to the July 2018 Consultation, paragraph 5.1.1, page 10.

breakdown by activity type should, as a minimum, include royalties and rental income which we understand are currently among the key trading activities of the Public Service.

6.37    As some of this information is currently included in the BBC's statutory accounts (as set out in our consultation), the BBC can continue to include this information, and refine it as needed, in these accounts. However, if the BBC was to stop publishing this information in the accounts, it would need to include it in another publication.

6.38    Table 6.1 sets out a summary of our decisions, see also 2019 Requirements, Requirement D.1.

# Supply of pricing of goods and services

6.39    As discussed in Section 4, the BBC is required to ensure that all transactions between the Public Service and the commercial subsidiaries, joint ventures and/or third parties are undertaken in accordance with our pricing requirements. We explained that to establish whether the BBC's prices are in accordance with our pricing rules, we need to:

a)    understand the BBC's pricing methodologies;

b)    establish whether the BBC applies those methodologies in practice; and

c)    establish whether those methodologies are consistent with our pricing requirements.

6.40    We consider these points in turn, below.

## Clarity on the BBC's methodologies

6.41    To establish whether the BBC's prices are in accordance with our pricing rules we need to understand the methodologies the BBC is using to price these goods and services. Below we discuss how we can provide clarity around the methodologies that the BBC applies.

### Summary of consultation proposals

6.42    The BBC currently publishes manuals that set out the methodologies it uses for setting transfer prices for goods and services supplied to commercial subsidiaries by the Public Service and those supplied to the Public Service by the commercial subsidiaries.

6.43    We noted that while this provides transparency around the types of pricing methodologies used for goods and services between the Public Service and commercial subsidiaries, it did not provide transparency on how the Public Service charges third parties for the same goods and services. We considered that the methodologies for setting prices for goods and services sold to third parties would provide reassurance to us and other stakeholders that the BBC was following the same rules when supplying goods and services to third parties as its commercial subsidiaries.

6.44    We therefore proposed that the BBC should publish its methodologies for pricing all goods and services provided by the Public Service that are subject to our transfer pricing requirements (including BBC brands), regardless of whether they are sold to the commercial subsidiaries or third parties. We also proposed that the BBC should include in

the pricing manual the methodologies applied when the Public Service is buying the good or service. We proposed that these manuals be published annually, alongside a notification of changes made to the methodologies.

## Summary of consultation responses

6.45   The BBC agreed that its "methodology documents on the whole could be more transparent, including how [the BBC] treat[s] third parties".[198] It therefore considered that its published methodology manuals should include how it sets prices for goods and services provided to third parties for services that are also traded internally. The BBC also said that it will combine all the current transfer pricing methodology documents into one "*transfer pricing statement*" covering transfer prices to all commercial subsidiaries and prices to third parties.[199]

6.46   However, the BBC did not consider it was proportionate to require it to publish methodologies for all services provided to third parties which are not also provided to commercial subsidiaries.[200] It noted that a number of these services are provided on an ad hoc basis where the BBC has spare capacity. The BBC considered that "Ofcom's theories of harm in this area should chiefly relate to market distortion or unfair competitive advantage by the BBC's commercial subsidiaries, as the BBC is not a monopolist in providing goods and services to third parties."

6.47   Further, the BBC argued that "this requirement would be lagging, not leading" and that it considered it was more transparent to publish methodologies for the coming year rather than the previous financial year.[201]

6.48   Pact agreed with our proposals and welcomed the "additional clarity regarding the BBC's transfer pricing methodologies".[202]

## Our analysis and decisions

6.49   We welcome the BBC's decision to combine the manuals into one transfer pricing statement and consider this should make it easier for stakeholders to find and understand the BBC's approach.

6.50   We note the BBC's concern about the proportionality of publishing all methodologies for services provided by the Public Service to third parties (specifically where they are not also provided to the commercial subsidiaries). The methodology manuals are an important mechanism to allow us and stakeholders to monitor the processes the BBC has in place to set transfer prices. As we explain in paragraph 6.31, there is a risk that the Public Service will undertake trading activities that are commercial activities which should be conducted by separate commercial subsidiaries. Publication of the methodology manuals will help us

---

[198] BBC response to the July 2018 Consultation, Section 4.4.2, page 33.
[199] BBC response to the July 2018 Consultation, Section 4.4.2, page 33.
[200] BBC response to the July 2018 Consultation, Table 1, page 46.
[201] BBC response to the July 2018 Consultation, Table 1, page 45.
[202] Pact response to the July 2018 Consultation, paragraph 5.1.5, page 11.

and stakeholders to monitor the type of trading activities the Public Service is undertaking. We do not consider that this is likely to be a significant area of activity (and should not therefore be a significant burden on the BBC).

6.51    We consider that the methodology manuals provide transparency relating to the methodologies actually used in the half year or the full year reports submitted or published. We have a requirement for the biannual notification of changes to transfer pricing methodologies to Ofcom to ensure that we have ongoing transparency over any changes in the course of a financial year.

6.52    In addition, as discussed, in paragraph 4.46, we consider that it is necessary for the BBC to indicate in the methodology manuals the basis on which transfer prices for each category of goods and/or services provided to the commercial subsidiaries have been set (an open market process or market benchmark, using cost as a proxy for market prices, or to at least cover the long-run incremental cost).

6.53    We have therefore decided that the BBC must:

a)   set out methodologies for pricing all goods and services (including BBC brands) which cross the boundary between the Public Service and its commercial subsidiaries and are subject to our transfer pricing requirements, regardless of whether the Public Service is selling or buying the good or service indicating in each case the basis on which the pricing is done;

b)   include in the pricing manuals the methodologies applied in setting prices for the goods and/or services provided by the Public Service to third parties; and

c)   publish these manuals annually, alongside a notification of changes made to the pricing methodologies.

6.54    Table 6.2 sets out a summary of our decisions, see also 2019 Requirements, Requirements D.5(a), D.5(b), D.5(d), D.6, D.8(a) and D.9.

## Improved visibility of how these methodologies are applied in practice

6.55    Alongside the methodologies, we need to ensure that the BBC is applying these methodologies in practice. Below we discuss what information we will require on actual transfer charges.

### Our approach

*Summary of consultation proposals*

6.56    To provide us with a better understanding of the most significant types of goods and services supplied by the Public Service, we considered that additional information was required on the actual transfer charges that are billed and settled between the Public Service and the commercial subsidiaries. We explained that this additional information would allow us to review the level of transfer charges for the different categories and build up a picture of how these transactions evolves over time. We considered that this would

Case 3:23-cv-00720-TAD-KDM   Document 57-1   Filed 08/29/23   Page 82 of 110 PageID #:
773
BBC's commercial and trading activities: statement on Ofcom's requirements

help us to identify any anomalies in the level of different categories of transfer charge over time and request additional information from the BBC if and where necessary.

*Summary of consultation responses*

6.57    The BBC disagreed with our proposed requirements to provide further information on transfer charges. It argued that actual transfer charges would not aid Ofcom's understanding of the published methodologies which it has used to set transfer prices and how they are applied.[203]

6.58    The BBC also stated that "there are a number of reasons that transfer charges could vary over time, without any changes in methodology or price," for example, if BBC Studios were to stop using Public Service office space the total value of transfer charges would decrease (and would not be due to a change in methodology). The BBC considered that the transparency Ofcom should be concerned about is methodology and prices.[204]

*Our analysis and decisions*

6.59    To provide a better understanding of transfer pricing methodologies and their impact, we consider that information is required on the actual transfer charges that are billed and settled between the Public Service and its commercial subsidiaries. As explained above, this would allow us to review the level of transfer charges for the different categories and build up a picture of how these transactions evolves over time. We consider that this would give us enough information to monitor the actual charges and any anomalies and, if more granular information is required, we would be able to follow up with the BBC using our formal information gathering powers.

6.60    We accept that the information provided by the BBC under this requirement will not in itself allow us to assess compliance with the individual transfer pricing rules or published methodologies. However, it will allow us to monitor how the monetary value of transactions change over time and how the actual charges paid by the commercial subsidiary relate to the expected transfer charge which in turn will allow us to focus our review on the key transfer pricing methodologies.

6.61    We recognise that there could be a number of reasons why transfer charges for a key category may change significantly from one period to the next. As the BBC noted in an example this could occur due to BBC Studios ceasing to use Public Service office space. However, it is also possible that the services in question continue to be used, but for some reason are not being charged (for example as a result of an administrative or accounting error). Given the aggregate nature of the actual transfer pricing information that will be provided to us (i.e. totals for key categories), we may not be able to identify all issues, including the above, with how the BBC is implementing our transfer pricing requirements. However, alongside the methodology manuals, the information on actual transfer charges should help us to determine areas for further analysis that may not be picked up by the

---

[203] BBC response to the July 2018 Consultation, Section 4.4.1, page 31.
[204] BBC response to the July 2018 Consultation, Section 4.4.1, page 31.

various other sources of assurance (including audits). We therefore consider that this information will provide us and stakeholders with greater assurance on transfer pricing.

6.62    We have therefore decided to adopt our consultation proposal to require further information regarding transfer charges. We go through each of the reports that we proposed in our consultation and the specific comments that stakeholders had on these reports below.

**Detailed transfer charges**

*Summary of consultation proposals*

6.63    We proposed that the BBC should provide Ofcom the actual charges split by the same key categories as included in its manuals. We considered that as a minimum this should include property, HR, business affairs, finance, legal and procurement. We also proposed that the BBC must provide total contracted amounts of transfer charges for each category. Further, the actual transfer charges must be split into amounts that have been paid, written off[205] and remain unpaid.

6.64    We also proposed that the BBC should show the amounts that were paid, unpaid or written off in relation to previous financial years, where relevant and that the BBC should provide the total contracted value of each of the key categories of transfer charges. This information was proposed to be provided to Ofcom biannually.

*Summary of consultation responses*

6.65    The BBC argued that the requirement to provide us with details of total transfer charges is "unnecessarily duplicative"[206] as the information is already provided in the BBC Annual Report and Accounts. It further disagreed with our proposed requirement to report on contracted values as well as actuals as it did not believe that this would aid understanding. It noted that for some services, such as legal, there is likely to be no contracted amount and that these services are used when required. Finally, the BBC argued that "any requirement to report information relating to previous years would be retrospective" and that this would only be required in the first year as it would be providing this information to Ofcom annually going forward.[207]

6.66    Pact was supportive of the proposals for additional detailed reporting requirements on transfer charges between the Public Service and the commercial subsidiaries.[208] However, it was "particularly concerned that Ofcom could find overall that the BBC transfer pricing methodology manuals do not outline how and whether the BBC has followed these methodologies in practice".[209] Further, Pact noted that it was "deeply worried that Ofcom

---

[205] We clarified that 'written off' meant any instance where the amount owed is decreased for a reason other than it being paid.
[206] BBC response to the July 2018 Consultation, Table 1, page 47.
[207] BBC response to the July 2018 Consultation, Table 1, page 47.
[208] Pact response to the July 2018 Consultation, paragraph 5.1.6, page 11.
[209] Pact response to the July 2018 Consultation, paragraph 5.1.2, page 10.

have no transparency of how the actual transfer charges compare to the SLAs[210] the BBC has put in place".[211]

6.67    Sky argued that "in light of the BBC's unique funding and scale, and consequently the special responsibility of its commercial subsidiaries in having privileged access to those public service resources," information on transfer charges should be published.[212]

*Our analysis and decisions*

6.68    We require a more detailed breakdown of transfer pricing information than is published in the BBC's Annual Report and Accounts to enable us to monitor the BBC's compliance with the 2019 Requirements. We understand that this detailed information would be a further breakdown of the total intragroup trading figure disclosed in the statutory financial reports.[213]

6.69    In particular, the total contracted amount for each key category is important as this is the transfer charge we would expect the BBC to set using the relevant methodologies in the manuals. If the actuals were significantly different to these contracted values, this may require further information as to how the methodologies are applied in practice.

6.70    We understand the BBC's point that some transfer charges may have no contracted amount as they are used when required rather than on a regular basis. In this case, the BBC does not need to provide that information. However, the absence of a contract or contracted amount nevertheless means that there may be less control over how the services are treated and priced and this may require closer monitoring.

6.71    With respect to whether and if so, how the BBC implements its published methodologies in practice and whether these methodologies comply with our requirements, we draw some assurance from the audits carried out by the NAO and Deloitte, and we also note the BBC has proposed to undertake an internal audit. In addition, as explained in detail below, EY has recommended that the BBC should undertake "spot checks" of individual transfer pricing transactions.[214] We explain this further in paragraphs 6.101 to 6.108.

6.72    We disagree with Sky that this level of detail should be published as these requirements will likely cover commercially sensitive detailed cost and pricing information as well as contractual information.

6.73    In conclusion, we have decided that the BBC must:

   • provide Ofcom with the actual transfer charges split by the same key categories as included in its manuals. The key categories must include, as a minimum, property, HR, business affairs, finance, legal and procurement. Further, the actual transfer charges must be split into amounts that have been paid, written off and remain unpaid;

---

[210] Service Level Agreements.
[211] Pact response to the July 2018 Consultation, paragraph 5.1.2, page 11.
[212] Sky response to the July 2018 Consultation, paragraph 4, page 1.
[213] BBC 2017/18 Annual Report and Accounts, Note A1, page 190.
http://downloads.bbc.co.uk/aboutthebbc/insidethebbc/reports/pdf/bbc_annualreport_201718.pdf
[214] BBC Commercial Review, EY report, December 2018, Section 8.8, page 107.

- show the opening balance brought forward from previous years (where relevant), and in relation to that balance the amounts that were paid, unpaid or written off in the current year; and
- provide the total contracted value of each of the key categories of transfer charges.

6.74    We have decided to require this information to be provided to Ofcom biannually.

6.75    Table 6.2 sets out a summary of our decisions, see also 2019 Requirements, Requirement D.8(b) and D.9.

**Published transfer charges**

*Summary of consultation proposals*

6.76    We proposed that the split of total transfer charges (into key categories and amount paid, written off and remaining unpaid) must be published annually.

*Summary of consultation responses*

6.77    The BBC argued that our requirement to publish actual transfer charges between each commercial subsidiary and the Public Service would not aid the stakeholders in understanding of the methodologies it uses to set transfer prices and how they are applied.[215]

6.78    Further, the BBC was concerned that we had not fully considered the implications of requiring it to publish the actual aggregate transfer prices for each of the key categories. It focused on three points:

- There is no justification as to why the BBC should publish information that competitors do not need to publish; and that publishing this information could potentially provide its competitors with information that could lead to an unfair advantage for its competitors;
- Using the proposed published information, third parties may be able to calculate the details of how prices are set for subsidiaries that sell services to both the Public Service and third parties and this may harm the competitiveness of the commercial subsidiaries; and
- In instances where the BBC contracts with a third party supplier for a service, our requirement might lead to a breach of its contracts as the required information about pricing may be confidential under those contracts. As a result, the BBC could be required to "balance the risk of regulatory non-compliance with breach of contract".[216]

*Our analysis and decisions*

6.79    We engaged with the BBC to understand its concerns in relation to the commercial sensitivity of the transfer pricing information we proposed should be published. In response to our questions, the BBC provided a number of examples which, under the

---

[215] BBC response to the July 2018 Consultation, Section 4.4.1, page 31.
[216] BBC response to the July 2018 Consultation, Section 4.4.1, page 32.

current methodologies, would disclose information that the BBC considers to be commercially sensitive.[217] For example, as Studioworks is a smaller subsidiary, there may be several categories within the methodologies for Studioworks' use of BBC goods and/or services, or of its sales to the BBC, where there is only one service supplied. Given this, the BBC noted that there may be a situation where publication of this information may result in the value of the contract becoming public knowledge and lead to a breach of this supplier contract (if it prohibits publication of pricing information).[218]

6.80   We continue to consider it important and necessary to provide transparency to stakeholders in this area. However, in light of the BBC's comments, we have considered the appropriate level of detail for published transfer prices. Whilst publication of the total transfer prices, split by providing and receiving parties, for each commercial subsidiary would have the benefit of enabling stakeholders to understand the scale of each category of transfer pricing, we are now concerned about the risk of potentially sensitive information being disclosed. For that reason, we have decided against requiring disclosure at the level of detail proposed in our consultation. Instead, we have decided to require the BBC to publish more aggregated information on total transfer charges for each commercial subsidiary split by:

- Amounts paid by: (i) a commercial subsidiary to the Public Service; and (ii) the Public Service to a commercial subsidiary; and
- The total amounts that have been paid, written off or remain unpaid.

6.81   This requirement does not raise concerns about publishing potentially confidential information. Even though this data is more aggregated than our consultation proposals, we consider that it will still be informative for stakeholders as it will enable them to understand the scale of transfer charges for each subsidiary.

6.82   Table 6.2 sets out a summary of our decisions, see also 2019 Requirements, Requirement D.5(c).

**Overview of intragroup transactions**

*Summary of consultation proposals*

6.83   We proposed to require the BBC to provide Ofcom totals of all the intragroup transactions between the Public Service and each of its commercial subsidiaries split by key categories such as transfer charges, dividends and loans, together with information showing how the closing intercompany balances are arrived at from the opening intercompany balances.

6.84   Further, we proposed that the BBC must show how the total transfer charges and other intra-group transactions between the Public Service and the commercial subsidiaries as reported to Ofcom as above are treated in the BBC Group Accounts. We proposed that this information be provided to Ofcom annually.

---

[217] BBC response to formal information request dated 20 November, question 7.
[218] BBC response dated 6 December 2018, Question 7, to follow up questions to the formal information question dated 6 November 2018.

**BBC's commercial and trading activities: statement on Ofcom's requirements**

*Summary of consultation responses*

6.85    The BBC argued that the requirement to provide us with details of total transfer charges, dividends and loans is "unnecessarily duplicative"[219] as the information is already provided in the BBC Annual Report and Accounts.

6.86    Pact agreed with our proposal that the BBC should provide an overview of the intragroup transactions and show that the transfer charges are consistent with the BBC Group Accounts. It argued that this would give us "adequate information to interrogate the complete picture of the transfer pricing transactions between the Public Service and the commercial subsidiaries".[220]

6.87    For the reasons set out in paragraph 6.67, Sky considered that information on intragroup transactions should be published.[221]

*Our analysis and decisions*

6.88    We consider that this information would provide us with a full picture of all transactions between the Public Service and the commercial subsidiaries including the transfer charges between them. This would ensure that we have captured all supplies of goods and services and have transparency over the fund flows which could give rise to unfair advantage (such as loans provided on non-commercial terms). As explained above, we do not consider the BBC Annual Report and Accounts set out this information in the manner and the detail we require.

6.89    As set out in the consultation, this information would provide further assurance about the appropriateness of the transfer charges reported to us by the BBC. However, we consider it could be commercially sensitive and its publication would not therefore be appropriate.

6.90    We have decided to implement our proposal and require the BBC to provide to Ofcom annually the following information:

- totals of all the intragroup transactions split by key categories such as transfer charges, dividends and loans, together with information showing how the closing intercompany balances are arrived at from the opening intercompany balances; and
- explanations of how transfer charges and other intra-group transactions between the Public Service and the commercial subsidiaries as reported to Ofcom are treated in the BBC Group Accounts.

6.91    Table 6.2 sets out a summary of our decisions, see also 2019 Requirements, Requirement D.7.

---

[219] BBC response to the July 2018 Consultation, Table 1, page 47.
[220] Pact response to the July 2018 Consultation, paragraph 5.1.16, page 12.
[221] Sky response to the July 2018 Consultation, paragraph 4, page 1.

## Increased confidence that the BBC's methodologies are consistent with transfer pricing requirements

6.92    It is the BBC's responsibility to comply with our pricing requirements. While we may choose in future to review the appropriateness of the BBC's pricing methodologies and its compliance with our requirements in setting those methodologies from time to time, we consider it necessary to have some assurance that our requirements are being followed on an ongoing basis.

### Summary of consultation proposals

6.93    We discussed what assurance we may be able to gain from the current BBC audits in relation to whether the published transfer pricing methodologies have been followed in practice by the BBC, and whether those methodologies have been set in compliance with our requirements. We noted that one option could be to require the BBC to procure a third-party report to Ofcom, possibly in the form of an audit opinion or a report on the findings from the completion of tests, or agreed upon procedures, to be specified by Ofcom.

6.94    We have imposed similar requirements on other stakeholders, and this remains an option for the BBC. Before deciding whether such an approach was appropriate, we considered that we should establish whether the BBC's own procedures and the existing audit arrangements could provide us with the necessary assurance without the need for additional testing and reporting.

6.95    We did not therefore propose to introduce a requirement for a third-party report to Ofcom in the form of an audit report. Instead, we noted that we would continue to engage with the BBC's auditors and its internal audit function to better understand the scope of their work and the extent to which we can draw assurance from it.

### Summary of consultation responses

6.96    The BBC did not consider we had clearly set out our rationale for seeking greater assurance than can be gained from the BBC's Fair Trading Audit. It disagreed that there was limited information to inform our assessment of whether the BBC's transfer pricing is consistent with its methodologies and referred to our proposed reporting requirements on transfer pricing (the "five regulatory interventions").[222]

6.97    The BBC set out that the NAO regularity and financial audits involve reviews of the transactions between the Public Service and the commercial subsidiaries (including testing a sample of intra-group transactions), as well as the BBC's Fair Trading Committee work. It argued that we should consider whether the NAO audit provides sufficient assurance for us before we consider further audit obligations.

---

[222] BBC response to the July 2018 Consultation, Section 4.5, page 34.

6.98    Pact considered that "Ofcom needs to monitor whether the BBC methodologies are consistent with Ofcom's pricing requirements".[223] It further argued that any measures put in place by the BBC to monitor individual transfer pricing transactions should be clarified for stakeholders. Pact supported "Ofcom's work on establishing whether the current BBC audit arrangements prove to be adequate enough to judge whether the BBC's pricing is consistent with its methodologies".[224]

6.99    Pact was also interested in the possibility of an independent audit of the transfer pricing arrangements. It argued that "a wholesale review of the transfer pricing system and not just whether the arrangements themselves are satisfactory and appropriate would go some way in reassuring the market" and proposed this audit be published.[225]

6.100   Finally, Pact asked what the BBC's internal monitoring of individual transfer pricing transactions were and whether they would be published. In addition, it wanted to know how these measures would be tested by Ofcom.

**Our analysis and decisions**

6.101   We need to have reasonable assurance, amongst other things, that:

    (i)     the BBC is charging transfer prices in accordance with its published methodologies; and

    (ii)    the BBC's transfer pricing methodologies comply with our requirements.

6.102   We agree with the BBC that we will gain some assurance on these matters through our existing reporting requirements, as well as the requirements we have decided to impose in this document. However, in the consultation we considered that we need further assurance in this area, some of which could be gained from independent sources such as auditors. We therefore proposed to consider other sources of assurance. We discuss these below.

6.103   Since the publication of our consultation, the NAO has also published the audit opinions provided by the Comptroller & Auditor General (C&AG) on the financial statements of the BBC Group and the commercial subsidiaries. In respect of the BBC Group, an opinion is given on the regularity of transactions within the financial statements. The regularity opinion considered whether licence fee funding has been used for its intended purpose, as set out in the BBC's framework of authorities which are the Royal Charter, the Framework Agreement and other agreements between the BBC and government ministers. In his audit report,[226] the C&AG stated that an area of audit focus for the NAO's work had been the risk of the BBC using licence fee money inappropriately to fund commercial activities – for example, cross-subsidy of the BBC's commercial subsidiaries where transactions were not on arm's length terms. Our assessment of the NAO's work is that its audit could provide some assurance over whether the BBC is charging transfer prices in accordance with the

---

[223] Pact response to the July 2018 Consultation, paragraph 5.1.2, page 11.
[224] Pact response to the July 2018 Consultation, paragraph 5.1.7, page 12.
[225] Pact response to the July 2018 Consultation, 5.1.7, paragraph 5.1.7, page 12.
[226] BBC Annual Report 2017/18, pages 169-182.

requirements of the framework of authorities for regularity (the Royal Charter, Framework Agreement and other agreements entered into with other government ministers). However, where our requirements go beyond the framework of authorities, the NAO audit did not consider whether the BBC's transfer prices comply with these additional requirements.

6.104    The BBC's Fair Trading audit provides an opinion on whether the BBC has complied with our trading and separation requirements.[227] Therefore, as we explained in our consultation,[228] this could provide us with some assurance over whether the transfer pricing methodologies comply with our requirements.

6.105    We note that since our consultation, the EY report was published as part of the BBC Commercial Review. It discussed the audits that are currently undertaken and considered that the Fair Trading Audit provides "some evidence that the BBC is complying with Ofcom's trading and separation requirements" but that as the audit is conducted on behalf of the BBC Board, EY "cannot rely on the opinion as an external third party".[229]

6.106    Further, EY noted that there are "inherent limitations stated by Deloitte in its report which restrict the amount of assurance we can take from the audit." These inherent limitations refer to the fact that it is an audit of the system of controls and may not detect all errors or irregularities.[230]

6.107    In light of the above findings, we do not consider that an additional regulatory audit requirement is necessary at this stage to gain further assurance. However, we will continue to monitor the findings of the NAO and the Fair Trading Audit as appropriate. We will also examine the BBC's internal audit, including its scope and methodologies, to see if further assurance may be gained from it. If we find that the level of assurance gained from those sources is insufficient, we will consider putting in place additional regulatory audit requirements.

6.108    Pact proposed that a wholesale review of the transfer pricing system take place and that this review should be published. As noted previously, and for the reasons explained above, we do not consider that this would be necessary or proportionate at this time. We are currently considering whether to undertake specific work such as a one-off assessment on transfer pricing as part of our review BBC Studios. We have therefore decided not to propose any further audit requirements and, as noted above, if we find the assurance from existing audits is not sufficient, we will consider whether further audit requirements are necessary at that point in time.

---

[227] BBC Annual Report 2017/18, page 122.
[228] July 2018 Consultation, paragraph 5.65.
[229] BBC Commercial Review, EY report, December 2018, Section 8.7.2, page 104.
http://downloads.bbc.co.uk/aboutthebbc/insidethebbc/howwework/reports/pdf/commercial_review_2018.pdf
[230] BBC annual report 2017/18, page 122.

BBC's commercial and trading activities: statement on Ofcom's requirements

# Commercial rate of return

6.109    As discussed in section 5, the requirements state the BBC must:

- over an appropriate period of time, earn a commercial rate of return on its commercial subsidiaries and lines of business;
- assess an appropriate commercial rate of return for each of the commercial subsidiaries and lines of business;
- set a target rate of return for each of the commercial subsidiaries and lines of business that is at least the commercial rate of return; and
- where the BBC considers that one or more of the commercial subsidiaries or lines of business are not likely to earn a commercial rate of return over an appropriate period of time, conduct, as soon as practicable, a performance review, and implement any necessary steps, including a revised business plan, to enable the commercial subsidiaries and lines of business to earn a commercial rate of return over that period of time.

6.110    In the first instance, the requirements put the onus on the BBC to determine what the appropriate rate of return should be. In this section, we discuss the reporting requirements which we consider are needed to monitor actual performance against what the BBC has assessed is a commercial rate of return.

## Target rates of return

6.111    It is important that we review the BBC's benchmarking to allow us to monitor whether the BBC has set appropriate target rates of return.

### Summary of consultation proposals

6.112    We proposed that the BBC should provide the target rates of return for each of its commercial subsidiaries overall and each line of business. Further, we proposed that the BBC must inform us of the target rates of return it has set for the same period as any business plans it uses for managing its businesses, including the budget for the year ahead (which it currently provides).

6.113    In addition, we considered further information was required to better understand how the BBC sets its target rates of return and the reasons and evidence that supports its view that these targets are appropriate. Therefore, alongside the target rates of return, we proposed that the BBC should provide the following supporting information to Ofcom:

- A clear description of the activities of the commercial subsidiaries and each line of business within them;
- Definition of the metrics (e.g. EBITDA) used for assessing the target rates of return and reasons for selecting those metrics;[231]

---

[231] This information was included as part of the BBC's 2018/19 rate of return targets submission.

BBC's commercial and trading activities: statement on Ofcom's requirements

- A split into relevant categories of the revenues and costs (and assets, liabilities, capital employed and cash flows if applicable) used in the calculation of the target rates of return together with a description of those revenues and costs;
- Explanation of how any common costs or overheads have been allocated to each line of business; and
- The reasons and evidence on which the BBC has relied in forming the view that its target rates of return are commercial with reference to market benchmarks, including any internal and external reports on which it has relied to establish those market benchmarks.

#### Summary of consultation responses

6.114    The BBC disagreed with our proposal that it should report target rates of return over a period aligned with its business plans on the grounds that it would not be a proportionate or represent a targeted regulatory intervention. It considered that it would only be relevant to report over this time period if in the next financial year, the BBC was not projecting to make a commercial rate of return in the commercial subsidiary or line of business.[232] Further, the BBC highlighted that targets for future years would be less precise, and in its opinion of limited relevance to Ofcom.[233]

6.115    The BBC also noted that it does not currently prepare a full cash flow statement or balance sheet for each line of business in its commercial arm; instead, it consolidates this information at the level of each commercial subsidiary. The BBC argued that splitting out assets and liabilities across different lines of business "would require significant manual effort potentially on an ongoing basis, in addition to changes to current accounting systems and processes".[234]

6.116    Pact supported our proposed requirement to provide target rates of return for each commercial subsidiary, as well as each line of business. It also agreed that the BBC should inform us of the target rates of return for the same period as any business plans, the budget for the year ahead and a definition of the metrics used.[235]

#### Our analysis and decisions

6.117    We note the BBC's concerns about the accuracy of forecasts more than one year in advance, however, we consider that it is important to understand the BBC's expected profile of returns over the business plan period. It does not follow that because a line of business is forecast to make a return above the commercial rate in the first year, it will continue to make a return above the commercial rate in future years. If the BBC's target rate of return is below a commercial rate in the later years of the business plan, we would

---

[232] BBC response to the July 2018 Consultation, Section 3.2, pages 21 and 22.
[233] BBC response to the July 2018 Consultation, Section 3.2, page 21.
[234] BBC response to the July 2018 Consultation, Section 4.3, page 29.
[235] Pact response to the July 2018 Consultation, paragraph 5.1.8.

want to understand why that was the case and would need to understand the steps the BBC was taking to move its subsidiary or line of business to a commercial rate.

6.118    Also, in the case of a new line of business, the BBC's target in the early years of its business plan might be less than a commercial rate. In this instance, understanding how returns are expected to evolve to reach a commercial level would be important for our understanding of the BBC's assessment of what constitutes an appropriate rate of return.

6.119    We understand that the BBC works on the basis of forecasts spanning a 3-5 year period for its own business planning purposes, which includes the objective of ensuring a commercial rate of return. As we explain above, the rate of return may evolve over a period of a few years. Therefore, additional information about how the rate of return is expected to evolve plays a key part in our monitoring of the BBC's compliance with our rate of return requirements, and it is proportionate for us to require it.

6.120    Our proposal for the BBC to provide further details on its revenues, costs, cash, assets, liabilities, capital employed and cash flows in relation to its target rates of return was not intended to require it to provide information on the split of those items as a matter of course. Instead, our proposals require that the revenues, costs, cash, assets, liabilities, capital employed and cash flows should be reported (and split into key categories) only where these items are used in the calculation of the rates of return. Accordingly, if the BBC does not use revenue or costs or cash, assets, liabilities or capital employed in the calculation of its rates of return, under our proposals it would not be required to report those figures or split them into key categories.

6.121    On the other hand, if the BBC uses any of these figures and splits to calculate its rate of return, then we proposed to require those figures and splits to be provided to us to enable us to understand fully how the rates of return are calculated. For example, if the BBC used the return on capital employed ("ROCE") metric for a line of business, then it would need to split the capital employed and allocate it to that line of business for its calculation, in which case we would require the BBC to report the allocated capital employed and its split into key categories so that we can understand its ROCE calculation. We continue to consider that this approach is appropriate and proportionate.

6.122    We also note that the BBC's Commercial Transparency review recommended that the BBC develops "a regime for forward-looking disclosure for New Studios" to provide the internal and external stakeholders with information about its financial performance among other things. The report also recommends the inclusion of key future performance indicators such as margins in the BBC Commercial Holdings Annual Report.[236] This type of forward-looking information is useful for stakeholders, but as we have explained above it is part of the wider rate of return information which is paramount for us in understanding whether the commercial subsidiaries and the lines of business within them are making a commercial rate of return.

6.123    Taking all the evidence in the round, we have decided that the BBC must:

---

[236] BBC Commercial Transparency Review, paragraphs (XI)(A) and XI(C), 32, 33, 36, 39 to 41.

- provide the target rates of return for each of its commercial subsidiaries overall;
- inform us of the target rates of return it has set for the same period as any business plans it uses for managing its businesses, including the budget for the year ahead; and
- provide the supporting information:
  - A clear description of the activities of the commercial subsidiaries and each line of business within them;
  - Definition of the metrics (e.g. EBITDA) used for assessing the target rates of return and reasons for selecting those metrics;
  - A split into relevant categories of the revenues and costs (and assets, liabilities, capital employed and cash flows where they are used in the calculation of the target rates of return) together with a description of those revenues and costs;
  - Explanation of how any common costs and overheads have been allocated to each line of business; and
  - The reasons and evidence on which the BBC has relied in forming the view that its target rates of return are commercial with reference to market benchmarks, including any internal and external reports on which the BBC has relied to establish those market benchmarks.

6.124   This information will help us better understand how the BBC sets its target rates of return, and the reasons and evidence that supports the BBC's view that these targets are appropriate.

6.125   Table 6.3 sets out a summary of our decisions, see also 2019 Requirements, Requirement D.11 and D.12.

## Improving our understanding of the actual rates of return

6.126   We need to monitor the actual rates of return and understand how they may differ from a commercial rate of return and the actions the BBC intends to take (or may already have taken) to address any shortfalls. We also need to understand the reasons why they may differ from the targets that the BBC has set to understand the BBC's performance in relation to rates of return better. We also need to ensure that stakeholders have sufficient information about the performance of the BBC's commercial subsidiaries and the lines of business within them to gain assurance about the BBC's compliance and contribute to the development of our regulation.

### Summary of consultation proposals

6.127   We made a number of proposals in order to improve our understanding of the actual rates of return achieved by each of the commercial subsidiaries or lines of business.

*Published financial performance*

6.128   We proposed that the BBC must publish a description of the activities of each line of business, with the revenues and costs (and assets, liabilities, capital employed and cash flows if applicable) split by key categories with a description of these categories. We also proposed that the BBC should include an explanation of financial performance.

6.129    In order to gain assurance that the rate of return calculations have been carried out appropriately we proposed that the BBC should demonstrate how the actual rate of return figures that it publishes align with its statutory accounts and the primary statements within those accounts (i.e. the income statement, balance sheet, and the cash flow statement). We explained that since the statutory accounts are audited, this would allow us and stakeholders to have some assurance that the rate of return calculations have been carried out appropriately.

*Detailed financial performance (information only provided to Ofcom)*

6.130    We proposed that the BBC must provide us the budgeted figures as well as the actuals for the key categories of revenues and costs (and assets, liabilities and cashflow if applicable) that underpin the target rate of return calculations, together with the reasons for the differences between actual and budgeted figures. We also proposed that the BBC should include a description of the revenues and costs (and assets, liabilities and cashflow if applicable) as well as an explanation of any differences in cost allocation methods if different to those explained as part of the target setting process.

6.131    In addition, we proposed that the financial performance information that the BBC provides to us includes a split of total revenues and costs of each line of business into revenues and costs related to the Public Service, the commercial subsidiaries, other lines of business within the same commercial subsidiary, and third parties.

6.132    We proposed that the above detailed information should be provided to Ofcom biannually.

**Summary of consultation responses**

6.133    The BBC said that our proposals would require significant additional effort and that Ofcom had not provided sufficient justification for these, in particular:

i)     "Providing for each line of business revenues, costs, assets, liabilities, capital employed and cash flows in our reporting to Ofcom and published report and accounts; and

ii)    In reporting to Ofcom details of revenues and costs for each line of business split between revenues and costs related to the BBC public service, other lines of business in the same commercial subsidiary, other commercial subsidiaries and third parties."[237]

6.134    As discussed in paragraph 6.115, the BBC has said that it does not currently prepare a full cash flow statement or balance sheet for each line of business in the commercial arm but instead it consolidates and publishes this information for each main commercial subsidiary. It further added that "splitting out assets and liabilities across different lines of business will inevitably require a significant degree of judgement".[238] The BBC also noted that this would require significant manual effort and changes to account systems and processes.

---

[237] BBC response to the July 2018 Consultation, Section 4.3, page 29.
[238] BBC response to the July 2018 Consultation, Section 4.3, page 29.

6.135   In relation to information referred to in paragraph 6.133(ii) above, the BBC argued that it "fail[s] to see how this information could possibly be meaningful to Ofcom's regulation of the relationship between the BBC public service and commercial activities, in line with the requirements of the Charter and Agreement".[239] It further added that it does not currently record cost by reference to specific customers. The BBC argued that "to provide this information would require significant manual effort over and above current reporting" and that it would "involve material changes to current accounting systems and processes, particularly within BBC Studios".[240]

6.136   Pact was supportive of our proposals to require the BBC to publish the financial performance of each line of business, a description of the activities of each line of business, and how these actual returns align to the statutory accounts. It also agreed with the proposal that the BBC should provide more detailed financial performance information alongside budgeted figures to Ofcom (as well as the frequency of the provision of this information).[241] Pact proposed that this information should be audited.

**Our analysis and decisions**

6.137   In response to the BBC's point set out in 6.133(i), and as discussed in paragraph 6.120 to 6.121, the intention of our proposals is to require the BBC to provide information on the revenues, costs, assets, liabilities, capital employed and cashflow and a split of those items into key categories only where and to the extent that these items are used in the calculation of the rates of return. Accordingly, if the BBC does not use revenue or costs or cash or assets or liabilities or capital employed in the calculation of its rates of return, under our proposals it would not be required to report those figures or split them into key categories.

6.138   This applies to both the published report and the detailed report discussed below.

*Published financial performance*

6.139   As discussed above, the BBC has recently published its Commercial Transparency review. This report considered that the level of detail we proposed should be published by the BBC (Requirement D.9[242]) is "a level of granularity to which competitor organisations are not put and which is potentially damaging to the competitive position of the commercial subsidiaries".[243] We discuss why we consider that it is important to publish information in paragraph 6.11.

6.140   We do not consider that this requirement goes over and above what other companies produce as part of their annual reports. For example, ITV publishes revenue and EBITDA information on its Studios and Broadcast and Online segments.[244] Further, a production

---

[239] BBC response to the July 2018 Consultation, Section 4.3, page 30.
[240] BBC response to the July 2018 Consultation, Section 4.3, page 30.
[241] Pact response to the July 2018 Consultation, paragraph 5.1.9, page 13.
[242] D.10 as per the final Requirements published alongside this statement.
[243] BBC Commercial Transparency Review, paragraph 64, page 18.
[244] ITV 2017 Annual report, page 125.

company who competes with the production line of business within Studios, would also be likely to publish accounts. We also note that in previous years BBC Worldwide published headline profit information for each of its lines of business.[245] Therefore, we do not consider this requirement would damage the competitive position of the commercial subsidiaries.

6.141   We continue to consider that publishing this level of information would enable stakeholders to have assurance around how the rates of return of the lines of business and commercial subsidiaries are calculated as well as how they tie back to the audited accounts.

6.142   We have therefore decided that the BBC must:

- publish a description of the activities of each line of business;
- ensure that the revenues and costs (and assets, liabilities, capital employed and cash flows if applicable) of each line of business are split by key categories with a description of these categories; and
- provide an explanation of financial performance.

6.143   Table 6.3 sets out a summary of our decisions, see also 2019 Requirements, Requirement D.10.

*Detailed financial performance (information only provided to Ofcom)*

6.144   Following the BBC's response stating that certain parts of this report would require significant manual effort and system change, we asked for further information on what this would be likely to entail and the indicative costs. In response to a formal request for information, the BBC set out that the cost of creating this report could be up to between £1m and 10m £[✂].[246] This figure includes the potential use of external resources, ICT costs and costs caused by potential delays to other projects.

6.145   Our rationale for requiring revenues and costs of each line of business to be split by revenues and costs related to Public Service, other commercial subsidiaries, other lines of business within the same commercial subsidiary, and third parties was that this would enable us to understand the relative impact on the rate of return calculation of the BBC's external transactions as opposed to its internal transfer charges.

6.146   This report would enable us to see how the transfer charges and rates of return fit together. In particular, it would help us understand how sensitive rate of return calculations are to transfer pricing decisions and methodologies.

6.147   However, we understand that the BBC does not currently collect cost information at a line of business level, split by those related to the Public Service, the commercial subsidiaries, other lines of business, and third parties. Therefore, the BBC is likely to need to introduce processes and change its systems and that this may require additional resource and costs.

---

[245] https://www.bbc.co.uk/mediacentre/worldwide/2017/annual-review-results
[246] BBC response to our formal information request, question 6, dated 20 November 2018.

6.148   The BBC has said, however, that it would be simpler for it to give us this cost information at the subsidiary level rather than for each line of business. It also indicated that it could provide revenue split in the way proposed for the different lines of business. The BBC has explained that in particular producing cost splits for lines of business would require significant system changes or significant additional manual effort to produce.

6.149   We therefore consider that it would not be proportionate to ask the BBC to produce this report in the full detail proposed. We consider that this report without the costs split by each line of business would still provide us with sufficient information to understand the scale of the revenues from each stream (internal or external). This information would also allow us to identify any further information, including further splits for the costs, we may need to request using our information gathering powers.

6.150   We have therefore decided that the BBC must provide to us:

- the budgeted figures for the key categories of revenues and costs (and assets, liabilities and cash flows if applicable) underpinning the target rates of return calculations;
- the actuals for the key categories of revenues and costs (and assets, liabilities and cashflow if applicable) underpinning the rate of return calculations;
- the reasons for any differences between actual and budgeted figures; and
- a description of the revenues and costs as well as an explanation of any differences in cost allocation methods if different to those explained as part of the target setting process.

6.151   Accordingly, as set out above we have decided the BBC must provide to us:

- a split of total revenues for each line of business into revenues related to the Public Service, the commercial subsidiaries, other lines of business within the same commercial subsidiary, and third parties.
- a split of total revenues and costs for each commercial subsidiary into revenues and costs related to the Public Service, other commercial subsidiaries, and third parties.

6.152   We have decided that this information should be provided to Ofcom biannually.

6.153   Table 6.3 sets out a summary of our decisions, see also 2019 Requirements, Requirement D.14 and D.15.

## Improving our understanding of the steps taken by the BBC to return a line of business or subsidiary to a commercial rate of return

6.154   Neither the published information available nor the current information that was provided to us provide any evidence regarding what the BBC would do (or has already done) if its commercial subsidiaries or lines of business do not meet a commercial rate of return. We therefore proposed that the BBC provide us with additional information if it was not expecting to meet its targets, to enable us to better understand how the BBC has responded or intends to respond.

### Information on target rates of return below commercial level

*Summary of consultation proposals*

6.155    If the BBC's targets for any of its commercial subsidiaries or lines of business are below the BBC's own assessment of a commercial rate of return, we proposed that it should set out to Ofcom the reasons why and the steps it is planning to take to ensure a commercial rate of return is achieved, the time period over which this is expected to happen, and why the BBC considers this time period to be appropriate.

*Summary of consultation responses*

6.156    Pact agreed with our proposal that the BBC should provide information on the steps it will take if a target rate of return is below the commercial level. It considered that it will be important for Ofcom to find out not just when the BBC will hit the target but how it will look to reduce costs to get back to profitability.[247] Pact also questioned what would happen in the scenario where the BBC continued to miss a target. It considered that the guidance is vague on what action, if any, Ofcom would take if targets continually get missed. Pact insisted that Ofcom should carry out an investigation or direct action against the BBC if targets were continually missed.[248]

*Our analysis and decisions*

6.157    We continue to consider that if the BBC was to provide target rates for its business plan period which showed the expected rate of return was below what it considers to be a commercial rate, we would need to understand why that is expected to occur. However, we do not consider that it is appropriate to set out the actions that Ofcom would take if a subsidiary or line of business was not expected to earn a commercial rate of return over a business plan period. This is because any action that Ofcom might take (following an investigation), will depend on the individual circumstances of the subsidiary/line of business and the market(s) that it operates in. For example, if a subsidiary/line of business was investing in a new venture, it may be appropriate that it was not expecting to earn a commercial rate of return for the business plan period (as long as it had plans in place to earn this level of return within an appropriate time period). The appropriate time period for a new venture to earn a commercial rate of return would be based on market information and benchmarking.

6.158    We have therefore decided to implement our proposal. If the BBC's targets for any of its commercial subsidiaries or lines of business are below its own assessment of a commercial rate of return, the BBC must:

- Explain the reasons why the actual return is lower than the commercial rate;
- Set out the steps it is planning to take to ensure a commercial rate of return is achieved;
- Set out the time period over which this is expected to happen; and

---

[247] Pact response to the July 2018 Consultation, paragraph 5.1.11, page 13.
[248] Pact response to the July 2018 Consultation, paragraph 5.1.13, page 13.

- Explain why the BBC considers this time period is appropriate.

6.159    Table 6.3 sets out a summary of our decisions, see also 2019 Requirements, Requirement D.13.

### Information on actual rates of return below the level of a commercial rate of return

*Summary of consultation proposals*

6.160    In the event that the actual rate of return achieved by a line of business or a commercial subsidiary is lower than the target rate of return it was expecting to achieve, we proposed that the BBC inform us of the reasons for the shortfall and the steps the is planning to take or had already taken to reach the target rate of return in future.

*Summary of consultation responses*

6.161    The BBC noted that our proposals would require it to report to Ofcom when it failed to achieve a target rate of return as if it represented a failure to achieve a commercial rate of return. It did not consider that Ofcom had the powers to intervene in this event as long as it at least made a commercial rate of return. The BBC therefore argued that we should not require it to provide any additional information if its actual rate of return is lower than the target, as long as it was above the commercial rate of return.[249]

6.162    Further, the BBC considered that this information was not necessary as we already propose a general requirement for the BBC to notify Ofcom if the actual rate of return is below a commercial rate of return at any point in time and explain what steps it is taking to remedy that.

6.163    Pact agreed with our proposal that the BBC notify us if its actual rates of return are below the BBC's targets. Further, it considered it was important that the BBC provides reasons why this has happened and the steps the BBC is (or plans) to take. Pact noted that it "continue[s] to insist that the BBC's commercial activities must be able to fail like any other commercial business and it is able to shut operations down where appropriate".[250]

*Our analysis and decisions*

6.164    We recognise that there may be times that the BBC has achieved a rate of return greater than what it considers represents a commercial level but it has failed to meet its own targets. In this circumstance we would not intervene and would not expect the BBC to report the steps it is taking to meet its targets in future years. We have amended our proposed reporting requirements to ensure that this is clear.

6.165    However, as the commercial rate of return is more likely to be a range rather than a single rate, there is significant judgement involved in determining whether an achieved rate of return is commercial. We therefore consider that it is appropriate to require the BBC to notify us and provide reasons/commentary for why it has not met its own target. This will allow us to better understand the performance of the relevant subsidiary or line of

---

[249] BBC response to the July 2018 Consultation, Section 3.1, pages 19 and 20.
[250] Pact response to the July 2018 Consultation, paragraph 5.1.12, page 13.

business and how its rate of return is evolving compared with an appropriate commercial rate of return in the markets that it is operating.

6.166    Understanding why targets have not been met is also important for Ofcom to monitor because past financial performance is often a useful indicator of future financial performance. Given that the BBC already prepares this information for its own management to allow it to understand variances between target and actual performance, we do not consider that the requirement to report it to Ofcom presents a significant additional burden.

6.167    As explained in paragraph 6.157, we have decided to require the BBC to report the difference between the actual and target rate of return and provide any information on the reasons for this difference. If the return achieved is below a commercial rate of return, then the BBC will be required to provide information about the steps it has already taken or intends to take to reach a commercial a rate of return.

6.168    Table 6.3 sets out a summary of our decisions, see also 2019 Requirements, Requirement D.16.

### General notification if rates of return are below the commercial level

*Summary of consultation proposals*

6.169    In addition to the above requirements, if at any other point in time, the BBC identifies that a commercial subsidiary or line of business is not expected to earn a commercial rate of return over an appropriate time period, we proposed the BBC notify us and provide an explanation of the steps it is planning to take to address the issue. We also proposed that it must provide information on the period after which a commercial rate of return will be reached and the reasons why it considers this period is appropriate.

*Summary of consultation responses*

6.170    Pact agreed with our proposal but would also "like to know what would happen in the scenario where the BBC continues to keep missing a target".[251] For the reasons set out in paragraph 6.67, Sky considered any notification the BBC provides where a commercial subsidiary is not expected to earn a commercial rate of return should be published.[252]

*Our analysis and decisions*

6.171    The commercial subsidiaries (and lines of business) should make a commercial rate of return. We do not consider that it is necessary to require the BBC to explain the steps it is planning to take to achieve its own targets if the subsidiary or line of business has achieved a commercial rate of return. However, as explained in paragraph 6.164, we consider that it is important for our understanding of the financial performance of the commercial subsidiaries and lines of business to know the reasons for differences in actual performance compared with the targets.

---

[251] Pact response to the July 2018 Consultation, paragraph 5.1.13, page 13.
[252] Sky response to the July 2018 Consultation, paragraph 4, page 1.

6.172    We note Sky's suggestion that the BBC notifications should be published. We consider this information is likely to be highly confidential for the commercial subsidiaries or lines of business who are operating in competitive markets. In addition, we do not believe it necessary for stakeholders to have this information in order to contribute to the regulatory regime. They see the financial performance and actual rate of return for the year in the audited annual accounts and should be able to judge how the rate of return compares with a commercial level given their own knowledge of the industry.

6.173    We have therefore decided to implement our proposal that if the BBC's targets for any of its commercial subsidiaries or lines of business are below its own assessment of a commercial rate of return the BBC must:

- notify Ofcom;
- explain the reasons why; and
- set out the steps it is planning to take to ensure a commercial rate of return is achieved, the time period over which this is expected to happen, and why the BBC considers this time period to be appropriate.

6.174    Table 6.3 sets out a summary of our decisions, see also 2019 Requirements, Requirement D.17.

## Summary of our decisions

6.175    The following tables summarise our decisions discussed in this section.

**BBC's commercial and trading activities: statement on Ofcom's requirements**

**Table 6.1 Separate subsidiary and operational separation – summary of revised reporting requirements**

| Information required | Content | Frequency | Deadline | Publication | Reference to 2019 Requirements | Template | Existing or new requirement? |
|---|---|---|---|---|---|---|---|
| Trading activities revenues | Total revenues from trading activities with third parties split by key categories | Annual | At the same time as the Annual Report and Accounts publication | Yes | D.1 | N/A | New requirement |
| Operational Separation Statement | An Operational Separation Statement setting out how the BBC has complied with the operational separation requirements, including as a minimum, a description of the measures, controls and processes the BBC has in place during that financial year in relation to information sharing, governance arrangements, conflicts of interest, information systems, staff co-location arrangements, and training of employees | Annual | At the same time as the Annual Report and Accounts publication | Yes | D.2 | N/A | New requirement |
| Conflicts of interest | Information on all relevant conflicts of interest arising during the Financial Year, including the details of each conflict and the action the BBC has taken to address them | Annual | At the same time as the Annual Report and Accounts publication | No | D.3 | N/A | New requirement |
| Board and executive committee information | Terms of reference and a list of all members sitting on the boards and executive committees of each commercial subsidiary, identification of those who are Public Service employees, and the reporting arrangements between each board and executive committee | Ongoing when changes occur | Kept updated to reflect any changes | Yes | D.4 | N/A | New requirement |

BBC's commercial and trading activities: statement on Ofcom's requirements

**Table 6.2 Supply of goods and services – Summary of revised reporting requirements**

| Information required | Contents | Frequency | Deadline | Publication | Reference to 2019 Requirements | Template | Existing or new requirement? |
|---|---|---|---|---|---|---|---|
| Methodology manuals | Methodologies of pricing between the Public Service and the commercial subsidiaries and brand valuation together with methodologies for prices charged by the Public Service to third parties | Annual | At the same time as the Annual Report and Accounts publication | Yes | D.5(a), D.5(d) and D.6 | N/A | Existing requirement, new requirement for third parties |
| Notification of changes to transfer pricing methodologies | Any changes to pricing methodologies including impact assessments and reasons for changes | Biannual | Half year - Three months after the end of the first half of the financial year | No | D.8(a) and D.9 | T1 | Existing requirement but frequency reduced from quarterly to biannual |
| | | | Full year - At the same time as the Annual Report and Accounts publication | Yes | D.5(b) and D.6 | T1 | |
| Published transfer charges | Total transfer charges for the financial year charged by the Public Service to each commercial subsidiary, and total transfer charges for the financial year charged by each commercial subsidiary to the Public Service, all of which split by the total amounts paid, written off and remaining unpaid | Annual | At the same time as the Annual Report and Accounts publication | Yes | D.5(c) | T2 | New requirement |
| Detailed transfer charges | A breakdown of total transfer charges split by key categories as per the pricing methodology manuals showing actual versus contracted amounts for each key category. Total transfer charges split by the total amounts paid, written off and remaining unpaid, also showing amounts paid and still unpaid re previous years' charges | Biannual | Half year - Three months after the end of the first half of the financial year | No | D.8(b) and D.9 | T5 | New requirement |
| | | | Full year - At the same time as the Annual | No | D.8(b) and D.9 | T4 | |

93

BBC's commercial and trading activities: statement on Ofcom's requirements

| Information required | Contents | Frequency | Deadline | Publication | Reference to 2019 Requirements | Template | Existing or new requirement? |
|---|---|---|---|---|---|---|---|
| | | | Report and Accounts publication | | | | |
| Overview of intragroup transactions | Totals of intragroup transactions split by key categories showing how the balances at the end of the financial year are derived from the balances at the start of the financial year, together with explanations and calculations showing how intragroup transactions are treated in preparing the annual consolidated accounts of the BBC Group | Annual | At the same time as the Annual Report and Accounts publication | No | D.7 | T3 | New requirement |

**Table 6.3 Commercial rate of return – Summary of revised reporting requirements**

| Information required | Overview of information included | Frequency | Deadline | Publication | Reference to 2019 Requirements | Template | Existing or new requirement? |
|---|---|---|---|---|---|---|---|
| Target rates of return | Target rates of return for each commercial subsidiary and each line of business within them for the same period as the BBC budgets and business plans, together with a clear description of each line of business, definition of the metrics used and the reasons why, revenues, costs, (assets, liabilities, capital employed and cash flows where relevant) used in the calculation of those rates of return split into key categories with a description, common cost attribution methods, and reasons and evidence for appropriateness of targets | Annual | Before the 1st day of the financial year | No | D.11 and D.12 | T6 | Existing requirement but further supporting information added |
| Information on target rates below commercial level | For target rates of return set below the commercial level, the steps planned to reach a commercial rate of return, the period after which a commercial rate of return will be reached and reasons for appropriateness of that period together with supporting business planning and budgeting information | Annual (if applicable) | Before the 1st day of the financial year | No | D.13 | No | New requirement |

BBC's commercial and trading activities: statement on Ofcom's requirements

| Information required | Overview of information included | Frequency | Deadline | Publication | Reference to 2019 Requirements | Template | Existing or new requirement? |
|---|---|---|---|---|---|---|---|
| Published financial performance | Financial performance of each commercial subsidiary and each line of business within them, including a clear description of each line of business, rate of return, revenues, costs, (assets, liabilities, capital employed and cash flows where relevant) used in the calculation of the rate of return split into key categories with a description. Demonstration of how these figures reconcile to the statutory accounts of the relevant commercial subsidiary, and providing an explanation of financial performance | Annual | At the same time as the Annual Report and Accounts publication | Yes | D.10 | No | Existing requirement but clarified further |
| Detailed financial performance | Financial performance of each commercial subsidiary and each line of business within them including rates of return, the revenues, costs, assets, liabilities, capital employed and cash flows in the calculation of those rates of return split into key categories with a description, the budgeted figures for the key categories of revenues, costs, assets, liabilities, capital employed and cash flows used in the calculation of those rates of return together with reasons for variances, explanation of cost attribution methods.

A split of the revenues and costs used in the calculation of rates of return of each commercial subsidiary between the Public Service, other commercial subsidiaries, other lines of business and third parties; and a split of the revenues used in the calculation of rates of return of each line of business within each commercial subsidiary between the Public Service, other commercial subsidiaries, other lines of business within that commercial subsidiary and third parties.

If rate of return is below target, the reasons for the shortfall, and if the rate of return achieved is also below a commercial rate of return, the steps already taken or planned to reach target. | Biannual | Half year - Three months after the end of the first half of the financial year

Full year - At the same time as the Annual Report and Accounts publication | No

No | D.14, D.15 and D.16

D.14, D.15 and D.16 | T7, T8

T7, T8 | Existing requirement but frequency reduced from quarterly to biannual and further supporting information added |
| General notification for rate of return below commercial level | In addition to the relevant requirements above, if at any other point in time, the BBC identifies that a commercial subsidiary or a line of business is not expected to earn a commercial rate of return over an | When applicable | As soon as practicable | No | D.17 | No | Existing requirement but clarified further |

**BBC's commercial and trading activities: statement on Ofcom's requirements**

| Information required | Overview of information included | Frequency | Deadline | Publication | Reference to 2019 Requirements | Template | Existing or new requirement? |
|---|---|---|---|---|---|---|---|
| | appropriate time period, the BBC must provide an explanation of the steps it is planning to take to address the issue. If the BBC decides to take steps to ensure the commercial subsidiary or the line of business reaches a commercial rate of return, it must provide information on the period after which a commercial rate of return will be reached and reasons for appropriateness of that period together with business planning and budgeting information supporting all of the above | | | | | | |

**BBC's commercial and trading activities: statement on Ofcom's requirements**

# A1. Templates

A1.1     We discuss our monitoring, reporting and transparency requirements in section 6 of this document. In our consultation we set out proposed templates for some of our requirements where the BBC either needs to publish information or provide it to us. The BBC responded with some detailed comments on these. Below we set out the BBC's responses as well as our decisions. The templates are set out in the 2019 Requirements.

## Template 1 – Notification of changes to transfer pricing methodologies

A1.2     Template 1 sets out the impact of changes in transfer pricing methodologies. This information together with reasons for the changes will provide us with the necessary transparency to be able to monitor the changes in transfer charges and help ensure they continue to be in line with our transfer pricing requirements. It will also provide stakeholders with added transparency as to whether the BBC is meeting its transfer pricing requirements.

A1.3     In relation to material changes in pricing methodologies the BBC noted that it "do[es] not consider that in all instances it would be practical, or possible, to set out the £value impact of any such changes." In providing information using this template the BBC said it "would need to also set out a counterfactual for usage the service, which cannot be done through this template. Ofcom's trading and separation rules do not extend to how much of any good or service the BBC should trade with any of its commercial subsidiaries, but only to the pricing methodology." It also did not consider that this information "aids transparency for wider stakeholders."[253] The BBC proposed that it should provide the necessary information on a case by case basis rather than relying on the template.

A1.4     We consider that the value of the transfer charge before and after the change is an important input into the materiality of the change. If the difference in these two values is zero or immaterial in the period it is reported for (i.e. half year or full year), then the BBC is not required to show the impact. However, if the BBC considers that at some point after the period in question the change is likely to have a material impact, then it must explain the reasons for those changes as required by D.5(b)(i) and D.7(a)(i).

A1.5     Template 1 sets a minimum requirement for reporting the impact and the BBC has the option to provide any additional information which would help us and stakeholders in understanding the impact of the changes. If, as the BBC claims, the need for reporting Template 1 would be rare, then its preparation should not be resource intensive for the BBC allowing it to provide any further information which the BBC considers helpful.

---

[253] BBC response to the July 2018 Consultation, Table 2, page 50.

**BBC's commercial and trading activities: statement on Ofcom's requirements**

## Template 2, 3 and 4 – transfer charges (published and detailed)

A1.6    The BBC stated that it did "not consider it relevant in all instances to include the 'contracted' values within this" and explained that "charges depend on usage as well as pricing methodology". The BBC considered this was "disproportionate to any harm that Ofcom is seeking to prevent, noting the separate requirement to report any material changes." In addition, the BBC asked for clarification on whether 'paid' would be as at the reporting date (31 March).

A1.7    While Template 1 provides some additional transparency about the effect of methodology changes on transfer charges, they may also change due to changes in usage or rates charged. The comparison of actual transfer charges with the contracted amounts required in Templates 3 and 4 provides us with further information about those changes. We understand that there may not be a contract or a contracted amount for ad-hoc services and this is likely to mean there is less control over how the services are treated and priced. This makes it more important for us to understand what these services are and how they are treated by the BBC.

A1.8    Template 2 is for publication at the same time as the BBC's Annual Report and Accounts and is only required annually. As the 2019 Requirements come into effect following publication of this statement, the BBC will be required to provide the first one for the 2018/19 financial year. Templates 3 and 4 are confidential and cover respectively the first half of the year and the full year. Template 4 will also be required for the full 2018/19 financial year. The first time Template 3 will be required is for the first half of the financial year 2019/20.

A1.9    Templates 2, 3 and 4 require payments made as at the end of the half year or the year, not the date of the submission.

## Template 5 – Overview of intragroup transactions

A1.10    The BBC noted that "the funding elements of this [template] are separately reported: we have trading intercompany balances and separate funding balances, Ofcom should only be interested in the former as the latter is disclosed in the year end accounts."[254] It considered that the template "may not align with our statutory accounts, as this does not show trade between commercial subsidiaries, which further complicates any potential reconciliation between Ofcom reporting and statutory accounts".

A1.11    We are interested in all the transactions between the commercial subsidiaries and the Public Service because they could all potentially result in an unfair advantage or distortion of the market. This applies to funding transactions as well as transfer charges. Template 5 will provide us with a full picture of the financial transactions between each commercial subsidiary and the Public Service.

---

[254] BBC response to the July 2018 Consultation, Table 2, page 50.

A1.12   We understand that certain balances between a commercial subsidiary and the Public Service may be netted off for payment purposes. In such cases, the BBC could provide the net payment in the payment column related to the paying party and explain the net-off arrangement in a note.

A1.13   Template 5 has a column 'Other' in which the BBC could include items such as agency transactions and group tax relief. It sets out the minimum information required. However, the BBC could add new separate columns for other items, if it considers that this would be helpful.

A1.14   As explained above, we intend Template 5 to provide us with a full picture of the financial transactions between each commercial subsidiary and the Public Service. We also consider it is important to provide further assurance on how the numbers the BBC provides in Template 5 reconcile to the statutory accounts. We note that information provided pursuant to requirement D.6(b) would also provide us with some assurance and would enable the BBC to set out additional information and explanations as to how the information set out in Template 5 reconciles to the statutory accounts, if it considers that information helpful.

## Template 6 – Target rate of return

A1.15   The BBC noted that: "Line of business is the lowest level that the BBC Studios executive committee looks at performance – content sales, for example, is not further segmented, so there would be no "revenue stream 1", "cost stream 1" etc."[255] It did not consider that we should require more granular information than the BBC considers necessary.

A1.16   We require a breakdown of revenues and costs in Template 6 to the extent that it is used by the management of the subsidiary to monitor its rate of return performance. Template 6 must reflect the same granularity that is used in the BBC's budgets or business plans which inform its target rates of return.

---

[255] BBC response to the July 2018 Consultation, Table 2, page 51.