## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF LOUISIANA
## MONROE DIVISION

| | |
|---|---|
| CHILDREN'S HEALTH DEFENSE, TRIALSITE, INC., CREATIVE DESTRUCTION MEDIA, LLC. ERIN ELIZABETH FINN, JIM HOFT, DR. BEN TAPPER, BEN SWANN, DR. JOSEPH MERCOLA, TY BOLLINGER, CHARLENE BOLLINGER & JEFF CROUERE, | |
| PLAINTIFFS, | |
| v. | Civil Action No. 3:23-cv-00720 |
| WP COMPANY, LLC D/B/A THE WASHINGTON POST, THE BRITISH BROADCASTING CORP., THE ASSOCIATED PRESS & REUTERS NEWS & MEDIA, INC., | |
| DEFENDANTS. | |

## THE STATE OF LOUISIANA'S [PROPOSED] AMICUS CURIAE BRIEF IN SUPPORT OF THE PLAINTIFFS

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................ii

TABLE OF AUTHORITIES ........................................................................iii

INTEREST OF THE AMICUS CURIAE .....................................................1

ARGUMENT ...............................................................................................3

   I.   TNI MEMBERS' UNLAWFUL ANTITRUST CONSPIRACY HARMS LOUISIANA..........3

      A.   A Free Press Is Essential to Preserve Liberty. ............................................3

      B.   A Censored Press Harms State Officials.....................................................5

      C.   TNI Members' Conspiracy Threatens Free Speech. ....................................6

   II.   ANTITRUST LAWS WERE DESIGNED TO PRESERVE LIBERTY. ..............................8

   III.   CLAIMS AGAINST THE GOVERNMENT DON'T ABSOLVE THE TNI GROUP OF ANTITRUST LIABILITY.........................................................................12

CONCLUSION...........................................................................................14

# TABLE OF AUTHORITIES

**Cases**

*Appalachian Coals, Inc. v. United States,*
  288 U.S. 344 (1933) .......................................................................................... 2, 10

*Associated Press v. United States,*
  326 U.S. 1 (1945) ............................................................................................... 1, 12

*Biden v. Knight First Amend. Inst. At Columbia Univ.,*
  141 S. Ct. 1220 (2021) ........................................................................................ 2, 8

*Branzburg v. Hayes,*
  408 U.S. 665 (1972) ............................................................................................. 11

*Missouri v. Biden,*
  No. 3:22-CV-01213, 2023 WL 4335270 (W.D. La. July 4, 2023) ......................... 2, 13

*N.C. State Bd. of Dental Exam'rs v. FTC,*
  135 S. Ct. 1101 (2015) ........................................................................................ 12

*NetChoice, L.L.C. v. Paxton,*
  49 F.4th 439 (5th Cir. 2022) ................................................................................ 5

*Packingham v. North Carolina,*
  137 S. Ct. 1730 (2017) ........................................................................................ 5, 7

*Robert F. Kennedy Jr. v. Joseph R. Biden Jr.,*
  3:23-CV-00381 (W.D. La. Mar. 24, 2023) ............................................................. 13

*State of Ga. v. Pennsylvania R. Co.,*
  324 U.S. 439 (1945) ............................................................................................. 14

*Story v. Jersey City & B.P.P.R. Co.,*
  16 N.J. Eq. 13 (N.J. Ch. 1863) ............................................................................ 6

*Turner Broad. Sys. v. FCC,*
  512 U.S. 622 (1994) ............................................................................................. 8

*United States v. Topco Associates,*
  405 U.S. 596 (1972) ............................................................................................. 11

*Utah Republican Party v. Cox,*
  892 F.3d 1066 (10th Cir. 2018) ........................................................................... 6

## Statutes

15 U.S.C. § 15 ................................................................................................ 14

15 U.S.C. § 26 ................................................................................................ 14

## Other Authorities

1 *Cato's Letters*, No. 15, at 110 (Ronald Hamowy ed., Liberty Fund 1995) (1755) ..... 3

21 CONG. REC. 2569 (1890) ............................................................................. 12

Allum Bokhari, *Louisiana AG Jeff Landry Blasts Facebook Censorship of Breitbart in Letter to Zuckerberg*, Breitbart, https://www.breitbart.com/tech/2020/08/03/exclusive-louisiana-ag-jeff-landry-blasts-facebook-censorship-of-breitbart-in-letter-to-zuckerberg/ ............................ 3

Bret Swanson, *Covid Censorship Proved to Be Deadly*, Wall St. J. (July 7, 2023), https://www.wsj.com/articles/covid-censorship-proved-to-be-deadly-social-media-government-pandemic-health-697c32c4 ................................................................ 4

*Creator Dashboard*, Twitter (last visited Aug. 27, 2023), https://help.twitter.com/en/using-twitter/creator-dashboard ................................... 8

Daniel Victor, *YouTube Suspends Rand Paul for a Week Over a Video Disputing the Effectiveness of Masks*, N.Y. Times (Aug. 11, 2021), https://www.nytimes.com/2021/08/11/business/youtube-rand-paul-covid-masks.html ................................................................................................. 5

David G. Meyer, *The Magna Carta and the Sherman Act*, 24 CJAUPS 106 (2015) ...................... 2, 10

David K. Millon, *The First Antitrust Statute*, 29 Washburn L.J. 141 (1990) .. 9, 10, 11

Erin Karter, *As Newspapers Close, Struggling Communities are Hit Hardest by the Decline in Local Journalism*, Northwestern Now (June 29, 2022), https://news.northwestern.edu/stories/2022/06/newspapers-close-decline-in-local-journalism/ ...................................................................................................... 7

Jeff Landry, Letter Regarding Political/Scientific Censorship, (Aug. 3, 2020) ........... 3

John Stuart Mill, *On Liberty* 31 (Project Gutenberg ed., 2011) ................................. 5

*Preserving Free Speech and Reining in Big Tech Censorship: Hearing Before H. Comm. on Energy & Com.*, 118th Cong. 30, 33 (2023) ...................................... 4, 5, 6

Press Release, *Attorney General Jeff Landry Sues Monopolist Google for Violating Antitrust Laws*, Nat'l Ass'n of Attorneys General (Nov. 15th, 2020), https://www.naag.org/wp-content/uploads/2020/11/10-20-20-LA-AG-sues-Google.pdf ............................................................................................................. 12

*Social Media and News Fact Sheet*, Pew Research Center (Sept. 20, 2022), https://www.pewresearch.org/journalism/fact-sheet/social-media-and-news-fact-sheet/ ...................................................................................................................... 9

*Social Media Helps Newspapers Increase Website Traffic*, Pando Logic (Mar. 6, 2014), https://pandologic.com/publishers/newspapers-local-media/social-media-helps-newspapers-increase-website-traffic/ ............................................................... 7

Timothy P. Carney, *A New Role for Public Media: Local Government Watchdogs*, Knight Foundation (last visited Aug. 27, 2023), https://knightfoundation.org/public-media-white-paper-2017-carney/ ................... 9

Tyler O'Neil, *Liz Murrill BLASTS Legacy Media Coverage of Biden Big Tech Case: 'Demonizing the First Amendment'*, The Daily Signal (July 10, 2023), https://www.dailysignal.com/2023/07/10/demonizing-first-amendment-louisiana-official-blasts-legacy-media-coverage-biden-big-tech-case/ ...................................... 4

## INTEREST OF THE AMICUS CURIAE

Louisiana writes as amicus curiae to support the Plaintiffs, who have plausibly alleged that "members of the 'Trusted News Initiative' ('TNI') have agreed to work together, and have in fact worked together, to exclude from the world's dominant Internet platforms rival news publishers who engage in reporting that challenges and competes with TNI members' reporting on certain issues relating to COVID-19 and U.S. politics." Pls.' Compl., Doc. No. 1, at 2 ¶ 5. As alleged, such an agreement amounts to a conspiracy, which has "manifestly reduced the *output* of news available to consumers" and it has "substantially reduced the *quality* of news." *Id.* at 96 ¶¶ 552–53. And the "TNI's group boycott has reduced *consumer welfare* by deliberately stifling 'the widest possible dissemination of information from diverse and antagonistic sources,' which 'is essential to the welfare of the public.'" *Id.* at 97 ¶ 554 (quoting *Associated Press v. United States*, 326 U.S. 1, 20 (1945)).

The scope of TNI group's conspiracy is wide-ranging. Restricting disfavored information injures not merely the Plaintiffs, but also Louisiana residents and state officials.[1] Louisiana officials need a free press to communicate with and understand the concerns of the State's residents. Louisiana residents, in turn, need a free press to receive information and make up their own minds about what is true and what is

---

[1] Plaintiff Jeff Crouere is a resident of Louisiana, who alleges that TNI's group boycott has resulted in his news publications, which generate revenue for him, being censored, shadow-banned, or de-platformed from one or more social media platforms. Louisiana has a compelling interest in protecting Mr. Crouere and other similarly situated persons in Louisiana from such anticompetitive practices, which adversely affect the marketplace of ideas in which Louisiana citizens—including State officials and officers—necessarily participate as speakers and listeners.

false. The State has a strong interest in seeing the injuries the TNI group has inflicted on Louisiana officials and residents redressed.

Using antitrust law as a vehicle to ensure a free and competitive press is consistent with the purposes of the Sherman Antitrust Act of 1890, which was modeled on state laws meant to preserve liberty. *See* David G. Meyer, *The Magna Carta and the Sherman Act*, 24 CJAUPS 106 (2015); *see also Appalachian Coals, Inc. v. United States*, 288 U.S. 344, 359–60 (1933). To accomplish viewpoint diversity, the Court should apply "old doctrines to new digital platforms," using the tools of the Sherman Act to root out uncompetitive business practices that have a collateral effect on speech rights. *Biden v. Knight First Amend. Inst. At Columbia Univ.*, 141 S. Ct. 1220, 1221 (2021) (Thomas, J., concurring).

Finally, the State urges the Court to reject Defendants' contention that, by bringing suit against *the government* for pressuring social media companies to censor speech, the Plaintiffs are somehow precluded here from bringing antitrust claims against the TNI group. *See* Defs.' Br. in Support of MTD, Doc. No. 41-1, at 4. As the Court is aware, Louisiana has partnered with the State of Missouri in bringing a similar suit against the government. *See Missouri v. Biden*, No. 3:22-CV-01213, 2023 WL 4335270, at *73 (W.D. La. July 4, 2023). That litigation should not preclude Plaintiffs or, potentially, Louisiana from bringing antitrust claims against TNI members. Concluding otherwise would lead to the absurd result that illegal conspiracies are immune from antitrust suits so long as the executive branch also engages in such illegal activities.

## ARGUMENT

I. **TNI MEMBERS' UNLAWFUL ANTITRUST CONSPIRACY HARMS LOUISIANA.**

### A. A Free Press Is Essential to Preserve Liberty.

The value of free speech for public debate has been recognized since before the Founding, when John Trenchard and Thomas Gordon wrote that there is "no such thing as publick liberty, without freedom of speech." 1 *Cato's Letters*, No. 15, at 110 (Ronald Hamowy ed., Liberty Fund 1995) (1755). In words that would admonish today's censors, Trenchard and Gordon warned that the "[doing of] publick mischief, without hearing of it, is only the prerogative and felicity of tyranny." *Id.*

Louisiana officials have spoken out against powerful interests that have worked to prevent disfavored news from spreading to the populace. For example, Louisiana Attorney General Jeff Landry "has written a letter to Mark Zuckerberg, blasting the Facebook CEO and his platform for censoring medical discussion around coronavirus, in particular the censoring of a viral Breitbart News video of a press conference with frontline doctors and a member of Congress discussing responses to the virus." Allum Bokhari, *Louisiana AG Jeff Landry Blasts Facebook Censorship of Breitbart in Letter to Zuckerberg*, Breitbart, https://www.breitbart.com/tech/2020/08/03/exclusive-louisiana-ag-jeff-landry-blasts-facebook-censorship-of-breitbart-in-letter-to-zuckerberg/. Landry explained, "[i]n our free country, the American people deserve to hear all voices and stories so they can evaluate information and make decisions for themselves." *Id.* (quoting Jeff Landry, Letter Regarding Political/Scientific Censorship, (Aug. 3, 2020)).

3

Another official, Louisiana Solicitor General Liz Murrill, has spoken with media outlets about the "misinformation or disinformation censorship complex." Tyler O'Neil, *Liz Murrill BLASTS Legacy Media Coverage of Biden Big Tech Case: 'Demonizing the First Amendment'*, The Daily Signal (July 10, 2023), https://www.dailysignal.com/2023/07/10/demonizing-first-amendment-louisiana-official-blasts-legacy-media-coverage-biden-big-tech-case/. She "criticized media outlets for suggesting that this censorship apparatus is a good thing." *Id.*

Such concerns are well-founded. The American public went years without hearing many credible, yet disfavored narratives concerning the COVID-19 pandemic. For instance, in August 2021, Dr. Jay Bhattacharya of Stanford University was placed on a Twitter "blacklist" for his espousal of the Great Barrington Declaration, which "called for an end to economic lockdowns [and] school shutdowns . . . on the grounds that they disproportionately harm the young and economically disadvantaged." *Preserving Free Speech and Reining in Big Tech Censorship: Hearing Before H. Comm. on Energy & Com.*, 118th Cong. 30, 33 (2023) (statement of Jay Bhattacharya) [hereinafter *Preserving Free Speech*]. "When Stanford health policy scholar Dr. Scott Atlas began advising the White House, YouTube erased his most prominent video opposing lockdowns." Bret Swanson, *Covid Censorship Proved to Be Deadly*, Wall St. J. (July 7, 2023), https://www.wsj.com/articles/covid-censorship-proved-to-be-deadly-social-media-government-pandemic-health-697c32c4.      And "Twitter banned Dr. Robert Malone, a pioneer of mRNA vaccine technology, for

calling attention to the vaccines' dangers." *Id.* And those are only a "few examples" of the rampant censorship surrounding COVID-19. *Id.*

**B. A Censored Press Harms State Officials.**

TNI members' conspiracy against organizations distributing disfavored news impedes the ability of state officials to communicate information to their constituents. Given that social media sites are often viewed as "the modern public square," the exclusion of disfavored information from these "conduit[s] for news [and] comment" can curtail critical government functions. *NetChoice, L.L.C. v. Paxton*, 49 F.4th 439, 460 (5th Cir. 2022) (quoting *Packingham v. North Carolina*, 137 S. Ct. 1730, 1737 (2017)). When officials' views are shielded from the public conscience, the American public is "deprived of the opportunity of exchanging error for truth." John Stuart Mill, *On Liberty* 31 (Project Gutenberg ed., 2011). And, in the case of COVID-19, preventing officials from communicating with their constituents fostered "a policy environment where clear scientific truths were muddled . . . [and] destructive and ineffective policies persist[ed] much longer than they would have otherwise." *Preserving Free Speech*, *supra*, at 34.

For example, Senator Rand Paul of Kentucky was once suspended from YouTube (a subsidiary of Google) for posting a video doubting the efficacy of cloth masks at preventing coronavirus infection. Daniel Victor, *YouTube Suspends Rand Paul for a Week Over a Video Disputing the Effectiveness of Masks*, N.Y. Times (Aug. 11, 2021), https://www.nytimes.com/2021/08/11/business/youtube-rand-paul-covid-masks.html. In a similar vein, a video of Dr. Bhattacharya with Florida Governor

Ron DeSantis was "censored off of YouTube" because it discussed the inefficacy of masking children. *Preserving Free Speech, supra*, at 34.

Moreover, censorship of disfavored news makes it difficult for state officials to hear the concerns of their constituents. "Every legislator has a right to be informed of the views and wishes of all parties interested in the enactment of a law," so constraining citizens' available avenues for a petition of government "infringe[s] . . . the rights of the people *and of their representatives*." *Story v. Jersey City & B.P.P.R. Co.*, 16 N.J. Eq. 13, 20-21 (N.J. Ch. 1863) (emphasis added); *see also, e.g.*, *Utah Republican Party v. Cox*, 892 F.3d 1066, 1085 (10th Cir. 2018) (endorsing James Madison's "sound and important principle that the representative ought to be acquainted with the interests and circumstances of his constituents" (quoting The Federalist No. 56)).

### C. TNI Members' Conspiracy Threatens Free Speech.

The Plaintiffs' complaint alleges that the TNI group had an agreement to censor the online publication of TNI-prohibited reporting. *See* Pls.' Compl., Doc. No. 1, at 47 ¶¶ 294–95, 297. And, among other things, the complaint reveals that the former director of TNI expressly stated that the Defendants needed "to find practical ways to choke off" what she considered to be misinformation. *Id.* at 44 ¶ 277. In short, Plaintiffs have alleged that the Defendants agreed to "club together" to keep their "real competition"—the "tidal wave" of "unchecked" online news publishers—off the world's largest Internet platforms. *Id.* at 4 ¶ 19.

As discussed, any censorship of disfavored news harms Louisiana's interests in the free dissemination of information and ideas. But the scope of the alleged conspiracy is breathtaking. The market-distorting effect of online content moderation can only be understood by recognizing that social media has become the "principal source for knowing current events, . . . speaking and listening in the modern public square, and otherwise exploring the vast realms of human thought and knowledge." *Packingham*, 137 S. Ct. at 1732. Local news organizations are in decline: A fifth of the country's population, roughly 70 million people, now live in an area with no local news organization, and two newspapers are discontinued every week. *See* Erin Karter, *As Newspapers Close, Struggling Communities are Hit Hardest by the Decline in Local Journalism*, Northwestern Now (June 29, 2022), https://news.northwestern.edu/stories/2022/06/newspapers-close-decline-in-local-journalism/. Thus, social media will assume an even greater share of the public square in the future, making unrestricted access to it all the more important "for our democracy and our society." *Id.*

That is especially true because social media drives traffic to news publishers' websites. In 2013, for instance, "*The Washington Post* drove an average of 275,173 tweets each week, with *The New York Times* and *USA Today* rounding out the top three with 261,422 and 149,960 per week on average." *Social Media Helps Newspapers Increase Website Traffic*, Pando Logic (Mar. 6, 2014), https://pandologic.com/publishers/newspapers-local-media/social-media-helps-newspapers-increase-website-traffic/. If ever denied access to outlets like Twitter and

Facebook, small publishers would forgo a crucial revenue stream. Indeed, with Twitter now offering to pay creators "up to 97% of the revenue Twitter has earned" from their content, denying Louisiana news sites access to the social media giant would directly impact their profits. *Creator Dashboard*, Twitter (last visited Aug. 27, 2023), https://help.twitter.com/en/using-twitter/creator-dashboard.

While small outlets might have a small impact on public discourse, the "concentration" of power and attendant "network effects" enjoyed by social media behemoths, working in concert, gives them "enormous control over speech." *Knight First Amend. Inst.*, 141 S. Ct. at 1224 (Thomas, J., concurring). Louisiana has an interest in ensuring that this power is not abused. Indeed, "assuring that the public has access to a multiplicity of information is a governmental purpose of the highest order . . . [because] it promotes values central to the First Amendment." *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 663 (1994). Thus, there is "no choice but to address how our legal doctrines apply to highly concentrated, privately owned information infrastructure such as digital platforms." *Knight First Amend. Inst.*, 141 S. Ct. at 1221 (Thomas, J., concurring).

## II.   ANTITRUST LAWS WERE DESIGNED TO PRESERVE LIBERTY.

Louisiana's compelling interest in a free press translates here into a compelling interest in combating anticompetitive practices in the market for news information— like the practices at issue here, where large news organizations enlist their social media allies to banish journalism at odds with their favored viewpoints. Because digital news is "an important part of Americans' news media diet," with 71 percent of

Americans receiving news through social media, a group boycott amongst legacy media, while harnessing the takedown power of Big Tech, can obliterate journalistic diversity. *Social Media and News Fact Sheet*, Pew Research Center (Sept. 20, 2022), https://www.pewresearch.org/journalism/fact-sheet/social-media-and-news-fact-sheet/. Given the decline of local news, which some call "the biggest crisis in America," states like Louisiana have a keen interest in preventing such anticompetitive activity from obstructing online news consumption. Timothy P. Carney, *A New Role for Public Media: Local Government Watchdogs*, Knight Foundation (last visited Aug. 27, 2023), https://knightfoundation.org/public-media-white-paper-2017-carney/.

Understanding how to remedy this problem requires a dive into the history of antitrust law in America. Specifically, by looking at the work of state governments, whose early legislation inspired the Sherman Act, this Court can appreciate the *liberty interests* which provided the greatest impetus for the Sherman Act's adoption.

Federal antitrust policy was predated, and indeed *shaped*, by the States' interest in protecting their citizens' capacity for self-realization. The first general antitrust laws were passed at the state level: Twelve states "passed various forms of antitrust legislation before Congress approved the Sherman Act in 1890." David K. Millon, *The First Antitrust Statute*, 29 Washburn L.J. 141, 141 (1990). These statutes, enacted during the "explosion of industrial activity that followed the Civil War," were not intended to address "narrow concerns about higher consumer prices," but were instead drafted with an eye towards "protection of individual autonomy from coercive power." *Id.* at 141, 143. Indeed, despite the proliferation of trusts like Standard Oil

during this period, "prices generally declined while wages rose," and consumers were better off. *Id.* Something more than economic considerations, then, must have prompted the passage of antitrust legislation in the late 1800s.

The purpose of state antitrust laws, and later the Sherman Act, was grounded in a "conception of individual liberty defined largely in terms of autonomous self-direction and freedom from coercion." *Id.* We see evidence of this in the statutory language—instead of focusing narrowly on "price or output fixing," state antitrust laws were "general condemnation[s] of 'all arrangements, contracts, [and] agreements' . . . designed or tending 'to prevent full and free competition.'" *Id.* at 146. This is the original story of antitrust legislation in America—not a redress of economic inefficiency but a remedy to "unprecedented coercive power, wielded by small groups of distant and selfish men" who were able to "crush independent entrepreneurs unwilling to play by their rules." *Id.* at 144.

Americans' aversion towards the conglomeration of power would later influence the drafting of the Sherman Act. Indeed, the liberty-oriented focus of the state laws "represents an important step in the direction of . . . the Sherman Act's first section, a general proscription not limited to price or output restrictions." *Id.* at 146–47. Since then, the Supreme Court has frequently framed the Sherman Act as a "charter of freedom," which "may seem a curious choice to the modern antitrust lawyer . . . who views antitrust laws solely as a practical instrument to enhance economic efficiency." David G. Meyer, *The Magna Carta and the Sherman Act*, 24 CJAUPS 106 (2015); *see also Appalachian Coals, Inc. v. United States*, 288 U.S. 344,

359-60 (1933) ("As a charter of freedom, the [Sherman Act] has a generality and adaptability comparable to that found to be desirable in constitutional provisions."); *United States v. Topco Associates*, 405 U.S. 596, 610 (1972) ("The Sherman Act in particular [is] the Magna Carta of free enterprise." (punctuation omitted)). The historical record of the Sherman Act, and its subsequent interpretation, indicates that American antitrust laws were designed to address more than economic problems, a fact which might deepen our understanding of the Sherman Act as it applies to modern technologies.

Whereas Americans in the 1890s directed their antitrust concerns towards "the abusive practices of powerful railroads," today we face a different threat to individual liberty: the alliance of powerful media conglomerates, who, like the railroads before them, have become a critical juncture linking Americans to "life's necessities." Millon, *The First Antitrust Statute*, *supra*, at 141. News organizations' collusive actions threaten "the function of the free press," which is to "explore and investigate events, inform the people of what is going on, and to expose the harmful as well as the good influences at work." *Branzburg v. Hayes*, 408 U.S. 665, 722 (1972) (Douglas J., dissenting). The implicit paternalism of news censorship, which dictates that certain views be shielded from the public for its own good, is antithetical to a free society, and would have been roundly rejected by the rugged individualists who drafted the Sherman Act. As Senator John Sherman himself stated, "[courts must intervene] when [corporations] combine with a purpose to prevent competition," specifically

11

when "a humble man starts a business in opposition to them." 21 CONG. REC. 2569 (1890).

For Louisiana, enforcing the nation's antitrust laws promotes the dual aims of individual liberty and economic prosperity. *See* Press Release, *Attorney General Jeff Landry Sues Monopolist Google for Violating Antitrust Laws*, Nat'l Ass'n of Attorneys General (Nov. 15th, 2020), https://www.naag.org/wp-content/uploads/2020/11/10-20-20-LA-AG-sues-Google.pdf ("Without competition, we do not have capitalism; and without capitalism, we do not have America."). Competition, enforced by antitrust legislation, is a core organizing principle of Louisiana's economy. *See, e.g.*, *N.C. State Bd. of Dental Exam'rs v. FTC*, 135 S. Ct. 1101 (2015) ("Federal antitrust law is a central safeguard for the Nation's free market structures."). Were multinational news organizations to coordinate a social media boycott of a Louisiana news publication, not only would citizens be denied "the widest possible dissemination of information," but a Louisiana business would suffer appreciable harm to its bottom line. *Associated Press v. United States*, 326 U.S. 1, 20 (1945). Enforcing the plain language of the Sherman Act against the "Trusted News Initiative" will ensure that Louisiana's constituents have critical access to viewpoint diversity, while also guaranteeing that the State's compelling interest in safeguarding the free flow of unabridged speech into and out of the marketplace of ideas remains inviolate.

## III.   CLAIMS AGAINST THE GOVERNMENT DON'T ABSOLVE THE TNI GROUP OF ANTITRUST LIABILITY.

As this Court is keenly aware, Louisiana joined Missouri to sue government officials who were unconstitutionally pressuring social media platforms to censor the

speech of their users. On July 4, 2023, this Court found that certain federal government officials were engaging in such conduct. *See Missouri v. Biden*, No. 3:22-CV-01213, 2023 WL 4335270, at \*73 (W.D. La. July 4, 2023) ("Opposition to COVID-19 vaccines; opposition to COVID-19 masking and lockdowns; opposition to the lab-leak theory of COVID-19; opposition to the validity of the 2020 election; opposition to President Biden's policies; statements that the Hunter Biden laptop story was true; and opposition to policies of the government officials in power. All were suppressed."). And the Court enjoined the government officials from engaging in that conduct. *See id.* at \*73 ("[A] preliminary injunction should issue immediately against the Defendants as set out herein.").

Some of the Plaintiffs here have also filed a similar suit against government officials. For example, Robert F. Kennedy Jr. sued officials in this Court because the federal government waged a "systematic campaign to induce [Facebook, Google, and Twitter] to censor speech." Compl. ¶ 11, ECF No. 1, *Robert F. Kennedy Jr. v. Joseph R. Biden Jr.*, 3:23-CV-00381 (W.D. La. Mar. 24, 2023).[2] And so, Louisiana is alarmed to see that the Defendants in this case contend that the Plaintiffs are precluded from bringing suit here in light of their allegations in the separate litigation. According to the Defendants, Plaintiffs' allegations in the separate litigation suggest that "government officials, not Defendants here, 'succeeded in inducing major social-media platforms to censor' a list of 23 'COVID-related claims.'" Defs.' Br. in Support of MTD,

---

[2] By order dated July 24, 2023 (doc. 316), in the case of *Missouri v. Biden*, Case No. 3:22-cv-01213, this Court consolidated for all purposes that case and *Kennedy v. Biden*, Case No. 3:23-cv-00381.

Doc. No. 41-1, at 4. In other words, Defendants' argument appears to be that if the *federal government* was responsible for inducing social media platforms to censor speech, then the TNI members' conspiracy *could not* be responsible for the censorship.

The Court should reject this argument outright. If accepted, it might preclude Louisiana from bringing a suit similar to this one against the TNI conspirators and others seeking to empty the marketplace of ideas of disfavored discussion. *See* 15 U.S.C. §§ 15, 26; *State of Ga. v. Pennsylvania R. Co.*, 324 U.S. 439, 447 (1945) (concluding States are "authorized to maintain suits to restrain violations of the anti-trust laws or to recover damages by reason thereof"). In any event, Defendants' argument makes no sense. Antitrust allegations are not thwarted merely because executive branch officials illegally pressured social media companies to censor speech. Concluding otherwise would lead to absurd results: Companies could violate federal antitrust law so long as they have the blessing or cooperation of the executive branch of the federal government. That cannot be the law.

## CONCLUSION

Louisiana respectfully asks the Court to deny Defendants' motions to dismiss.

Respectfully submitted,

JEFF LANDRY
ATTORNEY GENERAL

LOUISIANA DEPARTMENT OF
JUSTICE
1885 N. Third Street
Baton Rouge, Louisiana 70802
Tel: (225) 326-6705
murrille@ag.louisiana.gov
mcphees@ag.louisiana.gov
shortt@ag.louisiana.gov

ELIZABETH B. MURRILL (La #20685)
 Solicitor General

SHAE MCPHEE (La #38565)
 Deputy Solicitor General

 */s/ Tracy Short*
TRACY SHORT (La #23940)
 Assistant Attorney General

14

## CERTIFICATE OF SERVICE

I hereby certify that, on this date, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all CM/ECF participating attorneys.

This 29th day of August, 2023.

/s/ Tracy Short
Tracy Short
Assistant Attorney General

15